E-FILED
Wednesday, 30 May, 2018  08:32:18 AM
Clerk, U.S. District Court, ILCD

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## URBANA DIVISION

|  |  |  |
|---|---|---|
| PRAIRIE RIVERS NETWORK, | ) | No.  2:18-cv-02148 |
| *Plaintiff*, | ) | |
| v. | ) | |
| DYNEGY MIDWEST GENERATION, LLC, | ) | COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF |
| *Defendant*. | ) | |

## <u>NATURE OF THE CASE</u>

1.      Plaintiff Prairie Rivers Network ("PRN") brings this citizen enforcement action against Defendant Dynegy Midwest Generation, LLC ("Dynegy") for violations of the Clean Water Act ("CWA"), 33 U.S.C. §§ 1311 and 1342, at the Vermilion Power Station in Vermilion County, Illinois.

2.      Dynegy has discharged, and is discharging on an ongoing basis, pollutants into the Middle Fork of the Vermilion River ("Middle Fork") from numerous, discrete, unpermitted seeps on the riverbank.  Although Dynegy holds a permit that authorizes the company to discharge pollutants from the Vermilion Power Station to the Middle Fork through nine external outfalls, Dynegy's discharges of pollutants into the Middle Fork from these seeps violate the CWA because they are not authorized by any permit and are contrary to the limited authorization to discharge within Dynegy's discharge permit.

3.      Dynegy has also discharged, and is discharging on an ongoing basis, pollutants into the Middle Fork in concentrations, colors, and with characteristics that violate Illinois

effluent limits and water quality standards that are incorporated as conditions of the Vermilion permit.  By violating these permit conditions, Dynegy is also in violation of the CWA.

4.      Through this suit, Plaintiff seeks:

   a.    a declaratory judgment that Dynegy is violating the CWA at the Vermilion Power Station;

   b.    injunctive relief compelling Dynegy to cease all unpermitted discharges of pollutants into the Middle Fork from the Vermilion Power Station; and

   c.    an order directing Dynegy to pay civil penalties for its violations of the CWA.

## JURISDICTION AND VENUE

5.      This action arises under the citizen suit provision of the CWA, 33 U.S.C. § 1365(a).  This Court has jurisdiction pursuant to the CWA, as well as 28 U.S.C. § 1331 (the federal question statute).  This Court has jurisdiction over the parties.  This Court may award Prairie Rivers Network declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02.

6.      The CWA's citizen suit provision authorizes any affected citizen to commence a civil action against anyone "who is alleged to be in violation of . . . an effluent standard or limitation."  33 U.S.C. § 1365(a)(1).  The term "violation of . . . an effluent standard or limitation" means, *inter alia*, a discharge of a pollutant without authorization in a National Pollutant Discharge Elimination System ("NPDES") permit, or any violation of a NPDES "permit or condition thereof."  *Id.* § 1365(f)(1), (6); *see also id.* §§ 1311(a), 1342.  The CWA citizen suit provision, *id.* § 1365(a), empowers the Court to enforce such an effluent standard or limitation and to impose any appropriate civil penalties under section 309(d) of the CWA, *id.* § 1319(d).

7.     Plaintiff has provided Dynegy with notice of the CWA violations alleged in this Complaint and of its intent to sue Dynegy, as required by 33 U.S.C. § 1365(b)(1)(A).  A copy of this notice letter is attached as Exhibit A and was sent to Dynegy and its registered agent on January 31, 2018.  Plaintiff also sent copies of the notice letter to the Administrator and the Regional Administrator of the U.S. Environmental Protection Agency ("EPA") and to the Illinois Environmental Protection Agency ("IEPA").

8.     More than sixty days have passed since the January 31, 2018, notice letter was served, and, based on information and belief, the violations outlined in the notice letter and alleged in this Complaint are continuing at this time and are likely to persist.

9.     Neither EPA nor IEPA has commenced or is diligently prosecuting a civil or criminal action to redress the asserted violations as described in 33 U.S.C. § 1365(b)(1)(B).

