E-FILED
Tuesday, 09 October, 2018 01:46:28 PM
Clerk, U.S. District Court, ILCD

# Exhibit 1

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN



U.S. DISTRICT COURT
EASTERN DISTRICT - WI
FILED

'93 JUL 30 P 3:20

VILLAGE OF OCONOMOWOC LAKE and
the TOWN OF SUMMIT,

Plaintiffs,

v.

DAYTON-HUDSON CORPORATION,
GEORGE E. MEYER, Secretary, and the
WISCONSIN DEPARTMENT OF
NATURAL RESOURCES, VALDUS V.
ADAMKUS, Regional Administrator,
CAROL BROWNER, Administrator, and the
U.S. ENVIRONMENTAL PROTECTION
AGENCY,

Defendants.

Case No. **93 - C - 0797**

**STADTMUELLER**

---

## COMPLAINT

---

The Village of Oconomowoc Lake ("Village"), by its attorneys Friebert, Finerty

& St. John, S.C., and the Town of Summit (the "Town"), by its attorneys, Arenz,

Molter, Macy & Riffle, S.C., allege and show to the court as follows:

### I. JURISDICTION AND VENUE

1.     This is an action for declaratory and injunctive relief pursuant to 28 U.S.C.

§§ 1331, 1361, 2201 and 2202, and 33 U.S.C. § 1365 and 42 U.S.C. § 7604.

2.      Venue is proper in this district pursuant to 28 U.S.C. § 1391, 33 U.S.C.
§ 1365(c), and 42 U.S.C. § 7604(c).

3.      Prior to commencing the instant action the Plaintiffs gave notice of their
intent to do so pursuant to § 304(a)(3) and (b) of the Clean Air Act, 42 U.S.C.
§ 7604(a)(3) and (b), together with § 505 of the Clean Water Act, 33 U.S.C. 1365.

## II.  IDENTIFICATION OF PARTIES

3.      The Village is a municipal corporation with its principal office located at
35328 W. Pabst Road, Oconomowoc, Wisconsin 53066. The Village is duly empowered
by the Wisconsin legislature to exercise the powers enumerated in ch. 61, Wis. Stats.,
and elsewhere in the Wisconsin Statutes, in furtherance of the protection of the health,
safety and welfare of the citizens and residents of the Village, including but not limited
to the management and control of the property, highways, streets, navigable waters and
groundwater within the Village, and the taking of any action the Village finds necessary,
convenient or appropriate in the exercise of those powers to further the protection of the
substantial interests of its citizens and residents.

4.      The Town is a municipal corporation with its principal office located at
2911 North Dousman Road, Oconomowoc, Wisconsin 53066.  The Town is duly
empowered by the Wisconsin legislature to exercise the powers set forth in ch. 60, Wis.
Stats., and elsewhere in the Wisconsin Statutes, in furtherance of the protection of the
health, safety and welfare of the citizens and residents of the Town, including but not
limited to the management and control of the property, highways, streets, navigable

2

waters and groundwater within the Town, and the taking of any action the Town finds to be necessary, convenient or appropriate in the exercise of those powers to further the protection of the substantial interests of its citizens and residents.

5.     The Dayton-Hudson Corporation ("Dayton Hudson") is, upon information and belief, a foreign corporation with offices located at 777 Nicollet Mall, Minneapolis, Minnesota 55402.  Dayton Hudson is the owner and operator of its division, Target Stores.

6.     George E. Meyer ("Meyer" or the "Secretary"), is the Secretary of the Wisconsin Department of Natural Resources, and in that capacity he is responsible for supervising the agency and its employees to attain compliance by the agency and its officials and employees with the requirements of the Clean Air Act and the Clean Water Act in the State of Wisconsin.

7.     The Wisconsin Department of Natural Resources ("WDNR") is an administrative agency of the State of Wisconsin, organized and existing under the laws of the State.  Among other things the WDNR is responsible for securing compliance with the requirements of the Clean Air Act and the Clean Water Act in the State of Wisconsin, under the supervision of the U.S. EPA, to the extent that authority to act under those Acts has been delegated or assigned to the State of Wisconsin.

8.     The U.S. Environmental Protection Agency ("U.S. EPA") is an agency of the United States of America.  Among other things, U.S EPA is responsible for implementing and overseeing the requirements of the Clean Air Act and the Clean Water

3

Act, including but not limited to carrying out on a timely basis the mandatory and non-discretionary duties imposed upon the agency by those acts or other delegated authorities.

9.      Carol Browner ("Browner" or the "Administrator") is the Administrator of U.S. EPA.  In her official capacity she is responsible for supervising the actions of the agency and its staff, as well as carrying out the mandatory and non-discretionary duties imposed upon her by the Clean Water Act, the Clean Air Act, and other delegated authorities.

10.      Valdus V. Adamkus ("Adamkus" or the "Regional Administrator") is the Regional Administrator for the U.S. EPA, Region V, which includes the State of Wisconsin.  By delegations of authority from the Administrator of U.S. EPA, he is responsible for implementing and securing compliance with the requirements of the Clean Air Act and the Clean Water Act in Region V, including the State of Wisconsin.

### III. FACTS APPLICABLE TO ALL CLAIMS

8.      Dayton Hudson is presently in the process of constructing a 1.1 million square foot truck terminal and distribution center (the "Target Distribution Center" or "Distribution Center").  The construction site for the Distribution Center is located at the northwest corner of County Highway B and State Highway 67, within the limits of the City of Oconomowoc in Waukesha County.

9.      The Distribution Center is being constructed to serve as a warehouse and distribution center for merchandise sold at Target Stores retail outlets located in Wisconsin, Illinois and Iowa.  Upon information and belief, the principal purpose of the

4

facility is the servicing of more than 30 retail stores that are planned to be opened in the Metropolitan Chicago area during the next two years. An addition to the Distribution Center is planned for the near future, which will increase its size to approximately 1.5 million square feet.

10.   The Distribution Center is being constructed on a 100-acre parcel of land, and the plans for the Distribution Center include a parking lot and vehicle storage facilities sufficient to hold in excess of 1,300 vehicles, including over 600 employee vehicles and 700 semi-trailers. Portions of the Distribution Center will be utilized for on-site vehicle maintenance and vehicle and equipment cleaning operations. The plans for the facility also include a 10,000 gallon above-ground diesel fuel storage tank for the on-site fueling of semi-trucks and yard vehicles.

11.   The site on which the Distribution Center is currently being constructed is abutted on the east by 9 private residences that depend upon shallow "sand point" groundwater wells to supply drinking water. Additional private residences abut the site to the west. The Oconomowoc Corporate Park abuts the site to the south, across County Highway B. The Olympia Resort lies immediately to the north of the site. An elementary school attended by 500 children who utilize or are eligible to utilize bus transportation is immediately east of the site, on the northeast corner of the intersection of State Highway 67 and County Highway B.

12.   A number of wetlands exist in close proximity to the site which are dependent upon the natural groundwater table in the shallow sand and gravel aquifer that

5

lies approximately 15 feet beneath the site of the Distribution Center. Two large lakes are also in close proximity to the facility, Silver Lake being approximately 0.4 miles to the west southwest and Oconomowoc Lake being approximately 0.7 miles to the east northeast. The site is part of a major recharge area for the Niagara Dolomite Aquifer that is used for municipal drinking water supplies by municipalities to the east of the site.

13.     Upon information and belief, the operation of the Distribution Center at full capacity will entail approximately 400 to 500 semi-trucks either arriving at the facility with suppliers' merchandise and then leaving, or leaving the facility to deliver merchandise to individual Target Stores retail outlets and then returning. The facility will operate 20 hours a day, employing 700 "full-time equivalent" employees, in two shifts, generating substantially more that 700 employee vehicle trips per day in and out of the facility. All of the inbound and outbound semi-trucks are required to use the Hwy. 67 and Hwy. B intersection.

14.     Upon information and belief, the vast majority of trucks transporting suppliers' goods to the facility will travel via Interstate Highway 94 ("I-94"), from Chicago, through Kenosha, Racine, Milwaukee and Waukesha Counties, and return via the same route. The majority of outbound trucks transporting goods to individual Target Stores retail outlets will be travelling to the Metropolitan Chicago area and returning to the Distribution Center via I-94, through Waukesha, Milwaukee, Racine and Kenosha Counties. The distance from the Illinois-Wisconsin border to the Target Distribution Center via I-94 is approximately 65 miles.

6

15.     In order to secure a $ 775,000 loan/grant from the State of Wisconsin to partially defray the cost of constructing the Distribution Center, Dayton Hudson entered into a contract which requires it to place offers of employment through the "Job Service" division of the Wisconsin Department of Industry, Labor and Human Relations.

