E-FILED
Tuesday, 09 October, 2018  01:46:29 PM
Clerk, U.S. District Court, ILCD

# Exhibit 2

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
#35
221329

**ORIGINAL**

UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT
No. 93-3380

VILLAGE OF OCONOMOWOC LAKE,

    Plaintiff-Appellant,

and      **ON AIMS**

TOWN OF SUMMIT,      NOV 1 6 1993

    Plaintiff,

v.

DAYTON HUDSON CORPORATION,
GEORGE E. MEYER, Secretary, and the
WISCONSIN DEPARTMENT OF
NATURAL RESOURCES,

    Defendants-Appellees,

and

VALDUS V. ADAMKUS, Regional
Administrator, CAROL BROWNER,
Administrator, and the U.S.
ENVIRONMENTAL PROTECTION
AGENCY,

    Defendants.

Appeal from the United States
District Court for the Eastern
District of Wisconsin

File No. 93-C-0797

Hon. John W. Reynolds
Presiding

U.S.C.A. – 7th Circuit
**F I L E D**

NOV 1 5 1993 **CB**

THOMAS F. STRUBBE
CLERK

DOC. #_____

U.S.C.A. – 7th Circuit
RECEIVED
NOV 1 5 1993

THOMAS F. STRUBBE
CLERK

546269

---

## PLAINTIFF-APPELLANT'S BRIEF

---

FRIEBERT, FINERTY & ST. JOHN, S.C.
    William S. Roush, Jr.
    Matthew W. O'Neill
    Attorneys for Plaintiffs-Appellants

P.O. ADDRESS:
330 East Kilbourn Avenue - Suite 1250
Milwaukee, Wisconsin 53202
(414) 271-0130



## CERTIFICATE OF INTEREST

The undersigned, counsel of record for Village of Oconomowoc Lake, plaintiff-appellant, furnishes the following information in compliance with Rule 26.1:

(1)    The full name of every party or amicus the attorney represents in this case:

        Village of Oconomowoc Lake

(2)    If such party or amicus is a corporation:

i)    Its parent corporation, if any; and

ii)    A list of stockholders which are publicly held companies owning 10% or more of the stock in the party or amicus:

        The Village of Oconomowoc Lake, is a municipal corporation, does not have a parent corporation and does not have any publicly held stockholders.

(3)    The names of all law firms whose partners or associates have appeared for the party in the case or are expected to appear for the party in this court:

        Friebert, Finerty & St. John, S.C.
        Two Plaza East - Suite 1250
        330 East Kilbourn Avenue
        Milwaukee, Wisconsin 53202
        Phone:    414/271-0130
        Fax:    414/272-8191

Dated at Milwaukee, Wisconsin, this 15th day of November, 1993.

        FRIEBERT, FINERTY & ST. JOHN, S.C.

        By: _Matthew W O'Neill_____
           William S. Roush, Jr.
           Matthew W. O'Neill

ii

## TABLE OF CONTENTS

CERTIFICATE OF INTEREST . . . . . . . . . . . . . . . . . . . . . . . . . . . .   ii

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   iii

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . .   v

JURISDICTIONAL STATEMENT . . . . . . . . . . . . . . . . . . . . . . . .   1

STATEMENT OF THE ISSUES . . . . . . . . . . . . . . . . . . . . . . . . .   3

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . .   4

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   5

STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   7

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   7

I.  THE DISTRICT COURT HAD JURISDICTION OVER THE VILLAGE'S CLEAN AIR ACT CLAIMS . . . . . . . . . . . . . . . .   7

    A.  The Clean Air Act is Intended to Cover Cases Where States Fail to Comply With Mandated Air Pollution Regulations . . .   8

    C.  In Order to Comply with the Clean Air Act, Wisconsin Elected to Regulate Indirect Stationary Sources of Pollutants in its Part D SIP . . . . . . . . . . . . . . . . . . . . . . . . . . .   13

    D.  The Undisputed Allegations in the Complaint Demonstrate the Distribution Center is a Major Stationary Source of $NO_x$ Emissions Under Wisconsin's Part D SIP . . . . . . . . . . . .   19

    E.  Wisconsin's Part D SIP is Enforceable Under the Clean Air Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   20

II.  THE DISTRICT COURT HAD JURISDICTION OVER THE VILLAGE'S CLEAN WATER ACT CLAIMS . . . . . . . . . . . . .   27

A.    The Complaint Alleges that Dayton Hudson Has Discharged and is Currently Discharging Pollutants in Violation of § 301(a) of the Clean Water Act . . . . . . . . . . . . . . . . . 27

B.    The Discharge of Pollutants into Groundwater Which Will Migrate to Navigable Waters is Covered Under the Clean Water Act. . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

C.    The District Court Failed to Consider Other Violations of the Clean Water Act Alleged in the Complaint . . . . . . . . . . . 37

     1.    The CWA Requires Persons to Obtain a Storm Water Discharge Permit to Commence Construction Which Will Involve the Disturbance of More Than Five Acres of Land Area . . . . . . . . . . . . . . . . . . . . . . . . 38

     2.    The Notice of Intent Submitted by Dayton Hudson to WDNR Does Not Constitute Compliance With the Clean Water Act . . . . . . . . . . . . . . . . . . . . . . 40

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

DISTRICT COURT DECISION AND ORDER

STATUTORY ADDENDUM

# TABLE OF AUTHORITIES

Cases

*Barnhart v. United States*, 884 F.2d 295 (7th Cir. 1989) . . . . . . . . . . . 7

*Connecticut Fund for the Environment v. U.S. EPA*, 672 F.2d 998
    (2nd Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . 24, 26, 27

*Dague v. City of Burlington*, 935 F.2d 1343 (2nd Cir. 1991),
    *rev'd*, 112 S.Ct. 2638 (1992) . . . . . . . . . . . . . . . . . . . . 1, 28

*Dague v. City of Burington*, 976 F.2d 801 (2nd Cir. 1992) . . . . . . . . . . 1

*Hoffman Homes, Inc. v. Administrator, U.S. EPA*, 961 F.2d 1310
    (7th Cir. 1992), *vacated*, 975 F.2d 1554, *on rehearing*, 999
    F.2d 256 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Hoffman Homes, Inc. v. Administrator, U.S.EPA*, 999 F.2d 250
    (7th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Inland Steel Co. v. EPA*, 901 F.2d 1419 (7th Cir. 1990) . . . . . . . . . . . 32

*Kelley v. United States*, 618 F. Supp. 103 (W.D. Mich. 1985) . . . . . . 30-33

*McClellan Ecological Seepage Situation v. Weinberger*, 707
    F. Supp. 1182 (E.D. Cal. 1988) . . . . . . . . . . . . . . . . . . . . 32, 36

*Natural Resources Defense Counsel v. U.S. EPA*, 494 F.2d 519
    (2nd Cir. 1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Oregon Environmental Counsel v. Oregon Department of
    Environment Quality*, 36 E.R.C. 1001 (D. Or. 1992) . . . . . . . . . 8

*Oregon Environmental Counsel v. Oregon Department of
    Environmental Quality*, 775 F. Supp. 353 (D. Or. 1991) . . . . . . . 8

*Pullman-Standard v. Swint*, 456 U.S. 273, (1982). . . . . . . . . . . . . . . 7

*United States v. Frezzo Brothers, Inc.*, 602 F.2d 1123 (3rd Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 41

*United States v. Byrd*, 609 F.2d 1204 (7th Cir. 1979) . . . . . . . 31, 33, 37

*United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 34

*Zands v. Nelson*, 779 F. Supp. 1254 (S.D.Cal. 1991) . . . . . . . . . . . . . 1

Statutes and Regulations

28 U.S.C. § 1291 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

33 U.S.C. § 1311 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

33 U.S.C. § 1311(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 29

33 U.S.C. § 1342 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

33 U.S.C. § 1365 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

42 U.S.C. § 7401, *et seq.* . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

42 U.S.C. § 7410(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

42 U.S.C. §§ 7501, *et seq.* . . . . . . . . . . . . . . . . . . . . . . . . . . passim

42 U.S.C. § 7502 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

42 U.S.C. § 7503 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

42 U.S.C. § 7511a . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 25

42 U.S.C. § 7604(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

33 C.F.R. § 320.4(b)(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

40 C.F.R. § 122.21(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

40 C.F.R. § 122.21(c)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 39

40 C.F.R. § 122.26 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38, 39

40 C.F.R. § 122.26(a)(1)(ii) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

40 C.F.R. § 122.26(b)(14) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

40 C.F.R. § 123.25(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

40 C.F.R. § 123.27(a)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

§ 144.30(16), Wis. Stats. (1991-92) . . . . . . . . . . . . . . . . . . . . . . . . 17

§ 144.30(23), Wis. Stats., (1981-82) . . . . . . . . . . . . . . . . . . . . . . . . 15

§ 144.391(1)(a), Wis. Stats. (1981-82) . . . . . . . . . . . . . . . . . . . . . . 16

§ 144.393(2), Wis. Stats. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18-20

§ 144.393(3)(a), Wis. Stats. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

§ NR 400.02(29), Wis. Admin. Code . . . . . . . . . . . . . . . . . . . . . . . . 15

§ NR 400.02(47), Wis. Admin. Code . . . . . . . . . . . . . . . . . . . . . . . . 16

§ NR 405.02(22)(d), Wis. Admin. Code . . . . . . . . . . . . . . . . . . . . . . 17

§ NR 400.02(64), Wis. Admin. Code . . . . . . . . . . . . . . . . . . . . . . . . 16

§ NR 406.01, Wis. Admin. Code . . . . . . . . . . . . . . . . . . . . . . . . 19

§ NR 406.02(3), Wis. Admin. Code . . . . . . . . . . . . . . . . . . . . . . . . 19

§ NR 406.06(1)(a), Wis. Admin. Code . . . . . . . . . . . . . . . . . . . . . . 19

§ NR 406.13, Wis. Admin. Code . . . . . . . . . . . . . . . . . . . . . . 18, 25

§ NR 408.02(21), Wis. Admin. Code . . . . . . . . . . . . . . . . . . . . . . . . 18

§ NR 408.02(21)(b), Wis. Admin. Code . . . . . . . . . . . . . . . . . . . . . . 18

§ NR 408.03(5), Wis. Admin. Code . . . . . . . . . . . . . . . . . . . . . . . 18

Other Authorities

42 Fed. Reg. 37128 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

45 Fed. Reg. 38419 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

46 Fed. Reg. 22374 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 14

53 Fed. Reg. 40415 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

55 Fed. Reg. 26814 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

57 Fed. Reg. 59928 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

## JURISDICTIONAL STATEMENT

The Plaintiff-Appellant, the Village of Oconomowoc Lake (the Village), commenced this action in the United States District Court for the Eastern District of Wisconsin on July 30, 1993, pursuant to the citizen suit statutes in the federal Clean Air Act, 42 U.S.C. § 7604(a)(1) through (3), and the federal Clean Water Act, 33 U.S.C. § 1365; and, prior to the filing of the action, the Village served a Notice of Intent to commence the action on July 26, 1993.  Personal service was accomplished upon all of the named defendants in the action pursuant to Rule 4, Fed.R.Civ.P. Defendant-Appellee Dayton Hudson Corporation is incorporated in the State of Minnesota and also has its principal place of business in the State of Minnesota.

