E-FILED
Wednesday, 14 November, 2018  03:15:37 PM
Clerk, U.S. District Court, ILCD

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## URBANA DIVISION

| | | |
|---|---|---|
| **PRAIRIE RIVERS NETWORK,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **Case No. 18-CV-2148** |
| | ) | |
| **DYNEGY MIDWEST GENERATION, LLC,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## <u>ORDER</u>

Plaintiff, Prairie Rivers Network, filed this citizen enforcement action against Defendant Dynegy Midwest Generation, LLC for violations of the Clean Water Act ("CWA"), 33 U.S.C. §§ 1311 and 1342, at the Vermilion Power Station in Vermilion County, Illinois, on May 30, 2018.  Defendant filed a Motion to Dismiss (#14) on August 29, 2018, to which Plaintiff filed a Response (#19) on September 26, 2018.  Defendant filed its Reply (#21) on October 9, 2018.  The motion is now fully briefed and ready for ruling.  For the following reasons, the Motion to Dismiss (#14) is GRANTED.

## BACKGROUND

The following background is taken from the allegations in Plaintiff's Complaint (#1).  At this stage of the proceedings, the court must accept as true all material allegations of the complaint, drawing all reasonable inferences therefrom in the plaintiff's favor.  *Lewert v. P.F. Chang's China Bistro, Inc.*, 819 F.3d 963, 966 (7th Cir. 2016).

Case Overview

Defendant has discharged, and is discharging on an ongoing basis, pollutants into the Middle Fork of the Vermilion River ("the Middle Fork") from numerous, discrete, unpermitted seeps on the riverbank.  Although Defendant holds a permit that authorizes the company to discharge pollutants from the Vermilion Power Station to the Middle Fork through nine external outfalls, Defendant's discharge of pollutants into the Middle Fork from these seeps violate the CWA because they are not authorized by any permit and are contrary to the limited authorization to discharge within Defendant's discharge permit.  Defendant also discharged and is discharging on an ongoing basis, pollutants into the Middle Fork in concentrations, colors, and with characteristics that violate Illinois effluent limits and water quality standards that are incorporated as conditions of the Vermilion permit.  By violating these permit conditions, Defendant is also in violation of the CWA.

Parties

Plaintiff is an Illinois non-profit organization with more than 1,000 members that champions clean, healthy rivers and lakes and safe drinking water to benefit the people and wildlife of Illinois.  Plaintiff advocates public policies and cultural values that sustain ecological health and biological diversity of water resources and aquatic ecosystems.  Plaintiff holds events for members of the organization and the public along and on the Middle Fork, including immediately downstream of the pollution and discharge points of Defendant.  Its members, some of whom live, work, and recreate around the Middle Fork, have had their use and enjoyment of the Middle Fork harmed by Defendant's unauthorized and prohibited discharge of pollutants.

2

Defendant, a Delaware corporation, owns the Vermilion Power Station.
Defendant is a subsidiary of Vistra Energy, which is headquartered in Texas.

Factual Background

The Vermilion Power Station (VPS) is a retired coal-fired power plant located
five miles north of Oakwood, Illinois.  The plant sits on the west bank of the Middle
Fork, in a 17-mile section designated as Illinois' only National Scenic River and first
State Scenic River.  From the mid-1950s until 2011, the plant burned coal and generated
millions of tons of coal combustion residuals ("coal ash").  Defendant and its
predecessor mixed the coal ash generated at VPS with water and sluiced it into three
unlined coal ash pits, known as the Old East Ash Pond, the North Ash Pond System,
and the New East Ash Pond.  When the plant opened in 1955, ash was flushed into the
Old East Ash Pond.  That pit was in service until the North Ash Pond System, a two-cell
pit, was built in the mid-1970s.  In 1989, the coal ash was diverted to the New East Ash
Pond, which received coal ash until the plant's closure in 2011.  Although the coal ash
pits are out of service, all three continue to store coal ash- including coal ash as deep as
44 feet in some locations.  The three unlined coal ash pits contain an approximate total
of 3.33 million cubic yards of coal ash.  Defendant continues to own these pits and
remains responsible for maintaining them, as well as performing any remaining
activities at the plant.