10.    The Vermilion Power Station is located in Vermilion County in this judicial district.  Therefore, venue in this judicial district is appropriate pursuant to 33 U.S.C. § 1365(c)(1), and this case is properly filed in this court's Urbana Division.

## PARTIES

11.    Plaintiff PRN is an Illinois non-profit organization with more than 1,000 members that champions clean, healthy rivers and lakes and safe drinking water to benefit the people and wildlife of Illinois.  Drawing upon sound science and working cooperatively with others, PRN advocates public policies and cultural values that sustain the ecological health and biological diversity of water resources and aquatic ecosystems.

12.    PRN holds events for members of the organization and the public along and on the Middle Fork, including immediately downstream of the pollution discharge points of Dynegy.  It intends to hold similar events in the near future and thereafter.

13.     Individual members of PRN live near, study, work, and recreate in and around, the Middle Fork, including in the vicinity of the Vermilion Power Station.  These individuals' use and enjoyment of the Middle Fork is harmed, and has been harmed for years, by Dynegy's unauthorized and prohibited discharges of pollutants into the Middle Fork and the resulting degraded water quality.  Maintaining the aesthetic beauty and ecological vitality of the Middle Fork is crucial to a wide array of activities that occur on the Middle Fork, including recreation that involves direct and extended bodily contact with the water, many of which PRN members participate in.  Unauthorized and prohibited discharges from the Vermilion Power Station thus directly harm PRN members.  These members have a strong, direct, and immediate interest in ensuring that the water quality and environmental health of the Middle Fork support its full use and appreciation and that their neighbors on the Middle Fork use this shared resource in a manner consistent with state and federal law.

14.     The injuries suffered by the respective individual members of PRN are traceable to Dynegy's unauthorized and prohibited discharges from the Vermilion Power Station, because the unauthorized and prohibited discharges add pollution to the Middle Fork that contributes to degradation of the water quality adjacent to, and downstream of, the plant.  PRN members have already been harmed by unauthorized and prohibited discharges from the Vermilion Power Station, and they will continue to be harmed by such discharges.

15.     The requested declaratory and injunctive relief mandating that Dynegy comply with the CWA, as well as the imposition of civil penalties to deter future violations, will redress PRN's members' injuries.  These injuries will not be redressed except by an order from this Court assessing civil penalties against Dynegy and/or requiring Dynegy to take immediate and

effective action to stop the unauthorized and prohibited discharges into the Middle Fork, and ordering the other relief sought in this action.

16.     Defendant Dynegy owns the Vermilion Power Station.  Dynegy, a subsidiary of Vistra Energy, is headquartered at 6555 Sierra Drive in Irving, TX 75039.  Dynegy is incorporated in the State of Delaware.

## LEGAL BACKGROUND

17.     The CWA is the principal federal statute enacted to protect the quality of the waters of the United States.  The stated objective of the CWA is "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters" by, among other things, achieving the goal of "eliminat[ing]" "the discharge of pollutants into the navigable waters."  33 U.S.C. § 1251(a), (a)(1).  The CWA also seeks to attain "water quality which provides for the protection and propagation of fish, shellfish, and wildlife and provides for recreation in and on the water."  *Id.* § 1251(a)(2).  Further, the CWA establishes that "it is the national policy that the discharge of toxic pollutants in toxic amounts be prohibited."  *Id.* § 1251(a)(3).

18.     Section 301(a) of the CWA, *id.* § 1311(a), provides that "the discharge of any pollutant . . . shall be unlawful" unless, in pertinent part, the discharge is made pursuant to and is authorized by a NPDES permit, as provided by section 402 of the CWA, *id.* § 1342.  A NPDES permit is required to establish limits that, among other things, restrict the amount or concentration of pollutants that can be discharged into navigable waters.  NPDES permits also require that a discharger monitor and publicly report the amount or concentration of pollutants it discharges.  NPDES permits are issued for fixed terms that may not exceed five years in length. *Id.* § 1342(b)(1)(B).

19. The CWA defines "discharge of a pollutant" to include, *inter alia*, "any addition of any pollutant to navigable waters from any point source." *Id.* § 1362(12).