16.     As of approximately July 1, 1993, Job Service had registrations from persons seeking employment in positions classified as "warehousing" in the following Counties surrounding the location of the Distribution Center, in the following numbers: Waukesha County (86); Dodge County (25); Jefferson County (24); Kenosha County (136); Milwaukee County (656); Ozaukee County (11); Racine County (298); Washington County (14).

17.     The unemployment rate within Waukesha County is among the lowest in the State of Wisconsin and is currently approximately 3.5%.

18.     Due to the contractual obligations of Dayton Hudson, the absence of an available labor force in close proximity to the Distribution Center and the demographics existing in Southeast Wisconsin, the 700 "full-time equivalent" employees working at the Distribution Center will have to travel an average of at least 25 miles to and from work, principally from Milwaukee County.    At the present time there is no public mass transportation service that services the location of the Distribution Center.

19.     Construction of the Distribution Center began on or about June 1, 1993, and is continuing on a daily basis at the present time.    Such activities include clearing,

7

grading, removal of topsoil and excavation of the 100-acre parcel, and the construction

of footings and walls for the building.

## IV.  FIRST CLAIM FOR RELIEF UNDER THE CLEAN AIR ACT
### [Against Dayton Hudson]

20.     Pursuant to § 110 of the Clean Air Act, 42 U.S.C. § 7410(a)(1), the State

of Wisconsin received authorization from U.S. EPA, the Administrator and the Regional

Administrator to carry out a State Implementation Plan under which Meyer and the

WDNR are responsible for issuing air pollution control permits to new sources of air

pollutants and contaminants, under the supervision of Administrator and the Regional

Administrator.   The State Implementation Plan consists, in part, of State Statutes

§§ 144.30 through 144.426, and regulations promulgated by the WDNR, Ch. NR 400,

*et seq.*, Wis. Admin. Code.

21.     An integral part of the State Implementation Plan for Wisconsin is the

individual review and permitting of "stationary sources" of air pollutants and

contaminants, as that term is defined in § 144.30(23), Wis. Stats. Pursuant to § 110(a)(5)

of the Clean Air Act, 42 U.S.C. § 7410(a)(5), the State of Wisconsin elected to define

"Stationary Sources" to include "Indirect Sources," which are further defined by WDNR

regulations as facilities which may attract sources of pollutants and contaminants such as

cars and trucks, which are upon information and belief among the principal sources of

carbon monoxide and nitrogen oxides.  Upon approval, the State Implementation Plan

8

became a part of the federal program under the Clean Air Act, enforceable pursuant to federal law.

22.    According to an analysis of the air pollution emissions caused by the Distribution Center conducted by Tony E. Eggleston, Ph.D., C.E.P., a Vice President and National Program Manager of Air Quality Services for Geraghty & Miller, Inc., a national environmental engineering consulting firm, the Distribution Center is both a "major emitting facility" pursuant to 42 U.S.C. § 7479(1) and a "major source" pursuant to § 144.30(16), Wis. Stats., because it will directly and proximately cause the emission of more than 250 tons of carbon monoxide (CO) per year and more than 250 tons of nitrogen oxides (NOx) per year.  A true and correct copy of Dr. Eggleston's analysis is appended hereto and incorporated herein by reference as Exhibit B.

23.    Upon information and belief, nitrogen oxides are an ozone "precursor," which upon interacting with volatile organic compounds (VOCs) and other precursors may combine to form ozone.

24.    Pursuant to § 181 of the Clean Air Act, 42 U.S.C. § 7511, Waukesha County as well as Milwaukee, Racine and Kenosha Counties have been determined by U.S. EPA, the Administrator and the Regional Administrator to be in "severe" non-attainment with the National Ambient Air Quality Standards ("NAAQS") for ozone.

25.    Pursuant §§ 165 and 172(c)(5) of the Clean Air Act, 42 U.S.C. §§ 7475 and 7502(c)(5), and § 144.391, Wis. Stats, the construction of a major emitting facility of air pollutants and contaminants is prohibited in the absence of a valid permit.

9

26.  Upon information and belief, the permits required for a major emitting facility under the Clean Air Act, 42 U.S.C. §§ 7475(c) and 7502(c)(5), and the State Implementation Plan have not been issued to or obtained by Dayton Hudson, nor has Dayton Hudson complied with the requirements of 42 U.S.C. § 7475(a), relating to major emitting facilities for which construction has been commenced, or 42 U.S.C. § 7475(d)(1), which requires that notice be given to the Administrator regarding a permit application for major emitting facilities.

27.  Pursuant to § 173 of the Clean Air Act, 42 U.S.C. § 7503, and § 144.393, Wis. Stats., it is illegal to construct a new source of air pollutants and contaminants that will either cause or exacerbate a violation or exceedence of one or more NAAQS. By causing the emission of more than 250 tons per year of nitrogen oxides the Target Distribution Center will, upon information and belief, exacerbate the existing "severe" non-attainment with the NAAQS for ozone in Waukesha County and/or Milwaukee, Racine and Kenosha Counties.

28.  As part of the State of Wisconsin's approved plan for monitoring compliance with the NAAQS for carbon monoxide, the WDNR operates a continuous air monitoring station in Waukesha County. Upon information and belief, the second highest 8-hour average concentration of carbon monoxide measured at that air monitoring station from June, 1992 through June, 1993, was 3.8 ppm. According to analyses performed by the WDNR, the Distribution Center itself will cause a 7.6 ppm increase in the maximum 8-hour average concentration of carbon monoxide. The NAAQS for the 8-hour

10

average concentration of carbon monoxide, not to be exceeded more than once per year, is 9.0 ppm.

29.     Neither Dayton Hudson nor WDNR have performed any on-site monitoring of pollutant or contaminant concentrations to establish existing background conditions.

30.     According to analyses performed by Frank A. Jones, Ph.D., a Principal Toxicologist for Geraghty & Miller, the heavy diesel truck traffic associated with the facility will discharge particulates and diesel exhaust in such concentrations that, using the toxicity factors established and approved by U.S. EPA for the components of the diesel exhaust, the facility may create a human health risk greater than $2 \times 10^{-4}$.

31.     Upon information and belief, numerous and readily available alternative locations and other alternatives exist for the construction and operation of the Distribution Center, which would drastically reduce the emission of pollutants and contaminants attributable to the facility and would substantially limit the exacerbation of the severe non-attainment with the NAAQS for ozone in Waukesha, Milwaukee, Racine and Kenosha Counties.    Upon further information and belief, one such alternative location is an industrial park operated under the auspices of the State of Wisconsin and Wisconsin Electric Power Company ("WEPCO"), a public utility, commonly referred to as Wispark, located in Pleasant Prairie, Wisconsin, less than 10 miles away from a corporate office of Dayton Hudson.

11

32.   Upon information and belief, such alternatives are known to Dayton Hudson and were known to Dayton Hudson at the time it commenced construction of the Distribution Center.

33.   By engaging in the construction of a major emitting facility without a valid permit and by constructing a facility that will exacerbate an existing severe non-attainment of the NAAQS for ozone in Waukesha and Milwaukee Counties, Dayton Hudson is engaged in ongoing, separate violations of the Clean Air Act, with each day of each continuing violation constituting a separate offense punishable under § 113(b) of the Clean Air Act, 42 U.S.C. § 7413(b), and enforceable under § 304(a)(3), 42 U.S.C. § 7604(a)(3).

34.   Upon information and belief, the ongoing separate violations of the Clean Air Act by Dayton Hudson will continue unless and until they are enjoined.

## V.  SECOND CLAIM FOR RELIEF UNDER THE CLEAN WATER ACT
[Against Dayton Hudson]

35.   All of the foregoing allegations are incorporated herein by reference as though more fully set forth at length, except to the extent that they are inconsistent with the allegations that follow, in which case they are alleged in the alternative.

36.   The construction activities Dayton Hudson is currently engaged in include clearing, grading and excavation involving the disturbance of approximately 100 acres, substantially more than five (5) acres of total land area, and Dayton Hudson is presently engaged in ongoing "industrial activity" as defined in 40 C.F.R. § 122.26(a)(14).

12

37.     Upon information and belief, Dayton Hudson has failed to apply for and obtain a National Pollution Discharge Elimination System (NPDES) permit pursuant to the Clean Water Act authorizing it to commence construction activity involving the disturbance of five (5) or more acres of total land area.

38.     As reflected in the facts reported in by Exhibit C, attached hereto and incorporated herein by reference, due to inadequate controls and its failure to implement best management practices, the ongoing construction of the Distribution Center by Dayton Hudson has already resulted in, and upon information and belief will in the future result in substantial discharges of stormwater, soil and sediment off of the property and into drainage ways and channels that flow into waters of the United States.