The Village commenced the action on July 30, 1993, in reliance on the terms of 42 U.S.C. § 7604(a)(3), 33 U.S.C. § 1365 and the reported decisions in *Dague v. City of Burlington*, 935 F.2d 1343, 1349-50 (2nd Cir. (1991), *rev'd on other grounds*, 112 S.Ct. 2638 (1992)[1], and *Zands v. Nelson*, 779 F.Supp. 1254, 1260-61 (S.D.Cal. 1991.)

On September 24, 1993, the Clerk of District Court entered and docketed a final judgment, dismissing the Complaint in the action for lack of subject matter jurisdiction, consistent with the prior written Decision and Order of the District Court, issued on the same date.  After entry of the final judgment by the Clerk, the Village

---

[1] Certiorari was explicitly limited to the appropriateness of the attorneys fees awarded to the plaintiffs. *Dague v. City of Burlington*, 976 F.2d 801, 802 (2nd Cir. 1992).

1

filed a Notice of Appeal and paid the appropriate docketing fee on September 24, 1993, pursuant to Rule 3 and Rule 4, Fed.R.App.P.

The Court of Appeals for the Seventh Circuit has jurisdiction of this appeal as an appeal as of right pursuant to 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

The Village of Oconomowoc Lake filed this lawsuit alleging claims under the Clean Air Act and the Clean Water Act. The District Court dismissed the Complaint for lack of subject matter jurisdiction because it concluded: (1) Wisconsin's indirect source review program, adopted as part of its State Implementation Plan in order to comply with Part D of the Clean Air Act, is not enforceable under the Clean Air Act; and (2) groundwater which is connected by migration to navigable waters is not regulated by the Clean Water Act. Accordingly, the issues presented for review are:

1.      Does 42 U.S.C. § 7604(a)(3) include permits established in a State Implementation Plan, which is adopted pursuant to 42 U.S.C. § 7410(a) and Part D of the Clean Air Act, and formally approved by U.S. EPA?

        Answered by the District Court:          No.

2.      Is the intentional discharge of pollutants into a shallow groundwater aquifer which is hydrologically connected to nearby navigable waters of the United States subject to regulation under the Clean Water Act?

        Answered by the District Court:          No.

3.      Did the Village of Oconomowoc Lake properly state a cause of action under the Clean Water Act based upon Dayton Hudson's failure to apply for and obtain a Storm Water Discharge Permit prior to commencement of construction of the Target Distribution Center?

        Not answered by the District Court.

3

## STATEMENT OF THE CASE

On July 26, 1993, the Village served a Notice of Intent to commence a citizens' suit against Dayton Hudson, the Wisconsin Department of Natural Resources (WDNR) and its Secretary, and the U.S. EPA, its Administrator and Regional Administrator, pursuant to 42 U.S.C. §§ 7604(a)(1) through (a)(3), and 33 U.S.C. § 1365.  On July 30, 1993, the Village filed the Complaint in this matter, alleging, *inter alia*, that the Target Stores Distribution Center was being constructed in violation of the Clean Air Act (CAA) and in violation of the Wisconsin State Implementation Plan (SIP) that was approved by the U.S. EPA pursuant to § 110 of the CAA, 42 U.S.C. § 7410, and that the ongoing construction of the Distribution Center without a permit violated the Clean Water Act.

On August 27, 1993, the defendants moved to dismiss the Complaint for lack of federal subject matter jurisdiction.  On September 24, 1993, the District Court entered a Decision and Order granting the motion to dismiss for lack of federal subject matter jurisdiction, and formally dismissed the action.  (The District Court's *Decision and Order* is appended to the end of this Brief).  Pursuant to Rules 3 and 4, Fed. R. App. P., the Village filed a Notice of Appeal on September 24, 1993.

On October 8, 1993, the Village moved the District Court pursuant to Rule 62(c), Fed. R. Civ. P., for injunctive relief to prevent further construction of the Distribution Center pending the Village's appeal of the District Court's Decision and Order to this Court.  On October 13, 1993, the District Court denied the Village's motion.  On

4

October 29, 1993, the Village moved this Court for injunctive relief pending appeal pursuant to FRAP 8. That motion is currently pending.

## STATEMENT OF FACTS

Target Stores, a division of Dayton Hudson Corporation, is currently constructing a 1.1 million square foot Distribution Center on 100 acres of land at the northwest quadrant of the intersection of State Highway 67 and County Highway B in the City of Oconomowoc, Wisconsin. *Complaint*, ¶ 8 (*Appx.*, p. 11).[2] *See also Appx.*, p. 88.[3] The Village of Oconomowoc Lake lies immediately to the northeast of the proposed facility, surrounding Oconomowoc Lake. (*Appx.*, pp. 67-68). The site on which the Distribution Center is currently being constructed is abutted on the east and west by private residences, on the north by the Olympia Resort and on the south by a corporate park. *Complaint*, ¶ 11 (*Appx.*, p. 12, 88-89). An elementary school attended by 500 children is immediately east of the site, on the northeast corner of State Highway 67 and County Highway B. *Id.*

On April 9, 1993, Dayton Hudson filed a Notice of Intent (NOI) with WDNR for the proposed construction of the Distribution Center. (*Appx.*, pp. 68-72). On April 22, 1993, WDNR informed Dayton Hudson by letter of its receipt of Dayton Hudson's NOI,

---

[2] "*Appx.*, p. ___." refers to the Petitioner-Appellant's Appendix.

[3] Page 88 of the Appendix is a reproduction of an aerial photograph that was originally published on August 6, 1993, in the *Milwaukee Journal*. Viewing the facility from the south-southwest to the north-northeast, the photograph depicts the status of the Target Distribution Center at that time, and the location of the Distribution Center with respect to the Village of Oconomowoc Lake.

and stated that WDNR intended to have a general construction site storm water discharge permit available for issuance at an unspecified future date, after WDNR promulgated administrative rules regarding such discharges. (*Appx.*, p. 61-67). WDNR stated that the proposed Distribution Center construction would be covered by the permit as soon as it was issued. (*Appx.*, p. 61).

According to the Affidavit of Dean Wenger, a Dayton Hudson employee, construction of the Distribution Center began on June 4, 1993, and is continuing on a daily basis. (*Appx.*, pp. 90-92). The plans for the Distribution Center include a parking lot and vehicle storage facilities sufficient to hold in excess of 1,300 vehicles, including over 600 employee vehicles and 700 semi-trailers. *Complaint*, ¶ 10 (*Appx.*, p. 12). The plans also include a 10,000 gallon above-ground diesel fuel storage tank for the on-site fueling of semi-trucks and yard vehicles. *Id.*

A significant feature of the Target Distribution Center is the collection of all surface water runoff from the 1.1 million square foot roof of the building and more than 25 acres of paved areas, and the discharge of such runoff to a 6-acre retention pond, where it will be intentionally "exfiltrated" to the groundwater aquifer immediately beneath it. *Complaint* ¶ 45 (*Appx.*, p. 22). The private residences in the Town of Summit abutting the construction site on the east depend upon shallow "sand point" groundwater wells to supply drinking water. *Complaint*, ¶ 11 (*Appx.*, p. 12). The residents of the Village of Oconomowoc Lake, a few thousand feet to the northeast of the Distribution Center, depend upon shallow groundwater wells in that aquifer for drinking water, just

6

like the Town of Summit residents along Summit Center Drive. *Complaint*, ¶¶ 11, 51 (*Appx.*, pp. 12, 23).

## STANDARD OF REVIEW

This case was determined on a motion to dismiss pursuant to Fed. R. Civ P. 12(b)(1) for lack of federal subject matter jurisdiction. The District Court stated that in resolving the motion, it did not consider "facts outside the complaint." *Decision and Order*, p. 3 n.2. Therefore, because the issues before the Court involve only questions of law, the standard of review is *de novo*. *Pullman-Standard v. Swint*, 456 U.S. 273, 287 (1982).

On review of a District Court's grant of a motion to dismiss for want of subject matter jurisdiction, this Court has stated that it will reverse the decision "if there were any set of facts upon which relief might be granted." *Barnhart v. United States*, 884 F.2d 295, 296 (7th Cir. 1989).

## ARGUMENT

### I.   THE DISTRICT COURT HAD JURISDICTION OVER THE VILLAGE'S CLEAN AIR ACT CLAIMS.

The essence of the Village's CAA claim under 42 U.S.C. § 7604(a)(3) is that the Target Distribution Center is a major indirect source of $NO_x$ for which a permit is required under Wisconsin's Part D SIP, as approved by the U.S. EPA pursuant to § 110 of the CAA, 42 U.S.C. § 7410. Because Dayton Hudson applied for and was issued a "minor, new, attainment air pollution source" permit rather than a new, major,

7

nonattainment area permit, Dayton Hudson has never applied for or obtained the necessary permit to construct such a major nonattainment area source, no state or federal agency has made the findings necessary to support the issuance of such a permit,[4] and the ongoing construction violates the Wisconsin Part D SIP and the CAA.

## A. The Clean Air Act is Intended to Cover Cases Where States Fail to Comply With Mandated Air Pollution Regulations.

This case is what the Clean Air Act citizen suit statute, 42 U.S.C. § 7604(a), is all about. When a State fails to fulfill the promises it has made to the federal government under the CAA, Congress chose to enlist the assistance of citizens and has given them a forum before a disinterested and non-elected federal judiciary to compel compliance. That is why Congress created the citizen suit statute in the first instance, and that is why Congress strengthened and broadened the citizen suit statute in the CAA Amendments of 1977, when it created Part D of the CAA. *See, e.g., Oregon Environmental Counsel v. Oregon Department of Environmental Quality*, 775 F. Supp. 353, 364 (D. Or. 1991); *Oregon Environmental Counsel v. Oregon Department of Environment Quality*, 36 E.R.C. 1001, 1012-13 (D. Or. 1992).