Coal ash wastewater such as that in the coal ash pits contains heavy metals and
other toxic pollutants that are harmful and at times deadly to people, aquatic life, and
animals.  Among the contaminants found in coal ash are arsenic, barium, boron,
chromium, lead, manganese, molybdenum, nickel, and sulfate.  These contaminants can

inflict severe harm, including brain damage, cancer, learning disabilities, birth defects, and reproductive defects. Arsenic is a well-known carcinogen that also damages the nervous system. Manganese is associated with learning disabilities and nervous system impairment, and can render water unusable by discoloring the water, giving it a metallic taste, and causing black staining. Molybdenum has been linked to gout (joint pain, fatigue), increased blood uric acid levels, high blood pressure, liver disease, and potential adverse impacts on the reproductive system. Boron, a dependable indicator of coal ash contamination, can lead to reduced sperm count, testicular degeneration, birth defects, and low birth weight among humans.

Defendant's limited authorization to discharge wastewater from the VPS is set out in NPDES Permit IL0004057 ("the Permit"), granted by the Illinois Environmental Protection Agency (IEPA) pursuant to the IEPA's delegated authority under the CWA, 33 U.S.C. § 1342(b). The Permit regulates discharges of pollutants from the VPS, specifying which wastewater streams may be discharged from which points at the plant. It also establishes effluent limitations, as well as monitoring and reporting requirements for certain pollutants within those wastewater streams. To this effect, the Permit defines nine external outfalls at the VPS, each of which authorizes limited discharges of pollutants at specific outfalls to the Middle Fork.

Standard Condition 23 of the Permit states that "collected screening, slurries, sludges, and other solids shall be disposed of in such a manner as to prevent entry of those wastes (or runoff from the wastes) into the waters of the State. The proper authorization for such disposal shall be obtained from the Agency and is incorporated as part hereof by reference." Applicable Illinois regulations define "sludge" as "any

4

solid, semisolid, or liquid waste generated from a municipal, commercial, or industrial wastewater treatment plant, water supply treatment plant, or air pollution control facility or any other such waste having similar characteristics and effects." 35 Ill. Adm. Code § 301.395. Applicable Illinois law defines "disposal" as being "the discharge, deposit, injection, dumping, spilling, leaking, or placing of any waste or hazardous waste into or on any land or water ... so that such waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters." 415 Ill. Comp. Stat. 5/3.185.

Standard Condition 25 provides: "The permittee shall comply with, in addition to the requirements of the permit, all applicable provisions of 35 Ill. Adm. Code Subtitle C, Subtitle D, Subtitle E, and all applicable orders of the [Illinois Pollution Control Board]."

Subtitle C of the Illinois Administrative Code provides that "no effluent shall contain settleable solids, floating debris, visible oil, grease, scum or sludge solids. Color, odor and turbidity must be reduced to below obvious levels." 35 Ill. Adm. Code § 304.106. The term "effluent" is defined, in relevant part, as "any wastewater discharged, directly or indirectly, to the waters of the State or to any storm sewer, and the runoff from land used for the disposition of wastewater or sludges." 35 Ill. Adm. Code § 301.275.

Subtitle C of the Illinois Administrative Code further provides that "[n]o person shall cause or allow the concentration of the following constituents in any effluent to

5

exceed the following levels, subject to the averaging rules contained in Section 304.104(a)." Ill. Adm. Code § 304.124(a).  The current iteration of the Permit was issued and became effective on March 7, 2003.

Dating back to at least May 2013, the coal ash pits at VPS have discharged, and continue to discharge on an ongoing basis, pollutants – including, but not limited to, arsenic, barium, boron, chromium, iron, lead, manganese, molybdenum, nickel, sulfate, and totally dissolved solids – into the Middle Fork from numerous, discrete, unpermitted seeps on the riverbank adjacent to the North Ash Pond and Old East Ash Pond in areas where there are no permitted outfalls.

The Middle Fork is a surface water body within the jurisdiction of the CWA as well as a water of the state of Illinois. The Middle Fork has no specific use designation and, as such, is subject to the general use standards codified at 35 Ill. Adm. Code Part 302 Subpart B, which forms part of 35 Ill. Adm. Code Subtitle C. See 35 Ill. Admin. Code §§ 303.201, 302.101(b). The Middle Fork is also subject to the general effluent limitations set forth at 35 Ill. Adm. Code Part 304 Subpart A, which also forms part of 35 Ill. Adm. Code Subtitle C. See id. § 304.101(a).