20. The CWA defines "pollutant" to include, among other things, "solid waste," "chemical wastes," and "industrial . . . waste discharged into water." *Id.* § 1362(6).

21. The CWA defines "navigable waters" to mean "the waters of the United States." *Id.* § 1362(7).

22. The CWA defines "point source" to include "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, [or] container . . . from which pollutants are or may be discharged." *Id.* § 1362(14).

23. The CWA provides that a State may establish its own permit program, and after receiving EPA's approval, may issue NPDES permits. *Id.* § 1342(b). EPA first approved Illinois' NPDES program covering many of the waters of Illinois, including the Middle Fork and the Vermilion River, on October 23, 1977.

24. Section 303 of the CWA "requires each State, subject to federal approval, to institute comprehensive water quality standards establishing water quality goals for all intrastate waters." *PUD No. 1 of Jefferson Cnty. v. Wash. Dep't of Ecology*, 511 U.S. 700, 704 (1994) (citing 33 U.S.C. §§ 1311(b)(1)(C), 1313).

25. Under Section 303 of the CWA, water quality standards developed by States:

> shall consist of the designated uses of the navigable waters involved and the water quality criteria for such waters based upon such uses. Such standards shall be such as to protect the public health or welfare, enhance the quality of water and serve the purposes of this chapter. Such standards shall be established taking into consideration their use and value for public water supplies, propagation of fish and wildlife, recreational purposes, and agricultural, industrial, and other purposes, and also taking into consideration their use and value for navigation.

33 U.S.C. § 1313(c)(2)(A).

26.     The Illinois Pollution Control Board promulgates water quality standards in Illinois.  Section 302, Water Quality Standards, Section 303, Water Use Designations and Site Specific Water Quality Standards, and Section 304, Effluent Standards, contain standards applicable to waters of the state of Illinois.

27.     Any affected citizen may commence a civil action against a defendant "who is alleged to be in violation of . . . an effluent standard or limitation" under the CWA citizen suit provision, 33 U.S.C. § 1365(a)(1).  The term violation of "an effluent standard or limitation" includes any discharge of a pollutant that is not authorized by a NPDES permit, as well as any violation of any NPDES "permit or condition thereof."  *Id.* § 1365(f); *see also id.* §§ 1311(a), 1342.  The CWA citizen suit provision, *id.* § 1365(a), empowers the Court to enforce such an effluent standard or limitation and to impose any appropriate civil penalties under section 309(d) of the CWA, *id.* § 1319(d).  The action "may be brought . . . only in the judicial district" in which the alleged violation occurs.  *Id.* § 1365(c)(1).  Before commencing the action, the plaintiff must first give notice of its claims to the defendant and to federal and state government officials, and it may bring the action sixty days after notice is given.  *Id.* § 1365(b)(1)(A).

## FACTUAL BACKGROUND

### The Facility and Location

28.     The Vermilion Power Station is owned by Defendant Dynegy.

29.     The Vermilion Power Station is a retired coal-fired power plant located approximately five miles north of the village of Oakwood, Illinois.  The plant sits on the west bank of the Middle Fork, in a 17-mile section designated as Illinois' only National Scenic River and first State Scenic River.

30.     From the mid-1950s until 2011, the plant burned coal and generated millions of tons of coal combustion residuals ("coal ash").  Dynegy and its predecessor mixed the coal ash generated at the Vermilion Power Station with water and sluiced it into three unlined coal ash pits, known as the Old East Ash Pond, the North Ash Pond System, and the New East Ash Pond.

31.     When the plant opened in 1955, ash was flushed into the Old East Ash Pond. That pit was in service until the North Ash Pond System, a two-cell pit, was built in the mid-1970s.  In 1989, the coal ash was diverted to the New East Ash Pond, which received coal ash until the plant's closure in 2011.

32.     Although the coal ash pits are out of service, all three continue to store coal ash – including coal ash as deep as 44 feet in some locations.  The three unlined coal ash pits contain an approximate total of 3.33 million cubic yards of coal ash.

33.     Dynegy continues to own these coal ash pits and remains responsible for maintaining them, as well as performing any remaining activities at the plant.