39.     The continuing construction of the Distribution Center and any associated stormwater discharges without the required NPDES permit constitutes separate, continuing violations of the Clean Water Act effluent standards and limitations under 33 U.S.C. §§ 1311, 1342 and 1365(a)(1) and (f), and 40 C.F.R. §§ 122.21(c)(1), 122.26(a)(1)(ii), (b)(14)(x) and (c)(1), with each day of continued violation of each standard and limitation constituting a separate offense.

40.     Upon information and belief, Dayton Hudson will continue to engage in repeated violations of the standards and limitations identified in the preceding paragraph until it is otherwise enjoined from doing so.

41.     On information and belief, portions of the Distribution Center will also be utilized for vehicle maintenance, equipment cleaning and on-site fueling operations which

13

constitutes "industrial activity" as that term is used in 40 C.F.R. §§ 122.26(b)(14)(viii) and (xi).

42.     On information and belief, Dayton Hudson has failed to apply for a NPDES permit for operation of the Distribution Center not less than 180 days before commencing industrial activity and is currently engaged in ongoing, separate violations of the Clean Water Act, 33 U.S.C. § 1311, 1342 and 1365(a)(1) and (f), and 40 C.F.R. §§ 122.21(a) and (c)(1), 122.26(a)(1)(ii), (b)(14)(viii) and (c)(1), with each day of each violation constituting a separate offense.

43.     Upon information and belief, Dayton Hudson's ongoing violations of the Clean Water Act identified in the preceding paragraph will continue until otherwise enjoined.

44.     Pursuant to 33 U.S.C. § 1342 and 40 C.F.R. Part , the State of Wisconsin applied for and received authorization from U.S. EPA, the Administrator and the Regional Administrator to implement most portions of the federal program for issuing NPDES permits under the Clean Water Act.   As part of such authorization, the Administrator approved the following definition of covered waters under the Act, set forth at NR 200.02(10), Wis. Admin. Code:

> "Waters of the state" means those portions of Lake Michigan and Lake Superior within the boundaries of Wisconsin, all lakes , bays, rivers, streams, springs, ponds, wells, impounding reservoirs, marshes, water courses, drainage systems and other surface or groundwater, natural or artificial, public or private within the state or under its

14

> jurisdiction, except those waters which are entirely confined
> and retained upon the property of a person.

Upon information and belief, upon the Administrator's approval of the State program for issuing NPDES permits, the foregoing definition was incorporated into and became a part of the federal program, enforceable under the Federal Clean Water Act.

45.    A significant feature of the design for the Distribution Center being constructed by Dayton Hudson is the collection of all of the stormwater run-off from all of the impervious areas of the facility, including roofs, parking areas, cleaning and equipment maintenance areas, and on-site fueling areas, and the discharge of the run-off through pipes and other channelized conveyances into a 6-acre retention pond, where it will be intentionally discharged to the groundwater system.

46.    According to the design plans for the facility, the bottom of the retention pond for the stormwater run-off will be three feet or less above the natural groundwater table existing in the shallow sand and gravel aquifer at the site.

47.    Attached hereto and incorporated herein by reference as Exhibit D is a true and correct copy of a publication entitled *URBAN STORM RUNOFF: How Polluted Is It?*, authored by Ms. Carolyn Johnson, a UW-Extension Urban Water Quality Specialist, discussing the ramifications of sampling data gathered by Mr. Roger Bannerman, an employee of the Wisconsin Department of Natural Resources, and published jointly by the UW-Extension and Wisconsin Department of Natural Resources in December, 1992.

15

48.     Upon information and belief, and based on the reported results of data collected by Mr. Bannerman, the stormwater run-off that is intended to be discharged to the retention pond and then intentionally discharged to the sand and gravel aquifer will be contaminated with toxic pollutants and contaminants listed pursuant to § 307 of the Clean Water Act, 33 U.S.C. § 1307(a)(1), in concentrations that create an unreasonable cancer risk for human beings and are harmful to aquatic life.

49.     Upon further information and belief, and based on the reported data collected by Mr. Bannerman and others, the stormwater run-off that will be intentionally discharged to the retention pond will be contaminated with high lead, a toxic metal listed pursuant to § 307 of the Clean Water Act, 33 U.S.C. § 1307, in concentrations that create a substantial and unreasonable risk to human health and aquatic life.

50.     Upon information and belief, the contaminated stormwater in the retention pond will migrate out of the pond, into the groundwater in the shallow sand and gravel aquifer, and will be expressed and discharged into nearby wetlands and surface waters that are waters of the United States.

51.     The shallow sand and gravel aquifer into which the contaminated stormwater run-off will be discharged is the same aquifer that is used by residents for obtaining drinking water from shallow "sand point" wells, including but not limited to those within less than 1000 feet from the facility; and, upon information and belief, the contaminants and pollutants from the contaminated stormwater run-off will migrate to and contaminate such wells, creating unreasonable risks to such persons' physical health.

16

52.    Upon information and belief, the discharge of the contaminated stormwater run-off into the retention pond and the groundwater, and its expression and discharge to the nearby wetlands and other surface waters, will constitute a prohibited discharge of toxic and carcinogenic pollutants under § 307 of the Clean Water Act, 33 U.S.C. § 1307, for which Dayton Hudson has neither applied nor obtained a permit.

53.    As a result of the foregoing, Dayton Hudson is engaged in industrial activity, without the necessary permits, which will create an illegal discharge of pollutants, in violation of § 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

## VI.  THIRD CLAIM FOR RELIEF
### [Against Meyer and WDNR]

54.    All of the foregoing allegations are incorporated herein by reference as though more fully set forth at length, except to the extent that they are inconsistent with the allegations that follow, in which case they are alleged in the alternative.

55.    Pursuant to the Clean Air Act, 42 U.S.C. §§ 7401, et seq., U.S. EPA is charged with setting primary and secondary air quality standards for certain pollutants in order to protect the public health and welfare.

56.    The Clean Air Act provides that states are responsible for preparing their own implementation plans for achieving NAAQS.  Following U.S. EPA approval of a state implementation plan (SIP), the requirement and commitment of the SIP are binding as a matter of federal law upon the State.

17

57. The State of Wisconsin's SIP was originally approved by U.S. EPA on May 31, 1972. Since that time the Secretary and WDNR have had a mandatory and non-discretionary duty to comply with the SIP, as it was originally approved and subsequently amended.

58. The Clean Air Act has been amended to include more stringent requirements for those geographic areas that had failed to meet federal standards ("non-attainment areas"). Pursuant to those amendments, the U.S. EPA has designated six Counties in Southeastern Wisconsin as a "severe" non-attainment area with respect to the NAAQS for ozone. Among the Counties so designated are Waukesha, Milwaukee, Racine and Kenosha Counties.

59. An integral part of the Wisconsin SIP and the State's strategy for attaining and maintaining compliance with the NAAQS is the State's election to implement a permit program for "indirect sources" of air pollutants and contaminants, pursuant to which all persons proposing to construct or operate a new indirect source with more than 1000 vehicle parking spaces must obtain a permit from WDNR. If the permit is for a "major source" under § 144.30(16), Wis. Stats., or a "major emitting facility" under 42 U.S.C. § 7479(1), the Secretary and WDNR have a mandatory and non-discretionary duty to submit the permit to the Regional Administrator for review and approval.

60. On March 15, 1993, Dayton Hudson formally submitted a permit application to WDNR for an indirect source permit under NR 406.06(a)(1), Wis. Admin. Code. On May 19, 1993, WDNR issued a permit authorizing Dayton Hudson to construct the

18

Distribution Center as a "minor source" of air pollutants and contaminants without submitting the permit application to the Regional Administrator.

61.   Upon information and belief, due to political pressure and haste, which precluded WDNR from conducting a thorough review of the emissions from the Distribution Center, WDNR erroneously concluded that the facility was a "minor" rather than a "major" source of carbon monoxide.  Upon further information and belief, neither Meyer nor WDNR made any estimate whatsoever of the number of tons of nitrogen oxide emitted by the Distribution Center on an annual basis.

62.   Due to their erroneous conclusion that the Distribution Center was a "minor source" of air pollutants and contaminants, the Secretary and WDNR are engaged in a continuing violation of the Wisconsin SIP and the Clean Air Act by having granted an air pollution control permit to Dayton Hudson as a "minor source" of air pollutants and by having issued a permit for a new source of air pollutants and contaminants that will cause or exacerbate a violation of the NAAQS for ozone in a "severe" non-attainment area, without having submitted the permit to the Regional Administrator for review, comment and approval.

63.   Upon information and belief, in issuing a permit for a major emitting source of ozone precursors in a severe non-attainment area for ozone, without evaluating alternatives to reduce the emissions to the lowest achievable emissions rate or requiring an offset for the increase in emissions, Meyer and WDNR have and are continuing to violate their clear and non-discretionary duties under 42 U.S.C. §§ 7502 and 7503.