The importance of the availability of a federal forum in which to ensure compliance with environmental regulation dictated by the CAA is highlighted when local political pressure and a State's overriding desire for economic development cause a State

---

[4] This factor completely distinguishes this case from cases in which a State agency properly applied the law to the facts and made the necessary findings, but the plaintiffs contended that the findings or the supporting review was erroneous.

to overlook or ignore those regulations.  The City of Oconomowoc wants the Distribution Center to be constructed so that the City can benefit from $800,000 a year in property tax revenues.  The State of Wisconsin wants the Distribution Center to be constructed in Wisconsin because it too will benefit from the influx of capital and the creation of jobs. The State has either paid or promised to pay Dayton Hudson and the City at least $ 1.1 million in State funds for land acquisition costs and road reconstruction costs, in order to induce Dayton Hudson to put the facility in the State of Wisconsin.[5]

In this case, Wisconsin was in direct competition for the Distribution Center with the State of Illinois.   Although Wisconsin elected to continue regulating "indirect"

---

[5] The influence of the State's zeal in securing and promoting the project was rather startlingly set out in the text of an April 15, 1993, "E-mail" memo to the Director of Wisconsin's Bureau of Air Management, Mr. Donald Theiler, from Mr. Ralph Patterson, an employee of the WDNR who was directly involved in the permitting of the Distribution Center:

> Target received a conditional use permit from the Oconomowoc City Council last night.  Our permit is the only permit they need to complete construction.
>
> * * *
>
> Mike Scott and I have a real concern regarding how the environmental assessment was handled by [southeast] district in this project.  *If you can believe this, the environmental assessment states that this project will "cause a significant increase in ground level ozone.*["]
>
> . . .  I would speculate, and Mike Scott does not disagree with this speculation, that *if we are brought to court on this we may be forced into completing an EIS which would delay the permit.  Target wants to dig dirt on May 1.  This would not make Governor Thompson look very good.*  (emphasis added)

*Complaint*, Exhibit A (*Appx.*, p. 33).

stationary sources in 1981, *see* 46 Fed. Reg. 22374[6] (discussed *infra* at pp. 13-19), the State of Illinois has no regulatory program for "indirect" stationary sources of air pollution.  It is also a matter of common knowledge that for more than a decade the State of Wisconsin and the State of Illinois have been bickering over who is to blame for the "Severe Area" of ozone nonattainment in southeast Wisconsin.  The two states routinely object to the inadequacies of each others' State Implementation Plan for ozone control; and, in 1980, Wisconsin went so far as to sue U.S. EPA to compel Illinois to implement more stringent controls over ozone precursors such as nitrogen oxides ($NO_x$) and volatile organic compounds (VOCs).[7]

Regardless of Wisconsin's desire for economic development, the fact remains that in 1981, pursuant to 42 U.S.C. § 7410(a)(5)(A)(i), the State of Wisconsin formally obligated itself to the federal government that, in order to reduce air pollution in Southeastern Wisconsin and other areas of "nonattainment," Wisconsin would regulate "indirect" stationary sources of air pollution in the same way it regulated "direct" stationary sources of air pollution, and that Wisconsin would subject both types of sources to the requirements of a State Implementation Plan (SIP) adopted pursuant to Part D of the CAA, 42 U.S.C. §§ 7501, *et seq.*

---

[6] Relevant rulemakings, states statutes and state and federal regulations are appended as an Addendum to this Brief.

[7] *See, e.g.,* 57 Fed. Reg. 59928 (12/17/92) (Wisconsin opposed lifting of sanctions against Illinois); 53 Fed. Reg. 40415 (10/17/88) (Wisconsin submitted comments opposing approval of portion of Illinois SIP); and 55 Fed. Reg. 26814 (6/29/90) (discussing *Wisconsin v. Reilly*, Case No. 87-C-0395 (E.D. Wis.)).  Relevant portions of the Federal Register are included in the Statutory Addendum.

As a result of Wisconsin's refusal to abide by its legal obligations in this case, the Village and its residents will suffer the exacerbation of unhealthful air quality in one of the few areas of the United States that has been classified as a "Severe Area" of ozone nonattainment.[8] The State cannot reasonably dispute the fact that the Distribution Center is a "major source" of nitrogen oxides ($NO_X$), an ozone "precursor." The State's own witness testified under oath that the Distribution Center will cause the emission of 327 tons of $NO_X$ per year.

> Q    Mr. Meier, I believe earlier we agreed that with respect to conducting an analysis like Exhibit 2, rather than 740 trucks per day we ought to use 504 trucks per day; correct?
>
> A    Yes.
>
> Q    And instead of 365 days per year, we should use 313 days per year; correct?
>
> A    Yes.
>
> **Q    Using 504 trucks per day, 313 days per year, with the average trip length of 50 miles, I'd like you to calculate, if you would, for me the total annual emissions of nitrogen oxide using the emission factor for heavy duty diesel vehicles traveling at 55 miles per hour that was calculated by Mobile 5.a in Exhibit 20.[9]**
>
> **A    Comes out to 327, if I punched the numbers correctly.**

---

[8] Only Los Angeles and the Upper Metroplex of New York City have worse ozone problems than Southeast Wisconsin.

[9] The U.S. EPA Mobile 5a computer model produces separate emission factors for carbon monoxide (CO), nitrogen oxides ($NO_X$), and hydrocarbons (HC), for a variety of vehicle types, ranging from light duty gas vehicles (LDGV) to semi-trucks or heavy duty diesel vehicles (HDDV).

Q      So, that would be 504 trucks per day -- just so I can run through the
       calculation, make sure I understand it, that would be 504 trucks per
       day, times 50 miles, times two trip ends per truck, times 313 days
       per year, times the emission factor of 18.83 grams per mile, divided
       by the conversion factor of 907,185 grams per ton?

A      That's correct.  Yes.

                             *   *   *   *   *

**Q      Now, you'd agree, then, I take it, that 327 tons per year is a
       reasonable estimate of the total annual emissions of nitrogen
       oxides for this facility as an indirect source?**

                    [Colloquy Omitted]

**THE WITNESS:  Yes, the way that the methods are, as far as
the arithmetic works out.**

*Meier Deposition*, pp. 119-20 (Appx. pp. 85-86).  Incredibly, the State completely failed

during the permitting process to calculate the total annual $NO_x$ emissions attributable to

the facility; the State failed to treat the facility as a major nonattainment area pollution

source, despite the fact that its own statutes and regulations required it to do so; and,

instead, the State treated the facility as a "minor, new, attainment air pollution source."

**B.     The Clean Air Act Has Consistently Required Each State to Adopt
       Enforceable Measures Designed to Promote Compliance with the
       National Ambient Air Quality Standards (NAAQS).**

       A long time ago Congress determined that something had to be done to eliminate

unhealthful air pollution in our Nation's urban areas.  The result was the Clean Air Act,

42 U.S.C. § 7401, *et seq.*  But the States' and local governments' continued inability and

unwillingness to take the steps necessary to reduce air pollution to the health-based

standards promulgated by U.S. EPA, has forced Congress to "take a stick" to the States on three separate occasions in the last 23 years, compelling them to propose, implement *and* enforce ever more stringent air pollution control measures, under the threat of federally ordered construction moratoriums or the withdrawal of federal funding for State projects, in order to attain compliance with the federally established National Ambient Air Quality Standards (NAAQS).

The first "stick" was the CAA Amendments of 1970; the second "stick" was the CAA Amendments of 1977; and, the latest "stick" was the CAA Amendments of 1990. Unless the federal courts are willing to enforce these requirements and the legally binding commitments of the States, however, the will of Congress will continue to be entirely frustrated.

In this case, the District Court erroneously concluded that it did not have "subject matter jurisdiction" to hear this case because 42 U.S.C. § 7604(a)(3) did not confer jurisdiction on the Court to enforce those portions of the Wisconsin SIP that had been submitted to and approved by U.S. EPA under Part D of the CAA, pursuant to 42 U.S.C. § 7410(a)(5)(A)(i).

**C.     In Order to Comply with the Clean Air Act, Wisconsin Elected to Regulate Indirect Stationary Sources of Pollutants in its Part D SIP.**

Wisconsin is one of the few States that elected, pursuant to 42 U.S.C. § 7410(a)(5)(A)(i), to continue its regulation of "indirect" sources of air pollution after Congress gave the States the option to rescind their indirect source review programs in

13

the CAA Amendments of 1977, codified at 42 U.S.C. § 7410(a)(5)(A)(i) through (iii). In order to comply with the mandatory requirements of 42 U.S.C. §§ 7502 and 7503, that were also a part of the 1977 CAA Amendments, Wisconsin amended its statutes to incorporate the new Part D requirements, making them applicable to both direct and indirect stationary sources under Wisconsin's existing indirect source review program. U.S. EPA issued its Notice of Proposed Rulemaking to incorporate the amended statutes and regulations into Wisconsin's SIP on June 9, 1980, 45 Fed. Reg. 38419.  The Final Rulemaking was published on April 27, 1981, at 46 Fed. Reg. 22374.

The 1981 revision of the Wisconsin SIP responded to the new provisions of 42 U.S.C. §§ 7502 and 7503, in Part D of the CAA, that forced States to submit SIP revisions requiring preconstruction review or New Source Review (NSR) of major emitting sources in "nonattainment areas," and prohibiting the construction of new major sources of air pollutants in nonattainment areas until: (a) sufficient, legally binding and federally enforceable off-setting emission reductions had been obtained from allowable emissions from existing sources (§ 7503(a)(1)(A)); (b) the source demonstrated compliance with the lowest achievable emission rate (LAER) (§ 7503(a)(2)); (c) the owner of the new source demonstrated that all of its other sources were in compliance with emission limitations (§ 7503(a)(3)); and, (d) an analysis of alternative sites, sizes, production processes, and environmental control techniques for such proposed source demonstrated that the benefits of the proposed source significantly outweighed the

14

environmental and social costs imposed as a result of its location, construction or modification (§ 7503(a)(5)).

One of the statutes incorporated by reference in the 1981 Part D SIP rulemaking was Wisconsin's definition of "stationary source" that, as permitted by 42 U.S.C. § 7410(a)(5)(A)(i), included both *direct* and *indirect* sources of air contaminants:

> "Stationary source" means any facility, building, structure or installation that *directly* or *indirectly* emits or may emit an air contaminant only from a fixed location. . . . (Emphasis supplied.)

§ 144.30(23), Wis. Stats., (1981-82).  The WDNR regulatory definitions of "direct" stationary sources and "indirect" stationary sources were also incorporated by reference; and, although they have been renumbered since 1981, those definitions have always provided as follows:

> *"Direct Source" means any stationary source* which may directly result in the emissions of any air pollutant or contaminant at a fixed location (e.g., building demolition, foundry, grain elevator, gravel or stone quarry, paper mill, power plant, etc.).  (Emphasis supplied.)