Groundwater monitoring at the North Ash Pond System and Old East Ash Pond was performed from 1992 through 2007, and again in 2011.  The groundwater monitoring at the site was reinitiated in 2017. Over the extended period of groundwater monitoring undertaken between 1992 and 2011, concentrations of boron and sulfate – primary indicators of coal ash contamination – consistently exceeded Illinois' groundwater protection standards and, on numerous occasions, also exceeded U.S. Environmental Protection Agency (EPA) drinking water health advisories for those

6

contaminants.  Defendant's consultants have concluded that the presence of boron and
sulfate at the concentrations found at the VPS "indicat[e] that groundwater quality at
the facility has been impacted by leachate from the [Old East Ash Pond] and [North Ash
Pond System]," and that the elevated concentrations of boron, sulfate, manganese, iron,
pH, and total dissolved solids in groundwater at the site are partially due to the impacts
of coal ash.

Coal ash at the VPS has groundwater flowing through it year round.  While the
thickness of saturated ash varies as groundwater levels rise and fall with the seasons,
groundwater has saturated coal ash at depths of more than 21 feet.  That groundwater
flows laterally through the ash, picking up contaminants in the process, while
precipitation leaching down through the top of the coal ash mixes with the
groundwater and further adds to the pollutant load contained within the discharge to
the Middle Fork.  Defendant's own reports and information have concluded that the
coal ash contaminated groundwater flows right into the adjacent Middle Fork.

In May 2016 and September 2017, Plaintiff sampled five discrete groundwater
seeps discharging into the river. Independent laboratory testing revealed concentrations
of arsenic, barium, boron, chromium, manganese, molybdenum, and sulfate in those
seeps that exceed background levels and, for multiple pollutants, exceed health-based
standards set by EPA and Illinois EPA.  Plaintiff's sampling also detected iron
concentrations as high as 241 mg/l and manganese concentrations as high as 7.35 mg/l.
Dating back to at least May 2013, discharges from the coal ash pits at VPS have
discolored, and are continuing to discolor, the Middle Fork in low-flow areas of the
river adjacent to the coal ash pits with a bright orange-red color not of natural origin.

<u>Plaintiff's Claims for Relief</u>

Count I of Plaintiff's Complaint alleges that Defendant discharged pollutants without authorization in an NPDES Permit.  Plaintiff alleges the Middle Fork is a navigable water as defined in § 1362(7) of the CWA, and that Defendant has discharged pollutants as defined in the CWA from the coal ash pits at the VPS to the Middle Fork. The discharge of pollutants from the VPS into the Middle Fork from discrete, unpermitted seeps on the riverbank adjacent to the North Ash Pond and Old East Pond are not authorized by the Permit, and are contrary to the limited authorization to discharge contained in the Permit.  Because Defendant violated § 1311 of the CWA, Plaintiff has brought suit.

Count II alleges discharges in violation of the NPDES Permit Conditions. Plaintiff alleges that the discharge of pollutants from the VPS coal ash pits into the Middle Fork violates Standard Condition 23 of the Permit.  Further, Defendant's discharge of pollutants have discolored the Middle Fork, and include iron and manganese at concentrations exceeding the effluent limits in Subtitle C of the Illinois Administrative Code, in violation of Standard Condition 25 of the Permit.  Plaintiff also alleges that the pollutants are a bright orange-red color that stands out "distinctly," and are not below "obvious levels," as well as containing solids that settle on the riverbed, in violation of Condition 25 of the Permit.  By violating these conditions, Plaintiff alleges, Defendant has violated § 1311(a) of the CWA and is subject to suit.

ANALYSIS

Defendant's motion argues that, because Plaintiff's Complaint alleges that the coal ash residuals at VPS were releasing contaminants to groundwater, and that the groundwater was discharging to the Middle Fork via discrete unpermitted seeps, the Complaint should be dismissed because Seventh Circuit precedent establishes that the CWA does not regulate discharges to groundwater, even where the groundwater is hydrologically connected to surface waters regulated by the CWA.  Plaintiff counters that the Seventh Circuit decision is distinguishable and inapposite to the instant case. Further, Plaintiff alleges the allegations in Count II set forth distinct violations of the CWA that provide an independent basis for the court's jurisdiction.