34.     Coal ash wastewater such as that in the coal ash pits contains heavy metals and other toxic pollutants that are harmful and at times deadly to people, aquatic life, and animals. Among the contaminants found in coal ash are arsenic, barium, boron, chromium, lead, manganese, molybdenum, nickel, and sulfate.  These contaminants can inflict severe harm, including brain damage, cancer, learning disabilities, birth defects, and reproductive defects. Arsenic is a well-known carcinogen that also damages the nervous system.  Manganese is associated with learning disabilities and nervous system impairment, and can render water unusable by discoloring the water, giving it a metallic taste, and causing black staining. Molybdenum has been linked to gout (joint pain, fatigue), increased blood uric acid levels, high blood pressure, liver disease, and potential adverse impacts on the reproductive system.  And

boron, a dependable indicator of coal ash contamination, can lead to reduced sperm count, testicular degeneration, birth defects, and low birth weight among humans.

35.     The Middle Fork and the flora and fauna the river supports draw visitors from near and far.  Canoeing and kayaking on the Middle Fork are popular pastimes, as is hiking the trails of the Kickapoo State Recreation Area, Kennekuk Cove County Park, and Middle Fork State Fish and Wildlife Area, all located along the Middle Fork.  Other visitors come to the river and its shoreline parks to camp, walk their dogs, ride horses, hunt, photograph wildlife, picnic, or just to bask in the Middle Fork's scenic beauty.

**Dynegy's NPDES Permit for the Vermilion Power Station**

36.     Dynegy's limited authorization to discharge wastewater from the Vermilion Power Station is set out in NPDES Permit IL0004057 ("the Permit"), granted by IEPA pursuant to the state agency's delegated authority under the CWA, 33 U.S.C. § 1342(b).

37.     The Permit regulates discharges of pollutants from the Vermilion Power Station, specifying which wastewater streams may be discharged from which points at the plant (defined as permitted "outfalls").  It also establishes effluent limitations, as well as monitoring and reporting requirements for certain pollutants within those wastewater streams.  To this effect, the Permit defines nine external outfalls at the Vermilion Power Station – Outfalls 001, A01, B01, C01, 002, 003, A03, B03, and C03 – each of which authorizes limited discharges of certain pollutants at specific outfalls to the Middle Fork.

38.     Standard Condition 23 of NPDES Permit IL0004057 states that "[c]ollected screening, slurries, sludges, and other solids shall be disposed of in such a manner as to prevent entry of those wastes (or runoff from the wastes) into waters of the State.  The proper

authorization for such disposal shall be obtained from the Agency and is incorporated as part

hereof by reference."

39.     Applicable Illinois regulations define "sludge" as "any solid, semisolid, or liquid

waste generated from a municipal, commercial, or industrial wastewater treatment plant, water

supply treatment plant, or air pollution control facility or any other such waste having similar

characteristics and effects."  35 Ill. Adm. Code § 301.395.

40.     Applicable Illinois law defines "disposal" as "the discharge, deposit, injection,

dumping, spilling, leaking or placing of any waste or hazardous waste into or on any land or

water . . . so that such waste or hazardous waste or any constituent thereof may enter the

environment or be emitted into the air or discharged into any waters, including ground waters."

415 ILCS 5/3.185.

41.     Standard Condition 25 provides: "The permittee shall comply with, in addition to

the requirements of the permit, all applicable provisions of 35 Ill. Adm. Code Subtitle C, Subtitle

D, Subtitle E, and all applicable orders of the [Illinois Pollution Control] Board."

42.     Subtitle C of the Illinois Administrative Code provides that "no effluent shall

contain settleable solids, floating debris, visible oil, grease, scum or sludge solids.  Color, odor

and turbidity must be reduced to below obvious levels."  35 Ill. Adm. Code § 304.106.  The term

"effluent" is defined, in relevant part, as "any wastewater discharged, directly or indirectly, to the

waters of the State or to any storm sewer, and the runoff from land used for the disposition of

wastewater or sludges."  *Id.* § 301.275.