19

64.     Upon information and belief, and as suggested by a memo between the Director of the WDNR Air Management Bureau and his staff, a true and correct copy of which is appended hereto as Exhibit A, the failure of Meyer and WDNR to carry out their clear and non-discretionary duties under the Clean Air Act is a direct and proximate result of political pressures brought to bear upon Meyer and WDNR to expedited the issuance of an air pollution control permit without having first complied with the mandatory requirements of the Clean Air Act and the Wisconsin SIP.

65.     Pursuant to §§ 402(b) and (p) of the Clean Water Act, 33 U.S.C. § 1342(b) and (p), as well as 40 C.F.R. §§ 123.25(a)(9) and 123.62(e), the WDNR and its Secretary, Meyer, have had a continuing mandatory and non-discretionary duty to promulgate regulations and propose revisions to the State NPDES program to maintain consistency with the federal NPDES program.

66.     The WDNR and Meyer have failed to obtain the necessary authority to implement a State program consistent with the requirements of §§ 402(b) and (p) of the Clean Water Act, 33 U.S.C. § 1342(b) and (p), as well as 40 C.F.R. §§ 122.26, 123.25(a)(9) and 123.62(e), within the time specified for them to so, and they are both engaged in a ongoing violation of the applicable regulations and their mandatory, non-discretionary duties under the cited statutes and regulations.

67.     Upon information and belief, as a direct and proximate result of the failure by WDNR and Meyer to secure the necessary authority and promulgate the regulations necessary to implement the requirements of § 402 of the Clean Water Act, 33 U.S.C.

20

§ 1342(b) and (p), as well as 40 C.F.R. §§ 122.26, 123.25(a)(9) and 123.62(e), they cannot consider or issue the necessary NPDES permits required for the Distribution Center, and they are allowing the Distribution Center to be constructed in violation of the Clean Water Act.

68.    Due to the failure of WDNR and Meyer to comply with their mandatory and non-discretionary duties in a timely manner, the only appropriate or legally authorized permitting authorities for the NPDES permit required by the Distribution Center is the Administrator, the Regional Administrator and U.S. EPA.

69.    Upon information and belief, the failure of WDNR and Meyer to carry out the non-discretionary duties impressed upon them under the federal statutes and regulations, will continue unless and until they are enjoined to comply with the Clean Air Act and the Clean Water Act.

VII.  FOURTH CLAIM FOR RELIEF
[Against Browner, Adamkus and U.S. EPA]

70.    All of the foregoing allegations are incorporated herein by reference as though more fully set forth at length, except to the extent that they are inconsistent with the allegations that follow, in which case they are alleged in the alternative.

71.    Pursuant to § 166 of the Clean Air Act, 42 U.S.C. § 7476, the Administrator and the Regional Administrator have a mandatory and non-discretionary duty to take such measures as may be necessary to prevent the construction of a new major emitting facility which does not conform to the requirements of §§ 160 through 169

21

of the Clean Air Act, 42 U.S.C. §§ 7470 through 7479; and, as previously alleged, the Distribution Center is, upon information and belief, a major emitting facility that is currently being constructed in violation of those requirements.

72.    In failing to prevent the construction of the Distribution Center, the Administrator and the Regional Administrator are failing to carry out their mandatory duties under § 166 of the Clean Air Act, 42 U.S.C. § 7476, and upon information and belief, they will continue to fail to carry out their mandatory duties unless otherwise ordered to do so.

73.    Under § 309 of the Clean Air Act, 42 U.S.C. § 7609, U.S. EPA, by and through the Administrator and Regional Administrator, have a mandatory and non-discretionary duty to review and comment in writing on the environmental impacts resulting from the issuance of any permit under the Clean Air Act, including a permit for the construction of a major emitting facility such as the Distribution Center.

74.    Upon information and belief, U.S. EPA has not reviewed or commented upon the environmental impact of the permit issued to Dayton Hudson by WDNR for construction of the Distribution Center, and in so doing have failed and are continuing to fail to carry out their mandatory and non-discretionary duties under § 309 of the Clean Air Act, 42 U.S.C. § 7609.

75.    Pursuant to § 166 of the Clean Air Act, 42 U.S.C. § 7476, the Administrator has had a continuing mandatory and non-discretionary duty to promulgate standards and specific numeric increments for increases in the ambient air concentration

22

of carbon monoxide to prevent the significant deterioration of the quality of air and prevent the exceedence of the NAAQS for carbon monoxide.

76.    Upon information and belief, the Administrator has failed to promulgate the standards for carbon monoxide required by § 166 of the Clean Air Act, 42 U.S.C. § 7476, by the applicable deadline, and is engaged in an ongoing failure to comply with the specific mandatory duties imposed upon the Administrator pursuant to 42 U.S.C. § 7476.

77.    Upon information and belief, and according to the findings of the WDNR, as a direct and proximate result of the construction and operation of the Distribution Center any additional significant commercial or industrial developments in the vicinity of the Distribution Center will be legally precluded due to the likelihood that the NAAQS for carbon monoxide will be exceeded.

78.    In the alternative, upon further information and belief, Meyer and WDNR do not have adequate legal authority to prevent the cumulative effects of further incremental industrial and commercial development with less than 1000 parking spaces each, and as a consequence of their allowing the Distribution Center to be constructed, the applicable NAAQS for carbon monoxide in the vicinity of the Distribution Center will be exceeded.

79.    Upon information and belief, as a direct and proximate failure of the Administrator's failure to promulgate the standards required by § 166 of the Clean Air Act, 42 U.S.C. § 7476, Meyer and the WDNR are allowing Dayton Hudson to construct

23

the Distribution Center, notwithstanding the fact that, according to WDNR's estimates, the facility will increase the maximum 8-hour average concentration of carbon monoxide by approximately 800%, from 1.1 ppm to 8.7 ppm, only 0.3 ppm less than the applicable NAAQS promulgated by the Administrator, and thereby consume more than 96% of the available clean air increment for carbon monoxide in the vicinity of the Distribution Center.

## VIII. DEMAND FOR JUDGMENT

WHEREFORE, the Village and the Town demand judgment as follows:

(a)     Declaring that Dayton Hudson is in violation of the Clean Air Act and the Clean Water Act and injunctive relief requiring Dayton Hudson to cease construction activities until it is in compliance with these Acts.

(b)     Assessing daily penalties against Dayton Hudson for each day of each separate violation of the Clean Air Act and the Clean Water Act committed by Dayton Hudson, in an amount to be determined by the Court;

(c)     Declaring that the WDNR and its Secretary are in violation of Clean Air Act and Clean Water Act, having failed to carry out their mandatory duties, and enjoining WDNR and its Secretary to comply with their legal obligations;

(d)     Declaring the Administrator, Regional Administrator and U.S. EPA have failed to carry out their respective mandatory obligations under the Clean Air Act and the Clean Water Act, and enjoining them to carry out their mandatory duties;

24

(e)    Awarding the Plaintiffs their actual and reasonable attorneys fees and costs; and

(f)    Granting the Plaintiffs such other relief as the court deems just and appropriate under the facts and the law as determined by the Court.

Dated at Milwaukee, Wisconsin this _____ day of July, 1993.

FRIEBERT, FINERTY & ST. JOHN, S.C.
William S. Roush, Jr.
State Bar No. 1001662
Ted A. Warpinski
State Bar No. 1018812

By: _____
William S. Roush, Jr.
Attorneys for Plaintiff
Village of Oconomowoc Lake

P.O. ADDRESS:
Two Plaza East - Suite 1250
330 East Kilbourn Avenue
Milwaukee, Wisconsin 53202
(414) 271-0130

ARENZ, MOLTER, MACY & RIFFLE, S.C.
H. Stanley Riffle
State Bar No. 1012704

By: _____
H. Stanley Riffle
Attorneys for Plaintiff
Town of Summit

P.O. ADDRESS:
720 N. East Avenue
Post Office Box 1348
Waukesha, WI 53187
(414) 548-1340

25

```
From:   DNRVAX::THEILD       "Don Theiler, AM/10, 608 266-0603" 15-APR-1993 10:59:12.26
To:     WIBLEL, DNRSE::KLASSW
CC:
Subj:   This looks like a looming problem!

From:   DNRVAX::PATTER       "RALPH PATTERSON-AM/3 7-7546" 15-APR-1993 10:14:16.75
To:     DNRVAX::THEILD
CC:     PATTER
Subj:   RE: Target Distribution
```

Target received a conditional use permit from the Oconomowoc City
Council last night.  Our permit is the only permit they need to
complete construction.

Representatives from the Target corporate office are meeting with
us and DOD tomorrow on the permit.  These people are flying in
from the Twin Cities.