§ NR 400.02(29), Wis. Admin. Code.

> *"Indirect source" means any stationary source* which conveys motor vehicles or which attracts or may attract mobile source activity and thus indirectly causes the emission of any air contaminant.  Such indirect sources include, but are not limited to highways and roads; parking facilities; retail, commercial and industrial facilities; airports; office and governmental buildings; and educational facilities. (Emphasis supplied.)

15

§ NR 400.02(47), Wis. Admin. Code. Thus, for all purposes under the CAA, in the Wisconsin Part D SIP the term "stationary source" includes both "direct" stationary sources and "indirect" stationary sources.

The 1981 rulemaking by U.S. EPA also incorporated by reference what was then the statutory definition of a nonattainment "major source":

> *Nonattainment area major source.* A stationary source is a nonattainment area major source if:
>
> 1. The source is located in a nonattainment area or may significantly affect the air quality in a nonattainment area; and
>
> 2. The source, considering air pollution control equipment, is capable of emitting an air contaminant for which the area is classified as a nonattainment area in the following amounts:
>
> a. *One hundred tons per year or more of* sulfur dioxides, particulate matter, carbon monoxide, *nitrogen oxides or volatile organic compounds.* (Emphasis supplied.)

§ 144.391(1)(a), Wis. Stats. (1981-82). Nitrogen oxides and volatile organic compounds (VOCs) are both ozone "precursors" that interact with sunlight to form ozone. § NR 400.02(64), Wis. Admin. Code. Waukesha County was a nonattainment area for ozone in 1981, just as it is a "Severe Area" of ozone nonattainment now. *Complaint,* ¶ 24 (*Appx.,* p. 16). The 327 tons per year of $NO_x$ that the State's witness testified would be caused by the Distribution Center is certainly more than the 100 tons per year allowed by the 1981-82 statute.

The 1981-82 statutory definition of "major source" was subsequently amended to define "major source" in terms of rules that were promulgated by the WDNR. *See, e.g.,*

§ 144.30(16), Wis. Stats. (1991-92).  For purposes of construction permits issued to new sources[10] in "Severe Areas" of ozone nonattainment, the WDNR rules currently define "major source" as follows:

(21)  "Major source" means:

(a)1.  *Any direct stationary source* of air pollutants . . . .

2.  *Any stationary source* of nitrogen oxides specified under par. (b);

. . . .

(b)  For the purposes of applying the requirements of s. NR 408.03(5), a stationary source for which a complete construction permit application was submitted or required to be submitted *after November 15, 1992,* is major for nitrogen oxides if it is located in any ozone nonattainment area or ozone transport region and it emits, or has the potential to emit, nitrogen oxides as follows:

. . . .

---

[10] Under WDNR's existing rules there are very important differences between the Part D SIP definition of "major source" applicable to new, "major source" construction permits for indirect sources under Chapter NR 408, Wis. Admin Code, versus the definition of "major stationary source" in Chapter NR 405, Wis. Admin. Code, applicable to Prevention of Significant Deterioration (PSD) requirements for direct and indirect stationary sources.  The PSD definition of "major stationary source," in § NR 405.02(22)(d), Wis. Admin. Code, expressly excludes any consideration or counting of "indirect" motor vehicle emissions in determining the major/minor status of the facility:

(d) Mobile source emissions indirectly caused by a source which attracts Mobile source activity may not be considered in determining whether the source is a major stationary source *for the purposes of this chapter.*

The absence of any comparable exclusion in the nonattainment area New Source Review regulations for indirect source construction permits in Chs. NR 406 and 408, Wis. Admin. Code, is conclusive of the fact that "indirect" vehicle emissions *are* counted for purposes of the latter regulations that are part of the Part D SIP.

17

(3)  Twenty-five TPY or more of nitrogen oxides in any severe nonattainment area for ozone;  (Emphasis supplied.)

§ NR 408.02(21)(a)1., (a)2., and (b)3, Wis. Admin. Code.  The terms of § NR 408.03(5), Wis. Admin. Code, then require that the provisions of §§ NR 408.04 through NR 408.10, Wis. Admin. Code, be applied to new construction permits for major sources of NO$_X$ as defined by § NR 408.02(21)(b), Wis. Admin. Code.[11]

Any doubt about the applicability of Chs. NR 406 and 408, Wis. Admin. Code, to "indirect" stationary sources can be conclusively resolved by reference to WDNR's own rule granting indirect major sources an exemption from only one of the four, separate, Part D SIP permit criteria for nonattainment area major sources currently found in § 144.393(2), Wis. Stats.

> **NR 406.13 Exemption from requirements for indirect sources.**  Pursuant to s. 144.393(4)(a), Stats., the permit requirements in s. 144.393(2)(b) and (3)(a), Stats., do not apply to indirect sources.

§ NR 406.13, Wis. Admin. Code.  Indirect sources are thus exempted from the Part D SIP criteria in § 144.393(2)(b), Wis. Stats., requiring that new sources achieve the "lowest achievable emission rate" (LAER); and, they are also exempt from the requirements for new major sources in attainment areas under § 144.393(3)(a), requiring the application of the "best available control technology" (BACT).  Indirect sources continue to be subject to the remaining Part D SIP criteria in § 144.393(2), Wis. Stats.

---

[11] The ratcheting down of the definition for "major source" of NO$_X$ and VOCs in ozone nonattainment areas resulted from the requirements of the amendments to Part D of the CAA that were part of the CAA Amendments of 1990, 42 U.S.C. § 7511a.

The fact that WDNR promulgated specific, but limited regulatory exemptions for indirect sources in attainment and nonattainment areas should be conclusive of the fact that the other Part D SIP permit criteria in § 144.393(2), Wis. Stats., are legally applicable to "indirect" major stationary sources of $NO_x$ in ozone nonattainment areas, including: (a) the requirement for federally enforceable emission offsets (144.393(2)(a)); (b) the requirement that the applicant's other sources be in compliance (144.393(2)(c)); and (c) most particularly, the detailed analysis of alternatives required under § 144.393(2)(d), Wis. Stats.

Since the Target Distribution Center is located in a "metropolitan county" as defined in § NR 406.02(3), Wis. Admin. Code,[12] and since the Target Distribution Center has a parking capacity greater than 1000 vehicles, it is subject to the construction permit requirements of the Wisconsin Part D SIP and 42 U.S.C. § 7503. § NR 406.06(1)(a), Wis. Admin. Code. As specified by § NR 406.01, Wis. Admin. Code: "For nonattainment area major sources the construction permit requirements of ch. NR 408 apply in addition to the requirements of this chapter."

**D.    The Undisputed Allegations in the Complaint Demonstrate the Distribution Center is a Major Stationary Source of $NO_x$ Emissions Under Wisconsin's Part D SIP.**

As proof of the total annual $NO_x$ emissions caused by the Target Distribution Center, the Village incorporated by reference an affidavit of Dr. Tony E. Eggleston into

---

[12] The note to the regulation identifies the Counties of Kenosha, Milwaukee, Racine, and Waukesha as being among those so designated.

the Complaint, wherein Dr. Eggleston averred that the Distribution Center will cause the emission of more than 300 tons per year of $NO_x$ in counties which are designated as Severe Areas for ozone nonattainment. *Complaint*, Exhibit B (*Appx.*, pp. 34-35). Since then, the Village also obtained and submitted to the District Court the sworn testimony of Mr. John Meier, the WDNR employee responsible for determining whether the Distribution Center was a major or minor source of air pollutants and contaminants under the CAA and Wisconsin's SIP. Mr. Meier testified that, in making the major/minor determination for the Distribution Center, he did not calculate the $NO_x$ emissions. Upon reexamination of the data supplied by Dayton Hudson, and applying for the first time WDNR's customary method of calculating total annual emissions, Mr. Meier testified that the facility will cause the emission of 327 tons per year of $NO_x$. *See supra*, pp. 11-12.

The State cannot reasonably dispute the fact that the Distribution Center will cause the emission of over 300 tons per year of $NO_x$. Pursuant to the Wisconsin Part D SIP, any source emitting more than 25 tons per year of $NO_x$ is a "major source." The Distribution Center is plainly a "major source" of $NO_x$ for which a Part D permit is required. *See* § 144.393(2), Wis. Stats. The WDNR never required and Dayton Hudson never obtained such a permit.

### E.    Wisconsin's Part D SIP is Enforceable Under the Clean Air Act.

In its Decision and Order dismissing plaintiff's Complaint, the District Court distinguished between claims seeking enforcement of a State SIP under 42 U.S.C. § 7604(a)(1), versus claims under 42 U.S.C. § 7604(a)(3) to prevent persons from

20

constructing a new major source of air contaminants in a nonattainment area without a permit "required under" Part D of the CAA.   The essence of the District Court's Decision and Order was that, even if the Wisconsin SIP required Part D permits for major indirect sources of $NO_X$, such permits were nonetheless not "required under" Part D of the CAA.

> The plaintiffs point out, however, that although Wisconsin was not required to adopt an "indirect source review program," it has chosen to do so, and the program, along with the rest of the Wisconsin SIP, has been approved by the EPA in accordance with the CAA.   See 42 U.S.C. § 7410(a)(5)(A)(i).   As a result of that approval, plaintiffs contend, the requirements of the Wisconsin SIP have become, in effect, the requirements of the CAA.   Thus, plaintiffs say, if the SIP requires Dayton-Hudson to obtain a major-source permit prior to construction of the Center, then the permit is also required under the CAA, and so the citizen-suit provision applies.
>
> *The difficulty with this analysis is that the pertinent citizen-suit provision refers only to permits "required under" Parts C or D of the Act, and nothing in those parts purports to incorporate by reference the permit requirements of an approved SIP.*   This is significant, because when Congress intended to allow civil actions or enforcement actions based on noncompliance with the terms of a SIP, as opposed to the terms of the CAA, it made that clear.   Under a separate citizen-suit provision, for example, a federal suit may be brought against "any person . . . who is alleged to be in violation of . . . an emission standard or limitation under this act," and such a standard or limitation is defined to include any "standard limitation, or schedule established . . . under any applicable State implementation plan."   42 U.S.C. §§ 7604(a)(1), 7604(f)(4).   See also 42 U.S.C. §§ 7413(a)(1) (permitting EPA to issue orders requiring compliance with "an applicable implementation plan").   (Emphasis supplied.)

21

*Decision and Order*, pp. 5-6.[13]  Since Wisconsin, in its Part D SIP, elected to require permits for both new "direct" and "indirect" major stationary sources in nonattainment areas, but the federal statutes in Part D did not compel Wisconsin to do so, the District Court concluded it had no jurisdiction under 42 U.S.C. § 7604(a)(3) and dismissed the Complaint.