<u>Motion to Dismiss Standard</u>

Defendant asks that the Motion to Dismiss be considered under both Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  Motions to dismiss under Rule 12(b)(1) are meant to test the sufficiency of the complaint, not to decide the merits of the case. *Center for Dermatology and Skin Cancer, Ltd. v. Burwell*, 770 F.3d 586, 588 (7th Cir. 2014). In the context of a motion to dismiss for lack of subject matter jurisdiction, the court accepts as true the well pleaded factual allegations, drawing all reasonable inferences in favor of the plaintiff, but a plaintiff faced with a 12(b)(1) motion to dismiss bears the burden of establishing that the jurisdictional requirements have been met.  *Burwell*, 770 F.3d at 588-89.

A motion under Rule 12(b)(6) challenges the sufficiency of the complaint to state a claim upon which relief may be granted.  *Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009).  A complaint must contain sufficient

factual matter, accepted as true, to state a claim to relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). These allegations "must be enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The allegations that are entitled to the assumption of truth are those that are factual, rather than mere legal conclusions. *Iqbal*, 556 U.S. at 678-79.

Defendant argues that the court should evaluate its motion under both Rules 12(b)(1) and 12(b)(6), as some recent district courts have done in similar cases. See *Upstate Forever v. Kinder Morgan Energy Partners*, 252 F.Supp.3d 488, 498 (D.S.C. 2017), reversed on other grounds 887 F.3d 637 (4th Cir. 2018); *Sierra Club v. Virginia Electric and Power Co.*, 145 F.Supp.3d 601, 604 (E.D. Va. 2015). However, in the Seventh Circuit's *Oconomowoc* decision, the district court dismissed the complaint pursuant to Rule 12(b)(1), a decision affirmed by the appeals court. *Village of Oconomowoc Lake v. Dayton Hudson Corp.*, 24 F.3d 962, 963 (7th Cir. 1994). Based on the Seventh Circuit precedent, the court will analyze the motion under Rule 12(b)(1). However, the court would note that, under either 12(b)(1) or 12(b)(6), the result would be the same.

<u>Count I</u>

For Count I, Defendant argues that Seventh Circuit decision in *Oconomowoc* is "on all fours" with the factual situation in the instant case, and is clear that the CWA does not regulate discharges of contaminants to groundwater, even where that contaminated groundwater reaches navigable waters. Because Plaintiff's Complaint is entirely predicated upon alleged discharges to groundwater, the court should dismiss it. Plaintiff responds that *Oconomowoc* is inapposite and that Defendant is mischaracterizing the decision, because that case "governs discharges *into groundwater*

10

*itself*, absent evidence that the groundwater discretely conveys pollution into a navigable water." Plaintiff contends that "is a separate question not at issue here," and that, in the specific factual circumstances of this case, the majority of courts have held that the plain language of the CWA applies to and prohibits such discharges.

In *Oconomowoc*, a local village sued Target for violations of the Clean Air Act and CWA. Target operated a warehouse in the area. Trucks parked at the warehouse dripped oil, which collected into rainwater runoff from storms. Rainwater runoff from the site then collected in a 6-acre artificial pond on the site. From the retention pond water seeped into the ground, possibly carrying hydrocarbons and other unwelcome substances. The district court judge, regarding the rainwater runoff, dismissed the complaint, finding that parking lots and retention ponds were not "navigable waters" under the CWA. Even though groundwater eventually reached streams, lakes, and oceans, the district court held, it was not part of the "waters of the United States," as defined in § 1362(7) of the CWA.

The Seventh Circuit affirmed. The court began by noting that the CWA applied to "the waters of the United States," and that the CWA was a "broad statute, reaching waters and wetlands that are not navigable or even directly connected to navigable waters." *Oconomowoc*, 24 F.3d at 964. The court then noted that, though broad, the CWA's reach was not total, finding that the EPA's regulatory definition of "waters of the United States" included "intrastate lakes, rivers, streams (including intermittent streams), mudflats, sandflats, wetlands, sloughs, prairie potholes, wet meadows, playa lakes, or natural ponds, the use, degradation or destruction of which could affect

interstate or foreign commerce'[.]" *Oconomowoc*, 24 F.3d at 965, quoting 40 C.F.R. § 230.3(s)(3).