43.     Subtitle C of the Illinois Administrative Code further provides that "[n]o person

shall cause or allow the concentration of the following constituents in any effluent to exceed the

following levels, subject to the averaging rules contained in Section 304.104(a)."  *Id.*

§ 304.124(a).

44.    Subtitle C of the Illinois Administrative Code sets the effluent limit for iron (total)

at 2.0 mg/l, while the maximum level for manganese is 1.0 mg/l.  *Id.*

45.    Subtitle C of the Illinois Administrative Code contains averaging rules which

provide that no "grab sample" – that is, a sample "taken at a single time" – "shall exceed five

times the prescribed numerical standard."  *Id.* § 304.104(a)(3), (b)(3).

46.    Subtitle C of the Illinois Administrative Code further provides that "[w]aters of

the State shall be free from sludge or bottom deposits, floating debris, visible oil, odor, plant or

algal growth, color or turbidity of other than natural origin."  *Id.* § 302.203.

47.    The current iteration of the Permit was issued and became effective on March 7,

2003.

### **Dynegy's Discharges into the Middle Fork**

48.    Upon information and belief, dating back to at least May 2013, the coal ash pits at

the Vermilion Power Station have discharged, and continue to discharge on an ongoing basis,

pollutants – including, but not limited to, arsenic, barium, boron, chromium, iron, lead,

manganese, molybdenum, nickel, sulfate, and total dissolved solids – into the Middle Fork from

numerous, discrete, unpermitted seeps on the riverbank adjacent to the North Ash Pond and Old

East Ash Pond in areas where there are no permitted outfalls.

49.    The Middle Fork is a surface water body within the jurisdiction of the CWA as

well as a water of the state of Illinois.  The Middle Fork has no specific use designation and, as

such, is subject to the general use standards codified at 35 Ill. Adm. Code Part 302 Subpart B,

which forms part of 35 Ill. Adm. Code Subtitle C.  *See* 35 Ill. Admin. Code §§ 303.201,

11

302.101(b).  The Middle Fork is also subject to the general effluent limitations set forth at 35 Ill.

Adm. Code Part 304 Subpart A, which also forms part of 35 Ill. Adm. Code Subtitle C.  *See id.*

§ 304.101(a).

50.      Groundwater monitoring at the North Ash Pond System and Old East Ash Pond

was performed from 1992 through 2007, and again in 2011.  Upon information and belief,

groundwater monitoring at the site was reinitiated in 2017.

51.      Over the extended period of groundwater monitoring undertaken between 1992

and 2011, concentrations of boron and sulfate – primary indicators of coal ash contamination[1] –

consistently exceeded Illinois' groundwater protection standards[2] and, on numerous occasions,

also exceeded EPA drinking water health advisories for those contaminants.[3]

52.      Dynegy's consultants have concluded that the presence of boron and sulfate at the

concentrations found at the Vermilion Power Station "indicat[e] that groundwater quality at the

facility has been impacted by leachate from the [Old East Ash Pond] and [North Ash Pond

System],"[4] and that the elevated concentrations of boron, sulfate, manganese, iron, pH, and total

dissolved solids in groundwater at the site are partially due to the impacts of coal ash.[5]

53.      Coal ash at the Vermilion Power Station has groundwater flowing through it year

round.[6]  While the thickness of saturated ash varies as groundwater levels rise and fall with the

---

[1] *See* Kelron Environmental, Hydrogeology and Groundwater Quality of the Old East Ash Pond, Vermilion Power Station, at 33, 35 (Mar. 15, 2012) [hereinafter "OEAP Report"].
[2] *See* Kelron Environmental, Hydrogeology and Groundwater Quality of the North Ash Pond System, at Tables 10 & 11 (Mar. 15, 2012) [hereinafter "NAPS Report"].
[3] *Id.*; *see also* EPA, 2018 Edition of the Drinking Water Standards and Health Advisories Tables (Mar. 2018), https://www.epa.gov/sites/production/files/2018-03/documents/dwtable2018.pdf.
[4] Natural Resource Technology, Inc. ("NRT"), Application for Groundwater Management Zone, North Ash Pond System and Old East Ash Pond, at 1-3 (Mar. 27, 2012); *see also* NRT, Corrective Action Plan: North Ash Pond System (Revised), at 1-2 (Apr. 2, 2014) [hereinafter "NAPS Revised CAP"]; NRT, Corrective Action Plan: Old East Ash Pond (Revised), at 1-2 (Apr. 2, 2014).
[5] OEAP Report at vi.
[6] *Id.* at v.