Mike Scott and I have a real concern regarding how the environmental
assessment was handled by district in this project.  If you can
believe this, the environmental assessment states that this project
will "cause a significant increase in ground level ozone.
 Indirect sources are Type II actions under NR 150.  EIS
are required for "major actions".  The district said that no EIS is
required, although a justification was not given.  I would speculate,
and Mike Scott does not disagree with this speculation, that if we are
brought to court on this that we may be forced into completing
an EIS which would delay the permit.  Target wants to dig dirt
on May 1.  This would not make Governor Thompson look very good.

Regarding DOD and Trunzo.  I briefed Lyman Tuesday on what happened.
DOD is writing a letter for the Governor which addresses a number of
concerns the Town of Summit people have regarding the permit.  I am
not sure why they are writing the letter, but they are.

This will probably be an exciting permit, even more exciting than
now.

Ralph



EXHIBIT

A

STATE OF _CALIFORNIA_ )
                          ) SS.
_Contra Costa_ COUNTY )

Tony E. Eggleston, Ph.D., C.E.P., being first duly sworn on oath deposes and states as follows:

1.      I am a Vice President and the National Program Manager of Air Quality Services for Geraghty & Miller, Inc., a national environmental engineering consulting firm. Attached hereto and incorporated herein by reference as Exhibit A is my *curricula vitae*.

2.      Geraghty & Miller and I were retained by the Village of Oconomowoc Lake and the Town of Summit to review the emission of air pollutants and contaminants associated with the construction and operation of the Target Distribution Center that is currently being constructed by the Dayton Hudson Corporation at the northwest quadrant of the intersection of State Hwy. 67 and County Hwy. B, in the City of Oconomowoc, Waukesha County, State of Wisconsin.

3.      As part of the services rendered to the Village and the Town, my staff and I conducted a professional review and critique of calculations made by the Wisconsin Department of Natural Resources to make a determination whether the Target Distribution Center was a major emitting source of air pollutants under the Federal Clean Air Act and the Wisconsin State Implementation Plan. Attached hereto as Exhibit B is a true and correct copy of the analysis of the Wisconsin Department of Natural Resources.



**EXHIBIT**
**B**

4.      Attached hereto as Exhibit C is a copy of my report, setting forth my conclusions to a reasonable degree of professional and scientific certainty on the estimated annual emissions of carbon monoxide (CO) and nitrogen oxides ($NO_x$), associated with the Target Distribution Center.

5.      Based on the analysis in my report, the conclusion of the Wisconsin Department of Natural Resources regarding the annual emissions of carbon monoxide associated with the Target Distribution Center is inaccurate. My professional opinion as to a correct analysis of the annual emission of air pollutants associated with the facility, using realistic but nonetheless conservative assumptions tending to understate the actual total emissions, indicated that the facility will cause the emission of at least 260 tons of carbon monoxide per year and at least 300 tons of nitrogen oxides per year.

6.      Based on the analysis set forth in my report, it is my opinion to a reasonable degree of professional and scientific certainty that the Target Distribution Center is a major emitting facility for both carbon monoxide and nitrogen oxides, within the meaning of the Federal Clean Air Act and the Wisconsin State of Implementation Plan.

Dated at *Richmond*, *California*, this 23^d day of July, 1993.

_Tony E. Eggleston_
Tony E. Eggleston, Ph.D., C.E.P.

Subscribed and Sworn to before me
this 23 day of July, 1993.

_Lisa N. Ogles_
Notary Public, State of *California*
My Commission: # 988030

LISA D. OGLES
COMM. # 988030
Notary Public — California
CONTRA COSTA COUNTY
My Comm. Expires MAR 14, 1997

/lmc
target/affidavi.doc

## TONY E. EGGLESTON, Ph.D.

Vice President
Air Quality Program Manager

### CREDENTIALS/REGISTRATION

B.S. Microbiology, University of North Carolina
M.B.A., California Western University
Ph.D., Business Administration, California Western University
Certified Environmental Professional (#03245)
Registered Environmental Assessor (#03084)

### PROFESSIONAL AFFILIATIONS

Air and Waste Management Association
National Association of Environmental Professionals
American Industrial Hygiene Association
Source Evaluation Society (Past President, Board of Directors)

### FIELDS OF SPECIALIZATION

- Program Management
- Permitting and Regulatory Compliance
- Multi-Media Environmental Audits
- Emission Inventories
- Source Emission Testing and Monitoring
- Air Quality Monitoring
- Continuous Emission Monitoring System Design and Specification

### EXPERIENCE SUMMARY

Dr. Eggleston has twenty years of experience covering most aspects of environmental evaluation and permitting, as well as extensive experience in project and program management. Dr. Eggleston has performed various types of environmental evaluation and testing programs, including:

- Regulatory compliance audits;
- multi-media environmental audits;
- source emission testing and monitoring; and
- air quality (indoor and ambient) monitoring.

Dr. Eggleston is a recognized authority in the area of emissions assessment, and has made numerous presentations and published authoritative documents in this area. He has managed and participated in major multi-media environmental assessments, including a study of all waste streams (air, liquid, and solid) from over 150 processes selected to represent the entire population of U.S. combustion sources. During this and similar programs, he gained additional experience understanding of the role of environmental chemistry in the assessment of environmental problems.

**EXHIBIT**

Eggleston Aff't

Exhibit A

GERAGHTY & MILLER, INC.


During his career, Dr. Eggleston has been involved in many regulatory related activities, including determination of applicability of international, federal, state, and local regulations. He has assisted numerous clients in areas ranging from obtaining permits to responding to regulatory actions, and has provided testimony as an expert witness. He has also been responsible for the preparation of technical responses to support changes to various proposed environmental regulations.

Prior to joining Geraghty & Miller, Inc., Dr. Eggleston was employed by various environmental consulting firms, including positions as the Air Quality Principal for Law Environmental, Inc., as an Associate at Kilkelly Environmental Associates, and as Manager of Field Operations for the Environmental Engineering Division of TRW, Inc. He also was the Supervisor, Environmental Measurement for Owens Corning Fiberglas, Inc. Dr. Eggleston served as a Captain in the U.S. Air Force from 1964-1968.

SELECTED PUBLICATIONS AND PRESENTATIONS

Eggleston, T.E. and J.D. Miller. Air Monitoring Should Be Considered As Part Of An Overall Remediation Strategy," Hazardous Waste Strategies Update, Environmental Law Series, Volume 3, November 4. Shepard's/McGraw-Hill, Inc., Colorado Springs, Colorado, June, 1992.

Eggleston, T.E. Development and Use of a Real-Time Remote Air Monitoring System for Hazardous Waste Remediation Projects. Presented at Haztech International '92, Second Annual Exhibition & Conference, San Juan, Puerto Rico. October 1992

Eggleston, T.E. The Role of Environmental Services in Management Decisions. Presented at the Environmental Seminar, Soviet Executive Program, George Washington University. Washington, DC. June 1991.

Eggleston, T.E. and W.C. Gray, Jr. Continuous Emission Monitoring Guidelines Update. Electric Power Research Institute CS 5998. Palo Alto, CA. September 1988.

Eggleston, T.E., et al Improved Specifications for Continuous Emission Monitoring. Published in "Continuous Emission Monitoring Systems for Power Plants: The State-of-the-Art." American Society of Mechanical Engineers, E.C. - Vol. 1. New York, NY. September 1988.

Eggleston, T.E. PM-10 Source Emission Measurements: Their Relationship to the Development of Emission Factors and Other Implementation Issues. Presented at the Air Pollution Control Association/Environmental Protection Agency specialty conference on "PM-10: Implementation of Standards," San Francisco, CA. February 1988.

Eggelston, T.E. and R.D. McRanie. Alternative Approaches to Quality Assurance for Continuous Emission Measurements. Presented at the Emission Monitoring Symposium, Louisiana Section, Air Pollution Control Association and Louisiana Department of Natural Resources, Baton Rouge, Louisiana. April 1983.

Eggleston011593.cv

Department of Natural Resources

Page 1 of 1

Made By: MEIER / ROTH          Date: 18 MAR 93

Discussed With & Checked By: _____

Re: MAJOR/MINOR SOURCE DETERM.
TARGET DISTRIBUTION CTR - OCONOMOWOC

_____          Date: _____

Approved: _____          Date: _____

Permit #: _____          Date: _____

---

AUTO (POV) TRAFFIC -

$$\left(\frac{652 \text{ AUTO}}{\text{day}}\right)\left(15 \text{ miles}\right)\left(\frac{2 \text{ tripends}}{\text{AUTO}}\right)\left(\frac{365 \text{ day}}{\text{yr}}\right) = 7{,}139{,}400 \text{ miles/yr}$$

$$\left(\frac{7{,}139{,}400 \text{ miles}}{\text{yr}}\right)\left(\frac{6.79 \text{ gm}}{\text{mi}}\right) = \frac{48476526 \text{ g/yr}}{907{,}185 \text{ g/TON}} = 53 \text{ TONS/yr}$$

TRUCK TRAFFIC - $\left(\frac{740 \text{ trucks}}{\text{day}}\right)\left(50 \text{ miles}\right)\left(\frac{2 \text{ tripend}}{\text{trk}}\right)\left(\frac{365 \text{ day}}{\text{yr}}\right) = 27{,}010{,}000 \text{ miles/yr}$

$$\left(\frac{27{,}010{,}000 \text{ miles}}{\text{yr}}\right)\left(\frac{5.61 \text{ gm}}{\text{mi}}\right) = \frac{151{,}526{,}100 \text{ gms/yr}}{907{,}185 \text{ g/TON}} = 167 \text{ TONS/yr}$$

$$53 \text{ TONS/yr} + 167 \text{ TONS/yr} = \boxed{220 \text{ TONS/yr}}$$

Annual Total emissions (CO) from facility are less than 250 TONS/yr,
this source is a MINOR source.