The Village submits that the first error in the District Court's reasoning lies in the fact that Part C (Prevention of Significant Deterioration) and Part D (Nonattainment Area New Source Construction Permits) of the CAA *do not* in any way create any federal permitting program for permits to be "required under" their respective provisions. Rather, and specifically with respect to Part D, the federal statutes require States to submit revisions to their SIPs, to adopt specific emission control strategies to regulate and issue State permits to new major sources in nonattainment areas.  As part of their Part D SIP, States are free to elect to regulate both direct and indirect sources in nonattainment areas in the same fashion pursuant to 42 U.S.C. § 7410(a)(5)(A)(i).

The second error in the District Court's reasoning lies in the fact that the federal statutes, by their terms, do incorporate by reference the provisions of each State's SIP. The conclusion that the language in 42 U.S.C. § 7604(a)(3) regarding permits "required

---

[13] As the District Court pointed out in its Decision and Order, the federal definition of "stationary source" applicable to Part D would exclude "indirect" stationary sources.  However, the federal definition reflects the prohibition against the Administrator *requiring* States to regulate indirect sources that was codified in 42 U.S.C. § 7410(a)(5)(A) as part of the CAA Amendments of 1977, but does not preclude States from electing to apply a broader definition of "stationary source" to regulate indirect stationary sources as part of their Part D SIP submittal under 42 U.S.C. §§ 7410(a)(5)(A)(i) and 7502, *et seq.*

under" Part D refers to the Wisconsin Part D SIP is made manifest from the terms of the

statutes themselves.   The basic statute requiring the submittal of the Wisconsin SIP, 42

U.S.C. § 7410(a), provides as follows:

> (a)  .  .  .
>
> (2)  Each implementation plan submitted by a State under this Chapter shall be adopted by the State after reasonable notice and public hearing.  Each such plan shall - ·
>
> .  .  .
>
>    (C)  Include a program to provide for the enforcement of the measures described in subparagraph (A), and regulation of the modification and construction of any stationary source within the areas covered by the plan as necessary to assure that national ambient air quality standards are achieved, *including a permit program as required in parts C and D;*
>
> .  .  .
>
> (5)(A)(i)  Any State may include in a State implementation plan, but the Administrator may not require as a condition of approval of such plan under this section, any indirect source review program.   The Administrator may *approve and enforce, as part of an applicable implementation plan, an indirect source review program which the State chooses to adopt and submit as part of its plan.* (Emphasis supplied.)

42 U.S.C. §§ 7410(a)(2)(C) and (a)(5)(A)(i).  The quoted statute makes it clear that the

permits "required under" Part D are the permits "required under" the Wisconsin SIP, and

that the provisions of a state SIP are unenforceable under the CAA.   As part of its

strategy for regulating air pollution in nonattainment areas, Wisconsin could and did elect

to regulate indirect sources of air pollutants by requiring them to obtain a permit under

that portion of the Wisconsin SIP that was submitted to U.S. EPA for approval pursuant to Part D.

The statutes that comprise Part D of the CAA, 42 U.S.C. §§ 7501, *et seq.*, expressly contemplate the incorporation by reference of the plan and permitting program submitted by Wisconsin under 42 U.S.C. § 7410(a). The terms of 42 U.S.C. § 7502(c), entitled "Nonattainment Plan Provisions," required that SIP revisions be submitted by Wisconsin under Part D for the implementation of all "reasonably available control measures" as expeditiously as practicable. 42 U.S.C. § 7502(c)(1). The same statute required Wisconsin to submit plans to demonstrate reasonable further progress towards attainment of the NAAQS in nonattainment areas. 42 U.S.C. § 7502(c)(2). More particularly, the same statute required Wisconsin to submit SIP revisions to: ". . . include enforceable emission limitations, *and such other control measures, means or techniques . . . as may be necessary or appropriate* to provide for attainment of such standard in such area by the applicable attainment date specified in this part." 42 U.S.C. § 7502(c)(6).

As suggested by the Court of Appeals' decision in ***Connecticut Fund for the Environment v. U.S. EPA***, 672 F.2d 998 (2nd Cir. 1982), requiring indirect sources to obtain a permit under the SIP submitted pursuant to Part D of the CAA is an available "control measure" and may even be a "reasonably available control measure" for States, such as Wisconsin, to reduce pollutants and make "reasonable further progress" towards attaining compliance with the NAAQS.

24

> In its Brief, EPA argues in the alternative that ISR [Indirect Source Review] is not a RACM [Reasonably Available Control Measure] since, among other reasons, it is "politically unacceptable."   We have no need to reach the overall argument, but we categorically reject the notion that the political acceptability of a measure has any relevance to whether the measure is "reasonably available" under section 7502(b)(2).

*Id.* at 1014 n. 32; *citing Natural Resources Defense Counsel v. U.S. EPA*, 494 F.2d 519, 524 (2nd Cir. 1974) (rejecting social unacceptability test).  Based on the approval of Wisconsin's Part D SIP revision in 1981, the terms of § 144.393(2), Wis. Stats., and the very limited exemption to the Part D SIP requirements for indirect sources found in § NR 406.13, Wis. Admin. Code, it is clear that this was indeed intended to be part of Wisconsin's Part D strategy.

Although 42 U.S.C. § 7503 is entitled "Permit Requirements," it is nonetheless clear that the permits referred to and "required under" § 7503 are those that are required by the States' SIP revisions that were submitted pursuant to § 7502 and approved under § 7410(a).  The statute expressly refers to, "the permit program required by § 7502(b)(6) [sic: 7502(c)(6)] of this title . . . ."  Similarly, the terms of 42 U.S.C. § 7511a(d), applicable to "Severe Areas" of nonattainment, compelled the States to submit revisions to their SIPs and their individual State permit programs, rather than creating programs for U.S. EPA to issue federal permits "required under" the amended provisions of Part D of the CAA.

> Each state in which all or part of a Severe Area is located shall, with respect to the Severe Area, make the submissions

> described under subsection (c) of this section (relating to
> Serious Areas), and shall also submit the revisions to the
> applicable implementation plan (including the plan items)
> described under this subsection.

*Id.* The numerous references to State plans, State plan submissions, and the numerous

cross references in Part D to the SIPs approved under 42 U.S.C. § 7410(a), inevitably

lead to the conclusion that the words "required under . . . Part D" in 42 U.S.C.

§ 7604(a)(3) can only refer to the Wisconsin SIP that was submitted to U.S. EPA for

approval under § 7410(a)(2) and (5).

The inextricable intertwining of Part D and the option to regulate indirect sources

of air pollution was also explicitly recognized in *Connecticut Fund for the Environment*,

*supra*.  In that case, an administrative appeal of U.S. EPA's review and approval of

Connecticut's Part D SIP submittal and Connecticut's proposal to rescind its indirect

source permitting program, the petitioner contended that U.S. EPA was precluded from

approving the rescission of that part of the Connecticut SIP requiring permits for indirect

sources in nonattainment areas under Part D, based on the argument that the statute

creating the rescission option, 42 U.S.C. § 7410(a)(5)(A)(iii), did not explicitly refer to

Part D of the CAA.  The Court of Appeals flatly rejected the argument:

> Section 7410(a)(2)(I) links Part D to the general SIP revision
> process.  All SIPs are submitted under § 7410; if they are for
> nonattainment areas, the only difference is that Part D poses
> additional requirements.  *Therefore the references in
> § 7410(a)(5)(A) to plans submitted under § 7410 include
> submissions to meet the requirements of Part D.*  (Emphasis
> supplied.)

26

*Id.* at 1014.  Even if it is not clear from the terms of the statutes themselves, it should be clear from the construction of the statutes in *Connecticut Fund for the Environment* that the permits referred to as being "required under . . . Part D" in 42 U.S.C. § 7604(a)(3) are State permits, required under a State's SIP, for areas classified as nonattainment areas under Part D.

Congress intended that citizens be entitled to sue in federal court under 42 U.S.C. § 7604(a)(3) to prevent the construction of a new major source in an nonattainment area in the absence of a permit "required under" a State's Part D SIP.  Any other reading of § 7604(a)(3) would make the statute completely meaningless, because there simply are no permits "required under" Part D other than those permits "required under" a State's Part D SIP.

In this case the Village properly invoked the District Court's subject matter jurisdiction under 42 U.S.C. § 7604(a)(3) pursuant to the clear and unambiguous terms of the statutes and regulations incorporated by reference into the Wisconsin Part D SIP.

## II.   THE DISTRICT COURT HAD JURISDICTION OVER THE VILLAGE'S CLEAN WATER ACT CLAIMS.

### A.   The Complaint Alleges that Dayton Hudson Has Discharged and is Currently Discharging Pollutants in Violation of § 301(a) of the Clean Water Act.

The citizen suit statute in the Clean Water Act (CWA) provides in part:

(a)     Except as provided in subsection (b) of this section,[14] any citizen may commence a civil action on his own behalf--

(1)     against any person (including (i) the United States, and (ii) any other governmental instrumentality or agency to the extent permitted by the eleventh amendment to the Constitution) who is alleged to be in violation of (A) an effluent standard or a limitation under this chapter . . .

The district court shall have jurisdiction, without regard to the amount in controversy or the citizenship of the parties, to enforce such an effluent standard or limitation, or such an order, or to order the Administrator to perform such act or duty, as the case may be, and to apply any appropriate civil penalties under § 1319(d) of this title.

33 U.S.C. § 1365(a). The term "effluent standard or limitation" is broadly defined in

the CWA as:

For the purposes of this section, the term "effluent standard or limitation of this act" means (1) effective July 1, 1973, an unlawful act under subsection (a) of § 301 of this Act . . . (6) a permit or condition thereof issued under § 402 of this Act, which is in effect under this Act . . .

33 U.S.C. § 1365(f). The terms of § 301(a), 33 U.S.C. § 1311(a), state:

---

[14] Subsection (b) requires that 60-day notice be provided prior to commencing an action under the CWA. 33 U.S.C. § 1365(b). One of the grounds argued by the defendants in their motion to dismiss was that the Village failed to comply with this notice requirement, as well as the notice requirement under the CAA, 42 U.S.C. § 7604. However, as fully set forth in the Village's brief in the District Court opposing the motion to dismiss, the CAA's notice requirement specifically does not apply to actions such as this one brought pursuant to the CAA's regulation of new sources. *Compare* 42 U.S.C. § 7604(a)(1) and (a)(2), with 42 U.S.C. § 7604(a)(3). And, because this is a "hybrid" claim alleging both CAA and CWA claims with respect to the same project, the 60-day notice requirement of the CWA does not apply. *See **Dague v. City of Burlington**, 935 F.2d 1343, 1351-52 (2d Cir. 1991), rev'd on other grounds*, 112 S.Ct. 2638 (1992). The District Court did not address this issue.