The court then asked the question "[w]hat of the possibility that water from the pond will enter the local ground waters, and thence underground aquifers that feed lakes and streams that are part of the 'waters of the United States'?" *Oconomowoc*, 24 F.3d at 965. Citing to *Wickard*'s[1] holding that wheat a farmer bakes into bread and eats at home is part of "interstate commerce" because those activities affect the volume of interstate shipments, the court theorized that, on a similar rationale, "all ground waters *could* be thought within the power of the national government." *Oconomowoc*, 24 F.3d at 965 (emphasis in original). However, the court found that:

> But the Clean Water Act does not attempt to assert national power to the fullest. "Waters of the United States" must be a subset of "water"; otherwise why insert the qualifying clause in the statute? (No one suggests that the function of this phrase is to distinguish domestic waters from those of Canada or Mexico.) Neither the Clean Water Act nor the EPA's definition asserts authority over ground waters, just because these may be hydrologically connected with surface waters.

*Oconomowoc*, 24 F.3d at 965.

The court concluded that the omission of groundwaters from the CWA was not an oversight, and Congress had elected to leave the subject of groundwater regulation to state law. *Oconomowoc*, 24 F.3d at 965.

The court then addressed the problem of pollutants traveling from groundwater to surface waters via a hydrological connection, writing:

> The possibility of a hydrological connection cannot be denied, see *Sierra Club v. Colorado Refining Co.*, 838 F.Supp. 1428 (D. Colo. 1993); *McClellan*

---

[1] *Wickard v. Filburn*, 317 U.S. 111 (1942).

> *Ecological Seepage Situation v. Cheney*, 763 F.Supp. 431, 437 (E.D. Cal. 1989),
> but neither the statute nor the regulations makes such a possibility a
> sufficient ground of regulation.  On several occasions the EPA has noted
> the potential connection between ground waters and surface waters, but it
> has left the regulatory definition alone. E.g., Preamble to NPDES Permit
> Application Regulations for Storm Water Discharges, 55 Fed. Reg. 47990,
> 47997 (Nov. 16, 1990) ("[T]his rule-making only addresses discharges to
> waters of the United States, consequently discharges to ground waters are
> not covered by this rulemaking (unless there is a hydrological connection
> between the ground water and a nearby surface water body.")) Collateral
> reference to a problem is not a satisfactory substitute for focused attention
> in rule-making or adjudication.  By amending its regulations, the EPA
> could pose a harder question.  As the statute and regulations stand,
> however, the federal government has not asserted a claim of authority
> over artificial ponds that drain into ground waters.

*Oconomowoc*, 24 F.3d at 965-66.

Based on the forgoing, the court finds that the Seventh Circuit's decision in *Oconomowoc* is directly applicable to the facts of the instant case.  Discharges from artificial ponds into groundwater are not governed by the CWA, even if there is an alleged hydrological connection between the groundwater and surface waters qualifying as "navigable waters" of the United States.

Plaintiff, however, argues that *Oconomowoc* is not applicable because *Oconomowoc* concerned only on whether the CWA governed discharges into the groundwater itself, absent evidence that the groundwater discretely conveyed pollution into a navigable water.  Plaintiff focuses on the court's use of "may" and "possibility[,]" seeming to argue that the court only considered the hydrological connection as a hypothetical, and did not actually make any determination or ruling as to whether the scenario faced by this court in the instant case is covered by the CWA.

13

The court finds Plaintiff's argument unpersuasive.  The Seventh Circuit affirmatively held that the CWA did not assert authority over groundwaters, just because those waters "may" be hydrologically connected with surface waters.  This court's reading of that passage is that the Seventh Circuit found any hydrological connection between surface waters and groundwater to be irrelevant in terms of whether groundwaters were covered by the CWA.  If the discharge is made into groundwater, and the pollutants somehow later find their way to navigable surface waters via a discrete hydrological connection, the CWA is still not implicated, because the offending discharge was made into groundwater, which is not subject to the CWA.  This interpretation is bolstered later in the decision, where the Seventh Circuit again considered "[t]he possibility of a hydrological connection" between groundwater and covered navigable waters, but concluded that "neither the statute nor the regulations makes such a possibility a sufficient ground of regulation."  *Oconomowoc*, 24 F.3d at 965.