seasons, groundwater has saturated coal ash at depths of more than 21 feet.[7]  That groundwater

flows laterally through the ash, picking up contaminants in the process, while precipitation

leaching down through the top of the coal ash mixes with the groundwater and further adds to the

pollutant load contained within the discharge to the Middle Fork.[8]

54.     Dynegy's own reports and information have concluded that the coal ash

contaminated groundwater flows right into the adjacent Middle Fork.[9]

55.     In May 2016 and September 2017, Plaintiff sampled five discrete groundwater

seeps discharging into the river.  Independent laboratory testing revealed concentrations of

arsenic, barium, boron, chromium, manganese, molybdenum, and sulfate in those seeps that

exceed background levels and, for multiple pollutants, exceed health-based standards set by EPA

and IEPA.

56.     Plaintiff's sampling also detected iron concentrations as high as 241 mg/l and

manganese concentrations as high as 7.35 mg/l.

57.     Upon information and belief, dating back to at least May 2013, discharges from

the coal ash pits at Vermilion Power Station have discolored, and are continuing to discolor, the

Middle Fork in low-flow areas of the river adjacent to the coal ash pits with a bright orange-red

color not of natural origin.

---

[7] *Id.*; *see also* NAPS Report at 22, Figures 6A, 6D.
[8] *See* OEAP Report at 26; NAPS Report at 26; NAPS Revised CAP at 2-2.
[9] *See, e.g.*, OEAP Report at vi, 26; NAPS Report at 26, Tables 10 & 11; NAPS Revised CAP at 2-2; Dynegy Form 10-K, at 22 (fiscal year ending Dec. 31, 2016),
https://www.dynegy.com/sites/default/files/Dynegy_2016_Annual_Report.pdf.

## CLAIMS FOR RELIEF

## Count 1: Discharges Without Authorization in a NPDES Permit

58.     Plaintiff re-alleges and incorporates the allegations of all the preceding paragraphs of this Complaint, as well as all exhibits, as if fully set forth herein.

59.     The Middle Fork is a navigable water as defined in the CWA, 33 U.S.C. § 1362(7).

60.     Dynegy is discharging and has discharged pollutants, as defined in the CWA, *id.* § 1362(6), (12), from the coal ash pits at the Vermilion Power Station to the Middle Fork.  Upon information and belief, these discharges will continue after the date of the filing of this Complaint.

61.     Discharges of pollutants from the Vermilion Power Station into the Middle Fork from discrete, unpermitted seeps on the riverbank adjacent to the North Ash Pond and Old East Ash Pond are not authorized by Permit IL0004057, and they are contrary to the limited authorization to discharge contained in that permit.

62.     Dynegy has violated and is continuing to violate the CWA, *id.* § 1311(a). Therefore, under the CWA citizen suit provision, *id.* § 1365, a civil action may be maintained against Dynegy.

63.     By committing the acts and omissions alleged above, Dynegy is subject to an assessment of civil penalties pursuant to 33 U.S.C. §§ 1319(d) & 1365 and 40 C.F.R. § 19.4.

64.     In a letter postmarked January 31, 2018, Plaintiff sent Dynegy notice of the violations alleged in this claim for relief as required by 33 U.S.C. § 1365(b)(1).  Plaintiff's notice letter is attached to this Complaint as Exhibit A.

65.     Unless Dynegy desists in its violations of 33 U.S.C. § 1311(a), Plaintiff, its respective members, and their communities will suffer irreparable harm.

66.     Plaintiff has no adequate remedy at law, and therefore equitable relief is warranted.

**Count 2: Discharges in Violation of NPDES Permit Conditions**

67.     Plaintiff re-alleges and incorporates the allegations of all the preceding paragraphs of this Complaint, as well as all exhibits, as if fully set forth herein.