---

Footnotes/References:

003934

**EXHIBIT**
Eggleston Aff't.
Exhibit B

# DETERMINATION OF POTENTIAL AIR EMISSIONS ASSOCIATED WITH THE TARGET TRUCK TERMINAL, OCONOMOWOC, WISCONSIN

Prepared by
Tony E. Eggleston, Ph.D., C.E.P.
Geraghty & Miller, Inc.

Activities relating to determining the potential air emissions associated with the planned Target truck terminal in Oconomowoc, Wisconsin included reviewing the related effort conducted by the State of Wisconsin and an independent determination. This report covers these activities.

The conclusion on the major/minor status of the facility is inaccurate due to a lack of thoroughness in the determination and the use of inaccurate assumptions. The mathematics involved in the calculations is correct. It is my assessment that the determination is inaccurate and should have been conducted in a more detailed and appropriate manner.

Several factors were overlooked or improperly accounted for in the DNR determination dated March 18, 1993, including:

- The number of automobiles is unrealistic (652) given the representation by Target that 700 "full-time equivalent" employees will be hired and the anticipated mix of part-time employees.

- Automobile traffic associated with lunch breaks and business-related traffic was not accounted for.

- The assumed mileage for each automobile (15 miles, one-way) is unrealistic given the location and existing labor base and demographics, and the potential for drop-off traffic of local employees, requiring a round trip for both drop-off and pick-up.

- The assumed mileage for trucks (50 miles, one-way) is unrealistic given the location of the stores, largely in other states. The driving distance to the Wisconsin state line, on the average, clearly exceeds 50 miles.

- The number of truck trips is inconsistent with limits of the air permit.

- The average vehicle speed of 50 mph is unrealistically high.

- The number of days of operation is overstated.

- The operation of the yard trucks and on-site driving by employee vehicles and arriving/departing semi-trucks was not accounted for in the DNR calculations.

EXHIBIT

Eggleston Aff't.

Exhibit C

GERAGHTY & MILLER, INC.

- The combustion of fossil fuels for space heating/domestic use at the site was not factored in to the determination.

- Nitrogen oxides (NO$_x$) were not evaluated at all in the major/minor determination.

Emissions of carbon monoxide (CO) from the proposed facility have been calculated using more realistic assumptions. The calculations are attached. Utilizing emission factors developed with the MOBILE5v3 model, the calculations show 264 tons per year (tpy) of CO. The added effects of on-site driving and use of yard trucks have been calculated and the effect of use of natural gas for space heating has been estimated. These calculations are attached but are not included in the 264 tpy value.

In addition, calculation of NO$_x$ emissions using the same mileage assumptions developed for CO emissions, and emission factors developed by MOBILE5v3 was conducted. This resulted in predicted emissions of 300 tpy NO$_x$ but are not included in the 300 tpy value. Calculations for the effect of yard diesel operation and space heating were also conducted. These calculations are attached.

The determinations described above were based upon more realistic but nonetheless conservative projections relating to trip duration and profile, including:

- Evaluation of availability of warehouse workers in the vicinity of the facility. Projections by the Labor Market Analysis section of the Wisconsin Department of Industry, Labor and Human Relations (copies attached) indicate that inadequate qualified labor is available in the immediate vicinity of the Target Terminal site. The closest significant source will be the Milwaukee area. Thus, use of a one-way trip distance (average) of 25 miles is conservative (i.e. not likely to over predict emissions).

- Use of 652 vehicles per day is conservative, considering plans to hire 700 full-time equivalent employees, utilizing a high percentage of part-time employees.

- Use of a vehicle operating mode which assumed 36 percent of the vehicles began their trips from a cold start. Logically that number would be much higher. (Cars at the end of a shift would largely be cold starts, representing approximately half the trips. Trucks after loading will be cold starts, per terms of the permit.)

- Average trip distances for trucks were based upon a distance of 65 miles to the Illinois border in route to the Chicago area; 120 miles to the Iowa border in route to or through Dubuque; 30 miles to the Milwaukee and Madison population centers; and 120 miles to various Wisconsin population centers north of the Target truck terminal. Assuming an even split of trips 30 miles and 120 miles in length would yield an average for them of 75 miles. The distance of 65 miles to Illinois, being lower than this value, was thus selected as a conservative

average. It is also consistent with the stated purpose of the facility, servicing new stores that are to be opened in the Metropolitan Chicago area during the next 18 to 24 months.

- MOBILE5v3 modeling to determine emission factors was conducted for both summer and winter operation of vehicles and the values averaged in order to further refine the emission factors. For summer operation a low volatility rating for the fuel (known as Reid Vapor Pressure, or RVP) was utilized.

Attached as Table 1 are the summarized calculations for air emissions associated with the Target truck terminal. Copies of the MOBILE5v3 outputs are also attached.

projects\target\potenair.doc



**Table 1.** Projected Air Emissions - Target Corporation Truck Terminal, Oconomowoc, Wisconsin.

---

See MOBILE5v3 output 7/15/93 for source of emission factors

Emission factors are average of summer and winter factors at 45 mph

| LDGV/GT[1] | Winter | Summer | Average |
|---|---|---|---|
| CO | 14.89 | 9.31 | 12.1 gms/mile |
| $NO_x$ | 1.77 | 1.51 | 1.64 gms/mile |

| HDDV[2] | | | |
|---|---|---|---|
| CO | 5.66 | 5.62 | 5.64 gms/mile |
| $NO_x$ | 12.73 | 12.18 | 12.46 gms/mile |

**LDGV/GT - CO**

652 vehicles/day x 25 miles (one-way) x 2 trips/auto x 313 days/yr =
10,203,800 miles/yr x 12.1 gms/mile = 123,465,980 gms/yr
÷ 907,185 gms/ton = 136.1 tons per year (CO)

**HDDV - CO**

504 trucks/day x 65 miles (one-way) x 2 trips/truck x 313 days/yr =
20,507,760 miles/yr x 5.64 gms/mile = 115,663,766.4 gms/yr
÷ 907,185 gms/ton = 127.5 tons per year (CO)

Total CO = 264 tons/yr

**LDGV/GT[1] - $NO_x$**

10,203,800 miles/yr x 1.64 gms/mile - 16,734,232 gms/yr
÷ 907,185 gms/ton = 18.4 tons per year ($NO_x$)

**HDDV[2] - $NO_x$**

20,507,760 miles/yr x 12.46 gms = 255,526,689.6 gms/yr
÷ 907,185 gms/ton = 281.7 tons/yr ($NO_x$)

Total $NO_x$ = 300 tons/yr

---

[1]     Light duty gasoline vehicle/light truck
[2]     Heavy duty diesel vehicle

Table 1 (Cont.).    Projected Air Emissions - Target Corporation Truck Terminal, Oconomowoc, Wisconsin.

Note: On-site operation was not accounted for in previous determination. To accommodate for this exclusion:

For 4 Yard HDDV - Assume:
        20 hrs/day
        3 mph average speed (equivalent to idle)
        20,000 miles on truck (app 1 yr usage)
Per AP-42, Vol II, Table 1.7.3
        Hot stabilized idle emissions (idle = 3 mph average speed)
        =      $ZML + (DR \times M)$
        = (Zero mile level) + (Deterioration Rate [gms/hr/10k mi] x Mileage [10,000]
        40.2 + (0.60/10,000 x 20,000 miles) = 41.4 gms/hr (CO)
        41.4 gms/hr x 4 trucks x 20 hrs/day x 313 days/yr = 1,036,656 gms/yr
        ÷ 907,185 gms/ton = 1.14 tons/yr (CO)

        For $NO_x$ (O Deterioration Rate) 13.2 gms/hr
        Similarly = 0.36 tons/yr ($NO_x$)

For Site Driving by Cars and Trucks:
Assume:    652 cars/day
        500 trucks/day (D&M/TES used 740 trucks)
        Average site distance for trucks 3 miles (from D&M/TES report)
        Average site distance for cars 0.9 miles (from D&M/TES report)
        Idle emissions CO (Table 1.1.3, AP-42, Vol. II) 1989 model car w/50k mi 48.41 gms/hr, for $NO_x$ 1.64 gms/hr
For Cars:
        652 cars/day x 2 trips x 0.9 miles/trip ÷ 3 miles/hr x 48.41 gms/hr =
        18,938 gms/day x 313 days/yr = 5,927,591 gms/yr
        ÷ 907,185 gms/ton = 6.5 tons/yr - cars (CO)
        Similarly 0.2 tons/yr ($NO_x$)
For Trucks:
        500 trucks x 2 trips x 3 miles ÷ 3 miles/hr x
        41.4 gms/hr x 313 days/yr ÷ 907,185 gms/ton =
        14.3 tons/yr (CO)
        Similarly 4.6 tons/yr ($NO_x$)

TOTALS FOR SITE OPERATION:
        CO 21.9 tons/yr
        $NO_x$ 5.2 tons/yr



Table 1 (Cont.).     Projected Air Emissions - Target Corporation Truck Terminal, Oconomowoc, Wisconsin.