>Except as in compliance with this section and §§ 302, 306,
>307, 318, 402, and 404 of this Act, the discharge of any
>pollutant by any person shall be unlawful.

A violation of the quoted statutes is independently enforceable, regardless of any other requirements. *United States v. Frezzo Brothers, Inc.*, 602 F.2d 1123, 1127 (3rd Cir. 1979) (criminal prosecution for violation of 33 U.S.C. § 1311(a)).

The only exception to § 301(a) which could serve to allow the illegal discharges alleged in ¶¶ 38-42 of the Complaint is the permit requirements of § 402 of the CWA, 33 U.S.C. § 1342. That section establishes the National Pollutant Discharge Elimination System (NPDES), under which persons may obtain permits to discharge pollutants, if the discharge will comply with specified requirements of the CWA. The Complaint alleges an ongoing discharge in violation of § 301(a) of CWA, and that Dayton Hudson did not apply for or obtain an NPDES permit to discharge pollutants.

As alleged in ¶ 36 of the Complaint, the ongoing construction of the Distribution Center constitutes "industrial activity" as defined in 40 C.F.R. § 122.26(b)(14). The Complaint further alleges that because Dayton Hudson failed to apply for an NPDES permit for operation of the Distribution Center not less than 90 days before commencing industrial activity, Dayton Hudson is therefore engaged in an ongoing violation of the CWA, pursuant to 33 U.S.C. § 1311, 1342 and 1365(a)(1) and (f), and 40 C.F.R. §§ 122.21(a) and (c)(1), 122.26(a)(1)(ii), (b)(14)(viii) and (c)(1).

The District Court dismissed the CWA claim for lack of subject matter jurisdiction, concluding that the CWA's regulation of discharges into navigable waters

29

does not include discharges into groundwater which will "migrate" to such navigable waters. The District Court erred because: (1) it failed to consider all of the violations alleged in the Complaint; and (2) the discharge to groundwater under the circumstances alleged in the Complaint is covered under the CWA.

**B.    The Discharge of Pollutants into Groundwater Which Will Migrate to Navigable Waters is Covered Under the Clean Water Act.**

The District Court concluded that the Village did not allege a claim upon which relief could be granted under the CWA because the Act does not cover discharges solely to groundwater, as groundwater is not among the "waters of the United States." *Decision and Order*, pp. 6-7, *citing*, *Kelley v. United States*, 618 F. Supp. 103, 105-07 (W.D. Mich. 1985). However, the Complaint alleges not merely a discharge to groundwater, but a discharge of pollutants through a manmade, channelized system to a surface water retention pond, the intentional exfiltration of pollutants and contaminants from that pond into the shallow groundwater aquifer, *and* the migration and discharge of those pollutants and contaminants into wetlands and other surface waters that are navigable waters of the United States which are clearly covered by the CWA.[15] *Complaint*, ¶¶ 50-52. The

---

[15] Indeed, a migrating plume of groundwater contamination has already polluted seven (7) nearby drinking water wells, creating a health hazard for the seven homeowners residing directly east of the construction site who, on October 14, 1993, received Drinking Water Health Advisories advising them not to drink water from their wells. (*Appx.*, pp. 93-99). The health advisories to several of the homeowners indicated that their wells were in a "known contaminant plume." (*Appx.*, pp. 96-99). The original source of the contamination is currently unknown; however, what is known is that approximately three months before the homeowners received the Health Advisories, Dayton Hudson had identified the contamination in the groundwater beneath the construction site, and concluded that the contamination in the vicinity of the residences was below the enforcement standards and preventive action limits. *See* Braun Intertec, *A Report to Target Stores* (July 9, 1993) (*Appx.*, pp. 73-81). Dayton Hudson was also
(continued...)

District Court rejected this claim, stating: "The fact that groundwater pollution will eventually migrate into waters of the United States does not . . . bring such pollution within the terms of the CWA." *Decision and Order*, p. 7. The District Court again cited *Kelley* as support for its conclusion.

This court, consistent with its past statements concerning the CWA, should decline to adopt the holding of *Kelley* and the holding of the District Court in this case. In *United States v. Byrd*, 609 F.2d 1204 (7th Cir. 1979), this court stated:

> The legislative history of the amendments establishes that Congress wanted to give the term "navigable waters" the "broadest possible constitutional interpretation". Conference Report, S. Rep. No. 236, 92d Cong., 2d Sess. 144, *reprinted in* [1972] U.S. Code Cong. & Admin. News, p. 3822. *See also, Natural Resources Defense Council, Inc. v. Callaway*, 392 F. Supp. 685 (D.D.C. 1975).

*Id.* at p. 1209. *See also United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 133 (1985) ("In adopting this definition of 'navigable waters,' Congress evidently intended to repudiate limits that have been placed on federal regulation by earlier water pollution control statutes and to exercise its powers under the Commerce Clause to regulate at least some waters that would not be deemed 'navigable' under the classical understanding of that term."). Because an interpretation of the term "navigable waters" including both surface and subsurface waters that flow into navigable waters does not violate any constitutional limitation, this Court should adopt such an interpretation.

---

[15](…continued)
aware that construction activities on the site have the potential to significantly change the groundwater flow direction. *Id.*

31

The District Court correctly points out that the District Court for the Western District of Michigan in *Kelley* held that the subsurface migration of groundwater to navigable waters does not bring those waters within the jurisdiction of the CWA. *See Kelley*, 618 F. Supp. at 1105, 1107. However, this legal issue has not been definitively resolved. In *Inland Steel Co. v. EPA*, 901 F.2d 1419, 1422-23 (7th Cir. 1990), this Court stated:

> [T]he legal concept of navigable waters might include groundwaters connected to surface waters--though whether it does or not is an unresolved question, *Exxon Corp. v. Train*, 554 F. 2d 1310, 1312 n.1 (5th Cir. 1977); *Kelley v. United States*, 618 F. Supp. 1103, 1105-07 (W.D. Mich. 1985); *McClellan Ecological Seepage Situation v. Weinberger*, 707 F. Supp. 1182, 1193-96 (E.D. Cal. 1988); c.f. *United States v. Byrd*, 609 F.2d 1204, 1209-11 (7th Cir. 1979)--a well that ended in such connective groundwaters might be within the scope of the Act.

As the District Court in *McClellan Ecological Seepage Situation v. Weinberger*, 707 F. Supp. 1182, 1194 (E.D. Cal. 1988), stated: "[P]ermits might be required for discharges to groundwater that has a direct hydrological connection to surface waters that themselves constitute 'waters of the United States.'"

On this appeal, this Court should decide whether the Village's allegations in the Complaint that the discharge of pollutants caused by the ongoing construction of the Distribution Center, and, in the future, by the operation of the Distribution Center, into groundwater which is hydrologically connected to navigable waters states a claim upon

32

which relief can be granted under the CWA. If it does state a claim, the District Court has jurisdiction over the Complaint in this case.

Consistent with this Court's statement in *Byrd* that the term "navigable waters" should be interpreted as broadly as constitutionally allowable, this Court should reject the holding of *Kelley*, and hold that, where pollutants are discharged to groundwater which has a direct hydrological connection to surface waters which are waters of the United States, the discharge is illegal absent a permit under the CWA. The net result of a discharge directly into navigable waters or a discharge into groundwater which then flows into navigable waters is the same: navigable waters of the United States become polluted.

A series of decisions by this Court supports the conclusion that a discharge of pollutants into groundwater which migrates into navigable waters is a discharge covered by the CWA. In *Hoffman Homes, Inc. v. Administrator, U.S. EPA*, 961 F.2d 1310 (7th Cir. 1992), *vacated*, 975 F.2d 1554, *on rehearing*, 999 F.2d 256 (1993),[16] this Court considered whether wetlands which are not adjacent to navigable waters are subject to regulation under the CWA. First, Judge Manion noted that "Congress' grant of authority under the Clean Water Act extends to all waters, and their *adjacent* wetlands, within constitutional reach under the Commerce Clause." *Id.*, 961 F.2d at 1314; 999

---

[16] While the decision in *Hoffman Homes I* (961 F.2d 1310) was vacated, this Court in *Hoffman Homes II* reaffirmed the original mandate of *Hoffman Homes I*, and the text of the original decision was incorporated by reference into the concurrence of Judge Manion. *Hoffman Homes II*, 999 F.2d at 262. Therefore, language from *Hoffman I* will herein be cited to both the original opinion and to Judge Manion's concurrence.

F.2d at 262 (Manion, J., concurring).  The opinion of Judge Manion then examined the

history of the CWA, as well as the Supreme Court's decision in *Riverside Bayview* and

concluded:

> The stated policy of the Act is "to restore and maintain the
> chemical, physical, and biological integrity of the nation's
> waters." 33 U.S.C. § 1251.  The legislative history merely
> documents this section's concern for maintaining the
> ecological balance of our nation's waters.  Wetlands which
> are adjacent to open bodies of water control pollution and
> flooding in those waters, thus contributing to maintaining "the
> chemical, physical, and biological integrity of the nation's
> waters."   Accordingly, although it is difficult to say
> "wetlands" are "waters," the Supreme Court in *Riverside* held
> that adjacent wetlands are within the scope of the Act.  But,
> wetlands which are not adjacent to open bodies of water,
> isolated wetlands, do not control pollution or flooding of any
> waters.  Isolated wetlands do not contribute to maintaining
> "the chemical, physical, biological integrity of the nation's
> waters."   Accordingly, they are not within the scope of the
> Act.

*Id.*, 961 F.2d at 1316 (citing cases); 999 F.2d at 262 (Manion, J., concurring).

The question which must be resolved with respect to groundwaters is whether

groundwaters hydrologically connected to navigable waters "contribute to maintaining 'the

chemical, physical, biological integrity of the nation's waters.'"  *Id.*

In *Riverside Bayview*, the United States Supreme Court cited with approval the

following language from the Army Corps of Engineers, which underscores the intended

breadth of the CWA with respect to "connected" aquatic systems:

> "The regulation of activities that cause water pollution cannot
> rely on . . . artificial lines . . . but must focus on all waters
> that together form the entire aquatic system.  Water moves in

34

hydrologic cycles, and the pollution of this part of the aquatic system [wetlands], regardless of whether it is above or below an ordinary high water mark, or mean high tide line, will affect the water quality of other waters within that aquatic system.