The Seventh Circuit acknowledged that the EPA has, on several occasions, noted the connection between surface and groundwaters, but found that the EPA has "left the regulatory definition alone[,]" concluding that "[c]ollateral reference to a problem is not a satisfactory substitute for focused attention in rule-making or adjudication." *Oconomowoc*, 24 F.3d at 965-66.

The Seventh Circuit in *Oconomowoc* was not distinguishing between discharges of pollutants into groundwater with only the hypothetical possibility of further seepage into navigable waters and discharge of pollutants into groundwater with *definite* seepage into navigable waters.  Rather, the court finds, the Seventh Circuit was holding that *even if* there was a possibility (or reality) of discharged pollutants into groundwater

14

seeping into navigable waters, such a discharge was not covered by the CWA, because the *actual discharge* from the artificial pond was into groundwater, regardless of whether those pollutants later seep into navigable surface waters via discrete groundwater seepage.

The court's interpretation of *Oconomowoc* is supported by a subsequent district court case citing the decision.  In *Cape Fear River Watch, Inc. v. Duke Energy Progress, Inc.*, 25 F.Supp.3d 798 (E.D.N.C. 2014), a district court in the Eastern District of North Carolina noted that *Oconomowoc* "held that an NPDES permit is not required for discharges to groundwater even if those discharges eventually migrate to surface waters." *Cape Fear River Watch*, 25 F.Supp.3d at 809.  In its own case, which involved discharges into groundwater that was hydrologically flowing into a lake, the court concluded that "[a]fter close review of the competing analyses, this court finds the reasoning of the Court of Appeals for the Seventh Circuit persuasive, and holds that Congress did not intend for the CWA to extend federal regulatory authority over groundwater, regardless of whether that groundwater is eventually or somehow 'hydrologically connected' to navigable surface waters." *Cape Fear River Watch*, 25 F.Supp.3d at 810.  The court dismissed the groundwater claim for lack of subject matter jurisdiction.

Plaintiff cites to out of circuit cases to support its argument that the CWA covers discharges to groundwater where the pollutants seep into navigable waters through hydrological connection.  However, this court is a district court in the Seventh Circuit, and is bound by that court's precedent, despite contrary precedent from other circuit courts.  See *Hart v. Wal-Mart Stores, Inc. Associates' Health and Welfare Plan*, 360 F.3d 674,

680 (7th Cir. 2004) ("it would generally be an abuse of discretion for a district court to follow out-of-circuit precedent which conflicts with binding precedent from its own circuit"); *Jacobson v. SLM Corp. Welfare Benefit Plan*, 669 F.Supp.2d 940, 941 (S.D. Ind. 2009). Further, it should be noted, the Sixth Circuit Court of Appeals has recently held that CWA does not cover discharges of pollutants through groundwater that is hydrologically connected to navigable waters. *Tennessee Clean Water Network v. Tennessee Valley Authority*, 905 F.3d 436, 446 (6th Cir. 2018); *Kentucky Waterways Alliance v. Kentucky Utilities Company*, 905 F.3d 925, 936-37 (6th Cir. 2018). Count I of Plaintiff's Complaint is dismissed.[2]

Count II

Plaintiff argues that, even if the court dismisses Count I for lack of subject matter jurisdiction under the CWA, Count II should survive because its claim that Defendant's discharges have violated the conditions of the Permit are independent of and unaffected by Defendant's argument that the CWA requires a direct discharge from a point source to navigable waters. Plaintiff argues that because the discharges violate the Permit, it has asserted a viable claim under 33 U.S.C. § 1311(a). Plaintiff elaborates that Conditions 23 and 25 of the Permit are "stand-alone" permit conditions that, if violated, constitute independent violations of the CWA. In support, Plaintiff notes that "[n]oncompliance with a permit constitutes a violation of the [CWA]." *Friends of the*

---

[2]The court is not unsympathetic to Plaintiff's claims about the pollution being discharged into groundwater that is finding its way into the Middle Fork of the Vermilion River. As characterized in Plaintiff's Complaint, this is a serious problem. However, Plaintiff is not without recourse. Despite this court's holding that the allegations are not covered by the CWA, Plaintiff may pursue this claim in the Illinois state courts with the Illinois EPA.

*Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 174 (2000), quoting

33 U.S.C. § 1342(h).

Defendant responds that Plaintiff, as in Count I, still bases its claim on a violation

of § 1311(a), which requires a discharge to navigable waters.  To establish liability in

Count II, Defendant argues, Plaintiff must show (1) a discharge to navigable waters and

(2) a violation of the Permit.  Because Plaintiff has failed to meet the first condition, as

explained above based on *Oconomowoc*, Count II is not actionable under the CWA.

The CWA prohibits point sources from discharging pollutants into waters of the

United States unless in conformance with a valid NPDES permit obtained prior to the

discharge.  33 U.S.C. §§ 1311, 1342; *Save the Valley, Inc. v. United States EPA*, 223

F.Supp.2d 997, 1007 (S.D. Ind. 2002).

> As noted, Section 301(a) of the CWA states that "the discharge of any
> pollutant by any person shall be unlawful," unless authorized by an
> NPDES permit.  33 U.S.C. § 1311(a). The CWA sets forth guidelines for the
> NPDES permits for the discharge of pollutants in Section 402, 33 U.S.C. §
> 1342.  To establish a violation of these sections, a plaintiff must prove that
> the defendant (1) discharged (2) a pollutant (3) into navigable waters (4)
> from a point source (5) without a permit.  See *National Wildlife Federation v.
> Gorsuch*, 693 F.2d 156, 165 (D.C. Cir.1982).

*Sierra Club v. El Paso Gold Mines, Inc.*, 421 F.3d 1133, 1141-42 (10th Cir. 2005).

The purpose of the Permit in question would be to allow certain discharges

within the limitations set by the Permit that would otherwise be in violation of the

CWA.  Plaintiff itself, at paragraph 74 of the Complaint, in Count II, states that by

violating the conditions of the Permit Defendant violated § 1311(a).  In order to violate §

1311(a), a defendant polluter must have "discharge[d]" a pollutant "into 'navigable

waters from a point source.'"  *Oconomowoc*, 24 F.3d at 963, quoting 33 U.S.C. § 1362(12).

17

The court has already determined that the CWA has no subject matter jurisdiction over the discharges in question because the discharges were made into groundwaters, which are not covered by the CWA, and are not "navigable waters" under § 1362(12), and thus there was no violative discharge of a pollutant under § 1311(a).  The violations alleged in Count II of Plaintiff's Complaint are identical to those alleged in Count I, different only in that, rather than just a violation of § 1311(a) in general, the discharges also violate Conditions 23 and 25 of the Permit.  Plaintiff still has not shown that there has been any "discharge into navigable waters" so as to invoke the jurisdiction of the CWA.

The question then becomes, for Plaintiff, can a claim be brought under the CWA for a violation of an NPDES permit even though the actual discharges in question were not into navigable waters and thus outside the jurisdiction of the CWA pursuant to § 1311(a)?  The CWA prohibits the discharge of any pollutant into the navigable waters of the United States. *Wisconsin Resources Protection Council v. Flambeau Mining Co.*, 727 F.3d 700, 702 (7th Cir. 2013).  However, there is nothing in the statute stating that the CWA covers discharges *not* into the navigable waters of the United States, so long as those discharges violate conditions of an NPDES permit.  Plaintiff has cited to no authority holding that, if the CWA does not cover the discharge in question, a plaintiff can still bootstrap a complaint into federal court because those same discharges violated a condition of the NPDES permit held by the defendant polluter. Count II is dismissed.

IT IS THEREFORE ORDERED:

(1)     Defendant's Motion to Dismiss (#14) is GRANTED.  Plaintiff's Complaint

(#1) is dismissed in full.  Judgment is entered in favor of Defendant and

against Plaintiff.

(2)     This case is terminated.

ENTERED this 14th day of November, 2018.

s/ COLIN S. BRUCE
U.S. DISTRICT JUDGE