68.     The Middle Fork is a water of the state of Illinois.

69.     Discharges of pollutants from the Vermilion coal ash pits into the Middle Fork violate Standard Condition 23 of the Permit.

70.     Dynegy's discharges of pollutants have discolored, and are continuing to discolor, the Middle Fork a bright orange-red color not of natural origin, in violation of Standard Condition 25 of the Permit.

71.     Dynegy's discharges have included, and continue to include, iron and manganese at concentrations exceeding the effluent limits in Subtitle C of the Illinois Administrative Code, in violation of Standard Condition 25 of the Permit.

72.     Dynegy's discharges of pollutants have been, and continue to be, a bright orange-red color that stands out distinctly and is not "below obvious levels," in violation of Standard Condition 25 of the Permit.

73.     Dynegy's discharges of pollutants have contained, and continue to contain, solids that settle on the riverbed, in violation of Standard Condition 25 of the Permit.

74.     By violating the conditions of the Permit, Dynegy has violated and is continuing to violate the CWA, 33 U.S.C. § 1311(a).  Therefore, under the CWA citizen suit provision, *id.* § 1365, a civil action may be maintained against Dynegy.

75.     By committing the acts and omissions alleged above, Dynegy is subject to an assessment of civil penalties pursuant to 33 U.S.C. §§ 1319(d) & 1365 and 40 C.F.R. § 19.4.

76.     In a letter postmarked January 31, 2018, Plaintiff sent Dynegy notice of the violations alleged in this claim for relief as required by 33 U.S.C. § 1365(b)(1).  Plaintiff's notice letter is attached to this Complaint as Exhibit A.

77.     Unless Dynegy desists in its violations of 33 U.S.C. § 1311(a), Plaintiff, its respective members, and their communities will suffer irreparable harm.

78.     Plaintiff has no adequate remedy at law, and therefore equitable relief is warranted.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff Prairie Rivers Network respectfully demands that this Court enter a judgment:

a)      declaring that Dynegy's discharges of pollutants into the Middle Fork from the coal ash pits at the Vermilion Power Station are not authorized by NPDES Permit IL0004057 and violate the CWA, 33 U.S.C. § 1311(a);

b)      ordering that Dynegy take all actions necessary to comply with the CWA, including ceasing all discharges that are not authorized by, or that violate a condition of, NPDES Permit IL0004057;

c) assessing Dynegy civil penalties under 33 U.S.C. §§ 1319(d) & 1365 and 40 C.F.R. § 19.4 not to exceed $53,484 per day for each violation of the CWA within the five-year statute of limitations period;

d) awarding Plaintiff its litigation costs and reasonable attorney fees incurred in prosecuting this action, pursuant to 33 U.S.C. § 1365(d); and

e) ordering such other relief as the Court may deem just and proper.

Dated: May 30, 2018

Respectfully submitted,

s/ Thomas Cmar
THOMAS CMAR (IL 6298307)
EARTHJUSTICE
1101 Lake Street, Ste. 405B
Oak Park, IL  60301
Telephone: (312) 257-9338
Facsimile: (212) 918-1556
Email: tcmar@earthjustice.org

JENNIFER CASSEL (IL 6296047)
EARTHJUSTICE
1101 Lake Street, Ste. 308
Oak Park, IL  60301
Telephone: (215) 717-4525
Facsimile: (212) 918-1556
Email: jcassel@earthjustice.org

MYCHAL OZAETA (CA 309851)
EARTHJUSTICE
1617 John F. Kennedy Blvd., Ste. 1130
Philadelphia, PA  19103
Telephone: (215) 717-4529
Facsimile: (212) 918-1556
Email: mozaeta@earthjustice.org

ELLYN BULLOCK (IL 6224579)
SOLBERG & BULLOCK, LLC
100 N. Chestnut St., Ste. 230
Champaign, IL  61820
Telephone: (217) 351-6156
Facsimile: (217) 351-6203
Email: ellyn@solbergbullock.com

*Counsel for Plaintiff Prairie Rivers Network*

17