Gas for Heating

Assume:     1.1 million sq. ft.
145 x 10⁶ cubic feet natural gas per year (based upon standard HVAC calculations for S.E. Wisconsin as provided by H. Stanford, P.E., Stanford White Associates).
From AP-42, Vol. 1 - Natural Gas Emission Factor =
27 lb/10⁶ f³ for CO and 17 lb/10⁶ f³ for $NO_x$ for commercial boiler with low $NO_x$ burners

145 x 10⁶ f³/yr x 27 lb CO/10⁶ f³ = 1.9 tons per year (2.6 tons per year*)
145 x 10⁶ f³/yr x 17 lb $NO_x$/10⁶ f³ = 1.23 tons per year (1.7 tons per year*)

---

*     Emission rate after expansion of facility to 1.5 million square feet.

projects\target\projair.tbl



7/15/93

```
TARGET DISTRIBUTION CENTER - EMPLOYEE PARKING 1994, WINTER DAY        MOBILE5v3

I/M program selected:

        Start year (January 1):            1984
        Pre-1981 MYR stringency rate:       20%
        First model year covered:         1980
        Last model year covered:          1994
        Waiver rate (pre-1981):           10.%
        Waiver rate (1981 and newer):      9.%
        Compliance Rate:                  94.%
        Inspection type:                  Centralized
        Inspection frequency              Annual
        Vehicle types covered:            LDGV - Yes
                                          LDGT1 - Yes
                                          LDGT2 - Yes
                                          HDGV - No
        1981 & later MYR test type:       Idle

Southeastern WI
            Minimum Temp: 42. (F)   Maximum Temp: 58. (F)
            Period 1 RVP: 13.5     Period 2 RVP: 13.5 Period 2 Yr: 2020
wVOC HC emission factors include evaporative HC emission factors.
----------------------------------------------------------------------

Emission factors are as of Jan. 1st of the indicated calendar year.

Cal. Year: 1994        Region: Low          Altitude: 500. Ft.
              I/M Program: Yes        Ambient Temp:  54.1 / 54.1 / 54.1 F
          Anti-tam. Program: No    Operating Mode:  36.5 / 4.1 / 36.5
          Reformulated Gas: No
Ether Blend Market Share: 0.035    Alcohol Blend Market Share: 0.129
Ether Blend Oxygen Content: 0.027  Alcohol Blend Oxygen Content: 0.031
                                   Alcohol Blend RVP Waiver: Yes
```

| Veh. Type: | LDGV | LDGT1 | LDGT2 | LDGT | HDGV | LDDV | LDDT | HDDV | MC | All Veh |
|---|---|---|---|---|---|---|---|---|---|---|
| Veh. Spd.: | 45.0 | 45.0 | 45.0 | | 45.0 | 45.0 | 45.0 | 45.0 | 45.0 | |
| VMT Mix: | 0.900 | 0.100 | 0.000 | | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | |

Composite Emission Factors (Gm/Mile)

| | LDGV | LDGT1 | LDGT2 | LDGT | HDGV | LDDV | LDDT | HDDV | MC | All Veh |
|---|---|---|---|---|---|---|---|---|---|---|
| VOC   HC: | 2.10 | 1.90 | 2.38 | 1.90 | 4.95 | 0.40 | 0.54 | 1.21 | 2.49 | 2.08 |
| Exhst HC: | 1.21 | 0.88 | 1.02 | 0.88 | 1.24 | 0.40 | 0.54 | 1.21 | 1.50 | 1.18 |
| Evap.  HC: | 0.39 | 0.45 | 0.72 | 0.45 | 2.74 | | | | 0.83 | 0.39 |
| Refuel HC: | 0.23 | 0.30 | 0.30 | 0.30 | 0.50 | | | | | 0.23 |
| Runing HC: | 0.17 | 0.17 | 0.23 | 0.17 | 0.39 | | | | | 0.17 |
| Rsting HC: | 0.10 | 0.10 | 0.10 | 0.10 | 0.09 | | | | 0.16 | 0.10 |
| Exhst CO: | 15.49 | 9.46 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 14.89 |
| Exhst NOX: | 1.81 | 1.34 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1.77 |

Hot Stabilized Idle Emission Factors (Gm/Hr)

| | LDGV | LDGT1 | LDGT2 | LDGT | HDGV | LDDV | LDDT | HDDV | MC | All Veh |
|---|---|---|---|---|---|---|---|---|---|---|
| VOCId HC: | 53.31 | 55.94 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 53.57 |
| Idle CO: | 556.26 | 624.86 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 563.12 |
| Idle NOX: | 3.75 | 4.24 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 3.80 |

----------------------------------------------------------------------



7/15/93

**TARGET DISTRIBUTION CENTER - TRUCK PARKING 1994, <u>WINTER DAY</u>**     MOBILE5v3

I/M program selected:

```
        Start year (January 1):          1984
        Pre-1981 MYR stringency rate:     20%
        First model year covered:         1980
        Last model year covered:          1994
        Waiver rate (pre-1981):           10.%
        Waiver rate (1981 and newer):      9.%
        Compliance Rate:                  94.%
        Inspection type:              Centralized
        Inspection frequency              Annual
        Vehicle types covered:        LDGV - Yes
                                      LDGT1 - Yes
                                      LDGT2 - Yes
                                      HDGV - No
        1981 & later MYR test type:       Idle
```

Southeastern WI
```
                Minimum Temp: 42. (F)   Maximum Temp: 58. (F)
                Period 1 RVP: 13.5    Period 2 RVP: 13.5 Period 2 Yr: 2020
VOC HC emission factors include evaporative HC emission factors.
```

---

```
Emission factors are as of Jan. 1st of the indicated calendar year.
Cal. Year: 1994        Region: Low        Altitude: 500. Ft.
              I/M Program: Yes      Ambient Temp:  54.1 / 54.1 / 54.1 F
            Anti-tam. Program: No   Operating Mode:  36.5 / 4.1 / 36.5
            Reformulated Gas: No
  Ether Blend Market Share: 0.035      Alcohol Blend Market Share: 0.129
  Ether Blend Oxygen Content: 0.027    Alcohol Blend Oxygen Content: 0.031
                                       Alcohol Blend RVP Waiver: Yes
```

| Veh. Type: | LDGV | LDGT1 | LDGT2 | LDGT | HDGV | LDDV | LDDT | HDDV | MC | All Veh |
|---|---|---|---|---|---|---|---|---|---|---|
| Veh. Spd.: | 45.0 | 45.0 | 45.0 | | 45.0 | 45.0 | 45.0 | 45.0 | 45.0 | |
| VMT Mix: | 0.000 | 0.000 | 0.000 | | 0.000 | 0.000 | 0.000 | 1.000 | 0.000 | |

Composite Emission Factors (Gm/Mile)

| | | LDGV | LDGT1 | LDGT2 | LDGT | HDGV | LDDV | LDDT | HDDV | MC | All Veh |
|---|---|---|---|---|---|---|---|---|---|---|---|
| VOC | HC: | 2.14 | 1.93 | 2.43 | 0.00 | 5.05 | 0.40 | 0.54 | 1.21 | 2.49 | 1.21 |
| Exhst | CO: | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 5.66 | 0.00 | 5.66 |
| Exhst | NOX: | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 12.73 | 0.00 | 12.73 |

Hot Stabilized Idle Emission Factors (Gm/Hr)

| | | LDGV | LDGT1 | LDGT2 | LDGT | HDGV | LDDV | LDDT | HDDV | MC | All Veh |
|---|---|---|---|---|---|---|---|---|---|---|---|
| VOCId | HC: | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 16.99 | 0.00 | 16.99 |
| Idle | CO: | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 50.71 | 0.00 | 50.71 |
| Idle | NOX: | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 19.38 | 0.00 | 19.38 |