"For this reason, the landward limited of Federal jurisdiction under Section 404 must include any adjacent wetlands that form the border of or are in reasonable proximity to other waters of the United States, as these wetlands are part of this aquatic system."

*Riverside Bayview*, 474 U.S. at 133-34, *citing* 42 Fed. Reg. 37128 (1977).  Under the reasoning of the Supreme Court, it can reasonably be concluded that groundwaters which are hydrologically connected to waters of the United States, such that together they "form the entire aquatic system," will affect the other waters within that aquatic system and should be considered "waters" under the CWA.[17]  The argument in favor of such a conclusion is particularly strong in this case because the area wetlands are hydrologically connected to Silver Lake and Oconomowoc Lake, through both groundwater and surface water discharges.

---

[17] The Court in *Riverside Bayview* noted that while it is likely that not all wetlands will be of great importance to connected bodies of water, this does not diminish the reasonableness of defining all such adjacent wetlands as "waters," because in a case where the wetlands are in fact of little importance, the Corps may allow for development or other uses of the wetland by issuing a permit. *Riverside Bayview*, 474 U.S. at 135 n.9, *citing* 33 C.F.R. § 320.4(b)(4) (1985).  Likewise if the permitting authority ultimately determines that the affected groundwater in this case is of little importance, it can issue a permit allowing proper development.  The point of the CWA is that it ensures that potentially harmful development does not and cannot occur until that potential harm is examined pursuant to the permitting process.

The dividing line between "adjacent" and "isolated" wetlands would appear to be a logical model upon which to base this decision.  Judge Manion explained that the basis for this distinction was grounded in the Commerce Clause:

> The case law leaves little doubt that tributaries of navigable waters, interstate waters which are used to irrigate crops, support a fishery, or are visited by interstate travelers, and wetlands adjacent to such waters may be regulated under the Commerce Clause. *Polluting such waters and their adjacent wetlands affects interstate commerce.*

*Hoffman Homes I*, 961 F. 2d at 1319; *Hoffman Homes II,* 999 F.2d at 262 (Manion, J., concurring).  The ability of Congress, through the CWA, to regulate the pollution of groundwater would logically appear to be based upon the same analysis.  With respect to isolated groundwater, such as that considered by the District Court in *McClellan Ecological Seepage Situation*, *supra*, pollution of such groundwater could not possibly extend to water which affects interstate commerce.  On the other hand, groundwater which is adjacent to navigable waters, and through which pollutants can or will migrate into navigable waters, do create the opportunity for pollution of water which will affect interstate commerce.

The conclusion of this Court in *Hoffman Homes II* is also helpful in this regard:

> The regulation [of EPA, 40 C.F.R. § 230.3(s)(3)] speaks of regulating wetlands and other bodies of water whose use, degradation or destruction "could" affect interstate commerce . . . . [T]he use of the word "could" indicates *the regulation covers waters whose connection to interstate commerce may be potential rather than actual, minimal rather than substantial.*

36

*Hoffman Homes, Inc. v. Administrator, U.S.EPA*, 999 F.2d 250 (7th Cir. 1993) (emphasis supplied).   The clearly alleged hydrological connection between the groundwaters at the Distribution Center site and adjacent navigable waters makes those groundwaters "potentially" connected to interstate commerce.

Therefore, consistent with the congressional mandate to "give the term 'navigable waters' the 'broadest possible constitutional interpretation,'" *Byrd*, 609 F.2d at 1209, groundwater which is hydrologically connected to navigable waters should be included within the reach of CWA.   Under this construction, the Village's allegation that the ongoing construction of the Distribution Center has discharged pollutants into groundwater hydrologically connected to navigable waters states a claim under the CWA over which the District Court has jurisdiction.

**C.   The District Court Failed to Consider Other Violations of the Clean Water Act Alleged in the Complaint.**

The District Court's decision with respect to the CWA was limited to its conclusion that groundwater is not covered under the CWA.   *Decision and Order*, pp. 6-7.   However, as indicated above, the Village alleged not only that Dayton Hudson failed to obtain a permit to discharge pollutants into the groundwater, but also that (1) in commencing construction activity involving the disturbance of more than five acres of land without applying for and obtaining a NPDES permit, Dayton Hudson violated the CWA; and (2) the ongoing construction of the Distribution Center has already resulted in ongoing and illegal discharges of stormwater, soil and sediment off the property and

37

into drainage ways and channels that flow into waters of the United States.  ***Complaint***, ¶¶ 36-43 (*Appx.*, pp. 12-14).   These allegations are distinct from the allegations concerning groundwater discharges, but were never ruled on or even discussed by the District Court.   Because this is a *de novo* review, *supra*, p. 7,  and because the determination of whether the facts alleged state a cause of action which properly invokes federal subject matter jurisdiction is a question of law, this Court should determine whether these additional CWA claims are viable.

> 1.    **The CWA Requires Persons to Obtain a Storm Water Discharge Permit to Commence Construction Which Will Involve the Disturbance of More Than Five Acres of Land Area.**

The Complaint alleges that "the ongoing construction of the Distribution Center by Dayton Hudson has already resulted in, and upon information and belief will in the future result in substantial discharges of storm water, soil and sediment off of the property and into drainage ways and channels that flow into waters of the United States." ***Complaint***, ¶ 38 (*Appx*, p. 13).  The U.S. EPA's NPDES Permit Regulations establish a permitting program for discharges of storm water.  40 C.F.R. § 122.26.   The regulations require persons to obtain a NPDES permit for such discharges "associated

with industrial activity."  40 C.F.R. § 122.26(a)(1)(ii).  Section 122.26(b)(14) of the

regulations defines industrial activity:

> (14) . . . The following categories of facilities are considered to be engaging in "industrial activity" for purposes of this subsection:
>
> . . .
>
> (x) Construction activity including clearing, grading and excavation activities except: operations that result in the disturbance of less than five acres of total land area which are not part of a larger common plan of development or sale.

Section 122.26(c)(1)(ii) sets forth the application requirements applicable to Dayton

Hudson.  The application must be submitted at least 90 days prior to commencing the

industrial activity.  40 C.F.R. § 122.21(c)(1).[18]

As alleged in the Complaint, the construction of the Distribution Center involves

the disturbance of approximately 100 acres.  *Complaint*, ¶ 36 (*Appx.*, p. 19).  Therefore,

the construction is an "industrial activity" for which Dayton Hudson was required to

apply for an NPDES permit prior to commencing construction of the Distribution Center.

---

[18] In addition to the requirement that the person must submit a permit application to U.S. EPA, § 122.26(a)(4) provides:

> (4) *Discharges through large and medium municipal separate storm sewer systems*.  In addition to meeting the requirements of paragraph (c) of this section, an operator of a storm water discharge associated with industrial activity which discharges through a large or medium municipal separate storm sewer system shall submit, to the operator of the municipal separate storm sewer system no later than May 15, 1991. or 180 days prior to commencing such discharge: the name of the facility; a contact person and phone number; the location of the discharge; a description, including the Standard Industrial Classification, which best reflects the principal products or services provided by each facility; and any existing NPDES permit number.

39

The allegation that Dayton Hudson failed to apply for and obtain such a permit properly alleges a cause of action under the CWA over which the District Court had jurisdiction.

### 2. The Notice of Intent Submitted by Dayton Hudson to WDNR Does Not Constitute Compliance With the Clean Water Act.

Dayton Hudson argued in the District Court that the submittal of a Notice of Intent (NOI) to WDNR satisfied its obligations under federal law to submit an application for a storm water permit prior to the commencement of construction. *See Appx.*, pp. 61-72. There are a number of problems with this theory. First, an NOI submitted to the State is not an application for a permit meeting the requirements of 40 C.F.R. § 122.26(b)(14) and (c)(1)(ii). Second, Dayton Hudson commenced construction on June 4, 1993, and the NOI was submitted to the State in April, 1993, less than 90 days prior to the commencement of construction. Third, and most importantly, due to the fact that Wisconsin has never adopted or promulgated requirements consistent with the mandatory federal regulations, the State has absolutely *no authority* to consider or review an NPDES storm water permit application, much less issue the permit required by federal law.

As indicated in WDNR's letter acknowledging receipt of Dayton Hudson's NOI, WDNR is currently unable to issue storm water discharge permits because it has not completed the necessary rulemaking. (*Appx.*, p. 61). U.S. EPA's regulations allowing States to establish NPDES permitting programs provide:

> All State Programs under this part must have legal authority to implement each of the following provisions and must be administered in conformance with each . . .:

40

. . .

(9) § 122.26--(Storm water discharges)

40 C.F.R. § 123.25(a).  In the absence of any administrative rules, it is impossible for WDNR to "administer" a State Program.  WDNR's suggestion that construction requiring a storm water discharge permit can be "covered" by a permit to be issued at an unspecified future date is obviously without merit.  If, for example, construction of the Distribution Center were found to violate the proposed requirements of Wisconsin's program, WDNR would be powerless to seek civil or criminal penalties for violation of a nonexistent permit condition.  *See*

40 C.F.R. § 123.27(a)(3) (requiring that State agencies administering a program have available civil penalties and criminal remedies for the violation of permit conditions).

Finally, the Complaint alleges specific and ongoing discharges by Dayton Hudson without a permit.  *See, United States v. Frezzo Brothers, supra*; *Complaint*, ¶¶ 38-40 (*Appx.*, p. 20).  Even if the NOI submitted to the State could be considered to be an application for a "permit" or an actual "permit," the Complaint alleges specific and ongoing discharges in violation of the "permit" and the federal regulations.  *Id.*  The Complaint clearly alleges existing and ongoing violations of the Clean Water Act cognizable under the citizen suit statute, 33 U.S.C. § 1365.

## CONCLUSION

Given a common sense reading of the detailed allegations in the Complaint, much less the liberal construction that the allegations are entitled to on a motion to dismiss under Rule 12(b), Fed. R. Civ. P., the Complaint clearly alleges claims upon which relief can be granted against the defendants under the Clean Air Act and the Clean Water Act and therefore alleges claims over which the District Court has jurisdiction.

For the reasons stated above, the Village of Oconomowoc Lake respectfully requests that this Court reverse the decision of the District Court.

Dated at Milwaukee, Wisconsin, this 15th day of November, 1993.

FRIEBERT, FINERTY & ST. JOHN, S.C.
William S. Roush, Jr. (#1001662)
Matthew W. O'Neill (#1019269)

By: _____
Matthew W. O'Neill
Attorneys for Plaintiff-Appellant
Village of Oconomowoc Lake

P.O. ADDRESS:
Two Plaza East - Suite 1250
330 East Kilbourn Avenue
Milwaukee, Wisconsin 53202
(414) 271-0130

42

## CERTIFICATE OF SERVICE

I, Matthew W. O'Neill, an attorney, hereby certify that I caused copies of Plaintiff-Appellants's Brief and Plaintiff-Appellant's Appendix to be served upon counsel of record, by placing the same in the United States mail, properly addressed and postage prepaid on 15th day of November, 1993.