---



7/15/93

**TARGET DISTRIBUTION CENTER - TRUCK PARKING 1994, <u>SUMMER DAY</u>**          MOBILE5v3

I/M program selected:

```
        Start year (January 1):          1984
        Pre-1981 MYR stringency rate:     20%
        First model year covered:        1980
        Last model year covered:         1994
        Waiver rate (pre-1981):          10.%
        Waiver rate (1981 and newer):     9.%
        Compliance Rate:                 94.%
        Inspection type:                 Centralized
        Inspection frequency             Annual
        Vehicle types covered:           LDGV - Yes
                                         LDGT1 - Yes
                                         LDGT2 - Yes
                                         HDGV - No
        1981 & later MYR test type:      Idle
```

Southeastern WI

```
            Minimum Temp: 70. (F)   Maximum Temp: 85. (F)
            Period 1 RVP: 9.0     Period 2 RVP: 9.0 Period 2 Yr: 2020
VOC HC emission factors include evaporative HC emission factors.
```

---

```
Emission factors are as of July 1st of the indicated calendar year.
Cal. Year: 1994        Region: Low        Altitude:  500. Ft.
                  I/M Program: Yes     Ambient Temp:  81.8 / 81.8 / 81.8 F
              Anti-tam. Program: No     Operating Mode:  36.5 / 4.1 / 36.5
              Reformulated Gas: No
```

| Veh. Type: | LDGV | LDGT1 | LDGT2 | LDGT | HDGV | LDDV | LDDT | HDDV | MC | All Veh |
|---|---|---|---|---|---|---|---|---|---|---|
| Veh. Spd.: | 45.0 | 45.0 | 45.0 | | 45.0 | 45.0 | 45.0 | 45.0 | 45.0 | |
| VMT Mix: | 0.000 | 0.000 | 0.000 | | 0.000 | 0.000 | 0.000 | 1.000 | 0.000 | |

Composite Emission Factors (Gm/Mile)

| | | LDGV | LDGT1 | LDGT2 | LDGT | HDGV | LDDV | LDDT | HDDV | MC | All Veh |
|---|---|---|---|---|---|---|---|---|---|---|---|
| VOC | HC: | 1.60 | 1.52 | 1.92 | 0.00 | 4.01 | 0.40 | 0.54 | 1.20 | 3.29 | 1.20 |
| Exhst | CO: | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 5.62 | 0.00 | 5.62 |
| Exhst NOX: | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 12.18 | 0.00 | 12.18 |

Hot Stabilized Idle Emission Factors (Gm/Hr)

| | | LDGV | LDGT1 | LDGT2 | LDGT | HDGV | LDDV | LDDT | HDDV | MC | All Veh |
|---|---|---|---|---|---|---|---|---|---|---|---|
| VOCId | HC: | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 16.91 | 0.00 | 16.91 |
| Idle | CO: | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 50.62 | 0.00 | 50.62 |
| Idle NOX: | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 18.71 | 0.00 | 18.71 |

---

7/15/93

**TARGET DISTRIBUTION CENTER - EMPLOYEE PARKING 1994, <u>SUMMER DAY</u>      MOBILE5v3**

I/M program selected:

```
      Start year (January 1):         1984
      Pre-1981 MYR stringency rate:     20%
      First model year covered:       1980
      Last model year covered:        1994
      Waiver rate (pre-1981):         10.%
      Waiver rate (1981 and newer):    9.%
      Compliance Rate:                94.%
      Inspection type:             Centralized
      Inspection frequency            Annual
      Vehicle types covered:          LDGV - Yes
                                      LDGT1 - Yes
                                      LDGT2 - Yes
                                      HDGV - No
      1981 & later MYR test type:     Idle
```

Southeastern WI
```
              Minimum Temp: 70. (F)  Maximum Temp: 85. (F)
              Period 1 RVP:  9.0    Period 2 RVP:  9.0 Period 2 Yr: 2020
VOC HC emission factors include evaporative HC emission factors.
```
------------------------------------------------------------------------

Emission factors are as of July 1st of the indicated calendar year.

```
Cal. Year: 1994          Region: Low           Altitude:  500. Ft.
                      I/M Program: Yes      Ambient Temp:   81.8 / 81.8 / 81.8 F
                 Anti-tam. Program: No     Operating Mode:  36.5 /  4.1 / 36.5
                 Reformulated Gas: No
```

| Veh. Type: | LDGV | LDGT1 | LDGT2 | LDGT | HDGV | LDDV | LDDT | HDDV | MC | All Veh |
|---|---|---|---|---|---|---|---|---|---|---|
| Veh. Spd.: | 45.0 | 45.0 | 45.0 | | 45.0 | 45.0 | 45.0 | 45.0 | 45.0 | |
| VMT Mix: | 0.900 | 0.100 | 0.000 | | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | |

Composite Emission Factors (Gm/Mile)

| | | LDGV | LDGT1 | LDGT2 | LDGT | HDGV | LDDV | LDDT | HDDV | MC | All Veh |
|---|---|---|---|---|---|---|---|---|---|---|---|
| VOC | HC: | 1.57 | 1.50 | 1.89 | 1.50 | 3.95 | 0.40 | 0.54 | 1.20 | 3.29 | 1.57 |
| Exhst | HC: | 0.75 | 0.59 | 0.68 | 0.59 | 1.09 | 0.40 | 0.54 | 1.20 | 1.16 | 0.74 |
| Evap. | HC: | 0.24 | 0.28 | 0.51 | 0.28 | 1.88 | | | | 1.80 | 0.24 |
| Refuel | HC: | 0.19 | 0.25 | 0.25 | 0.25 | 0.41 | | | | | 0.19 |
| Runing | HC: | 0.18 | 0.18 | 0.24 | 0.18 | 0.39 | | | | | 0.18 |
| Rsting | HC: | 0.22 | 0.20 | 0.21 | 0.20 | 0.18 | | | | 0.33 | 0.22 |
| Exhst | CO: | 9.63 | 6.47 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 9.31 |
| Exhst | NOX: | 1.55 | 1.15 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1.51 |

Hot Stabilized Idle Emission Factors (Gm/Hr)

| | | LDGV | LDGT1 | LDGT2 | LDGT | HDGV | LDDV | LDDT | HDDV | MC | All Veh |
|---|---|---|---|---|---|---|---|---|---|---|---|
| VOCId | HC: | 33.08 | 36.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 33.37 |
| Idle | CO: | 350.73 | 419.34 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 357.59 |
| Idle | NOX: | 3.12 | 3.67 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 3.17 |

------------------------------------------------------------------------

# CORRESPONDENCE/MEMORANDUM

**STATE OF WISCONSIN**

Date:  June 29, 93                    *File Ref:*

To:  Sam Gieryn

From:  Ron Ramlow
       Milwaukee - LMI Unit

Subject:  Job Service Applicant File.

Per your request, the number of Job Service Appli-
cants registered as Warehouse Workers is as follows.

    Milwaukee County:   656
    Ozaukee       "       11
    Washington     "       14
    Waukesha       "      86
                        ———
                      767





**JOBS, EMPLOYMENT AND
TRAINING SERVICES DIVISION**

Janesville Job Service
211 North Parker Drive
Janesville, WI 53547
Telephone: (608) 758-6000
Fax:        (608) 758-6009

**State of Wisconsin**
## Department of Industry, Labor and Human Relations



**CLAUDE J. MILLER
LABOR MARKET ANALYST**

State of Wisconsin
Department of Industry,
Labor and Human Relations

211 North Parker Drive
P.O. Box 1489
Janesville, WI 53547
Telephone: (608) 758-6006

TO: Sam Gieyren

FROM: Claude Miller · $\mathcal{M}$ 7-1-93.

**Per your request** the number of applicants coded as warehouse workers
in Dodge and Jefferson Counties are:

Dodge Co--25

Jefferson Co--24

Please feel free to contact me if you need additional information.





JOBS, EMPLOYMENT AND
TRAINING SERVICES DIVISIC

Racine Job Service
411 - 7th Street
Racine, WI 53403
(414) 636-3577

**State of Wisconsin**
**Department of Industry, Labor and Human Relations**

July 13, 1993

Wisconsin Environmental Decade
Sam Gieryn
1001 East Keefe Avenue
Milwaukee, WI 53212

Dear Sam:

At you request I have checked the availability of warehouse
applicants registered with Job Service for the geographic area of
Racine and Kenosha Counties. The database was matched using the
three digit Dictionary of Occupational Titles code number 922 as
the search criterion. In Kenosha there were 136 applicants and in
Racine there were 298 applicants. If you have any further
questions feel free to call me at (414) 638-7213.

Sincerely,

Mark E. Mundl
Labor Market Analyst

cc:   file

To: Bill Rausch

From: Sam Gieryn
      WED