Matthew W. O'Neill

# DISTRICT COURT DECISION AND ORDER

## SEPTEMBER 24, 1993

Copy mailed to Attorneys for
parties by the court pursuant
to rule 77(d) Federal rules of
civil procedure.

U.S. DIST. COURT EAST. DIST. WISC.
FILED

SEP 2 1 1993

_____ O'CLOCK_____M
SOFRON B. NEDILSKY

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN

---

VILLAGE OF OCONOMOWOC LAKE and
the TOWN OF SUMMIT,

        Plaintiffs,

      v.                      Civil Action No. 93-C-0797

DAYTON-HUDSON CORPORATION;
GEORGE E. MEYER, Secretary; and
the WISCONSIN DEPARTMENT OF
NATURAL RESOURCES,

        Defendants,

    and

CITY OF OCONOMOWOC,

        Intervenor.

---

## DECISION AND ORDER

---

      Plaintiffs Village of Oconomowoc Lake ("the Village") and
the Town of Summit (the "Town") claim that the ongoing construction
in the City of Oconomowoc ("the City") of a distribution center for
Target Stores, a division of defendant Dayton-Hudson Corporation
("Dayton-Hudson"), violates the Clean Air Act and Clean Water Act
because pollution permits necessary to the construction and
operation of the center have not been properly issued.  On August
27, 1993, defendants moved that this action be dismissed for lack
of subject matter jurisdiction, or that the court abstain from
deciding it because of pending state litigation.  For reasons
stated below, the motion to dismiss will be granted.

1

### I. The Clean Air Act Claim

Plaintiffs claim that when the distribution center becomes operational in August, 1994, the trucks and employee vehicles travelling to and from it will emit at least 300 tons of nitrogen oxides per year, as well as 260 tons of carbon monoxide per year. (Compl. at ¶ 27, Ex. B at ¶ 5.) Because nitrogen oxides combine with other matter to form ozone, plaintiffs say, operation of the center will increase the level of ozone pollution in southeastern Wisconsin, where the ozone level already exceeds what it should be under the applicable National Ambient Air Quality Standard ("NAAQS"). (Id. at ¶ 27.) Plaintiffs contend that under these circumstances, the Clean Air Act ("CAA"), 42 U.S.C. §§ 7502(c)(5), 7503, and Wisconsin's State Implementation Plan ("SIP"), Wis. Stat. § 144.30 et seq., require that prior to construction of the center, which began June 4, Dayton-Hudson obtain and the state issue a permit treating the center as a "major emitting facility" or "major stationary source" being constructed in an NAAQS "nonattainment area."[1]

No such permit was issued. Rather, on May 19, 1993, the defendant Wisconsin Department of Natural Resources ("DNR") issued to Target Stores an "air pollution control permit" describing the center as a "minor, new, attainment air pollution source." Issuance of the permit was not, therefore, subject to the far more

---

[1]Under the CAA, the EPA is required to establish an NAAQS for each of various air pollutants, and each state is required to develop and adopt a SIP, through which the NAAQS is to be attained. 42 U.S.C. §§ 7408-7410.

2

stringent standards applicable to the issuance of permit for construction of a major emitting facility or major stationary source in a nonattainment area.   See Wis. Stat. § 144.393; 42 U.S.C. § 7503(a).

Plaintiffs' suit challenging Dayton-Hudson's failure to obtain such a permit is brought pursuant to Section 304(a)(3) of the CAA, which provides in part that "any person may commence a civil action . . . against any person who proposes to construct or constructs any new or modified major emitting facility without a permit required under" parts C or D of the Act.   42 U.S.C. § 7604(a)(3).   Those parts provide, among other things, that permits must be issued prior to the construction of any "major emitting facility" or of any "major stationary source" in a nonattainment area.   42 U.S.C. §§ 7475(a), 7502(c)(5).

Defendants contend that the citizen-suit provision upon which plaintiffs rely is inapplicable because the distribution center is not a facility for which a permit is required under parts C or D of the CAA.[2]   Indeed, it is clear that the CAA does not itself require a permit for a facility like the distribution center.   Permits are required only for a "major emitting facility" or "major stationary source," both of which refer to a "stationary

---

[2]Plaintiffs contend that because defendants' argument goes to the substance of their federal claim, the motion to dismiss for lack of jurisdiction (under Fed. R. Civ. P. 12(b)(1)) should be treated instead as a motion to dismiss for failure to state a claim (under Fed. R. Civ. P. 12(b)(6)), in which case no facts other than those alleged in the pleadings may be considered.   The court need not resolve this conceptual wrinkle, however, because its decision does not hinge on facts outside the complaint.

. . . source" of pollution.  42 U.S.C. § 7602(j).  "Stationary

source" is defined to mean "any source of an air pollutant <u>except</u>

<u>those emissions resulting directly from an internal combustion</u>

<u>engine for transportation purposes</u> or from a nonroad engine or

nonroad vehicle."  42 U.S.C. § 7602(z) (emphasis added).  Because

the distribution center will cause only the excepted type of

emission, it cannot be a major emitting facility or major

stationary source within the meaning of the CAA.  Thus, the CAA

does not by its own terms require that Dayton-Hudson obtain a

permit for the center.

The exception for internal combustion engines to the

permit requirements of Parts C and D is consistent with a related

provision in Section 110 of Part A, 42 U.S.C. § 7410, which sets

forth the conditions to federal approval of state implementation

plans.  That section provides that the Environmental Protection

Agency ("EPA") may <u>not</u> require as a condition of approving a plan

that the plan include a program for determining whether an

"indirect source" of air pollution would cause or contribute to

nonattainment of an NAAQS.  42 U.S.C. § 7410(5)(A)(i).  "Indirect

source" is defined to mean "a facility, building, structure,

installation, real property, road, or highway which attracts, or

may attract, <u>mobile sources of pollution</u>."  42 U.S.C. §

7410(a)(5)(C) (emphasis added).  There is no dispute that the

distribution center falls within this definition and that,

therefore, the EPA could not have required Wisconsin to include in

its SIP a program under which a permit for the center would have
been necessary.

Plaintiffs point out, however, that although Wisconsin was
not required to adopt an "indirect source review program," it has
chosen to do so, and the program, along with the rest of the
Wisconsin SIP, has been approved by the EPA in accordance with the
CAA.  See 42 U.S.C. § 7410(a)(5)(A)(i).  As a result of that
approval, plaintiffs contend, the requirements of the Wisconsin SIP
have become, in effect, the requirements of the CAA.  Thus,
plaintiffs say, if the SIP requires Dayton-Hudson to obtain a
major-source permit prior to construction of the center, then the
permit is also required under the CAA, and so the citizen-suit
provision applies.

The difficulty with this analysis is that the pertinent
citizen-suit provision refers only to permits "required under"
Parts C or D of the Act, and nothing in those parts purports to
incorporate by reference the permit requirements of an approved
SIP.  This is significant, because when Congress intended to allow
civil actions or enforcement actions based on noncompliance with
the terms of a SIP, as opposed to the terms of the CAA, it made
that clear.  Under a separate citizen-suit provision, for example,
a federal suit may be brought against "any person . . . who is
alleged to be in violation of . . . an emission standard or
limitation under this Act," and such a standard or limitation is
defined to include any "standard, limitation, or schedule
established . . . under any applicable State implementation plan."

5

42 U.S.C. §§ 7604(a)(1), 7604(f)(4).  See also 42 U.S.C. §
7413(a)(1) (permitting EPA to issue orders requiring compliance
with "an applicable implementation plan").

Thus, as the citizen-suit provision upon which plaintiffs
rely refers only to permits required under Parts C and D of the
Act, it cannot afford a basis for challenging the failure to issue
or obtain a permit required under a state implementation plan.
Because that is indeed the nature of the instant claim, the court
lacks jurisdiction to hear it, and the claim must therefore be
dismissed.

## II. The Clean Water Act Claim

The Clean Water Act ("CWA") prohibits the discharge of
pollutants into the "waters of the United States" without a
National Pollutant Discharge Elimination System ("NPDES") permit,
which is to be issued by the EPA unless a state permit program has
been adopted and approved.  33 U.S.C. §§ 1311(a), 1342(a), 1342(b).
Plaintiffs claim that construction of the distribution center
requires an NPDES permit because stormwater runoff from the
construction site will be intentionally discharged from a large
retention pond into the groundwater system, through which the
polluted runoff will migrate "into nearby wetlands and surface
waters that are waters of the United States."  (Compl. at ¶¶ 45-
50.)  Plaintiffs further claim that an application for a stormwater
discharge permit filed by Dayton-Hudson's general contractor on
April 9, 1993, and the DNR's subsequent acceptance of the
application, did not satisfy the requirements applicable to an

6

NPDES permit.  Indeed, plaintiffs claim, the state has failed to obtain federal authority to issue such permits.  (Compl. at ¶ 66.)

Defendants contend that plaintiffs have failed to state a violation of the CWA because they allege that the stormwater will be directly discharged only into the groundwater system, and groundwater is not among the "waters of the United States."[3]  This position finds direct support in Kelley v. United States, 618 F. Supp. 1103, 1105-1107 (W.D. Mich. 1985), where the court held, based on a thorough analysis of the CWA's legislative history and related caselaw, that the CWA does not cover "groundwater contamination."  Plaintiffs argue, however, that their case differs from Kelley because they have alleged that the polluted stormwater will migrate through the groundwater system into "nearby wetlands and surface waters."  But Kelley in fact involved a similar claim, which the court described as follows:

> Plaintiffs further allege that these chemicals contaminated the groundwater underlying the Air Station and that the plume of contamination is migrating downgradient in a north-easterly direction through East Bay Township and eventually discharging into the East Arm of Grand Traverse Bay.

Kelley, 618 F. Supp. at 1105.  The fact that groundwater pollution will eventually migrate into waters of the United States does not, therefore, bring such pollution within the terms of the CWA.

Thus, because plaintiffs' CWA claim is based on allegations of groundwater pollution, the claim must be dismissed.

---

[3]See note 2, supra.

**IT IS THEREFORE ORDERED** that defendants' August 27, 19

motion to dismiss is GRANTED and this action DISMISSED.

Dated at Milwaukee, Wisconsin, this 24th day of Septem

1993.

BY THE COURT

John W. Reynolds
Senior Judge

8